**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| IN RE CARLOTZ, INC. SECURITIES LITIGATION | Lead Case No. 1:21-cv-05906-RA<br><br>**SECOND AMENDED COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

**TABLE OF CONTENTS**

PAGE

I. OVERVIEW ..... 1

II. JURISDICTION AND VENUE ..... 7

III. PARTIES ..... 8

A. Plaintiffs ..... 8

B. The CarLotz Defendants ..... 8

C. The Acamar Defendants ..... 11

D. Non-Defendant Relevant Entity ..... 13

IV. CONFIDENTIAL WITNESSES ..... 13

V. FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS ..... 15

A. CarLotz' Business Models ..... 15

B. The Macro Effects of Covid-19 on the Used Car Sector ..... 20

C. The Lasting Effects of Covid-19 on CarLotz ..... 23

D. CarLotz and Acamar Plan Their Merger ..... 26

E. The Fourth Quarter 2020 – As the Business Struggles, Defendants Paint a Rosy Picture to Investors ..... 31

F. The Prospectus and Shareholder Actions ..... 33

G. The Truth Gradually Emerges ..... 34

VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS ..... 37

A. The October 22, 2020 Announcement of the Merger Agreement ..... 37

B. The November 2, 2020 Gabelli Automotive Symposium Investor Presentation ..... 43

C. The November 19, 2020 Barclays Global Automotive Conference Presentation ..... 46

D. The December 2, 2020 Wells Fargo TMT Summit Presentation ..... 49

E. The December 17, 2020 Yahoo! Finance Live Interview ..... 49

F. The December 30, 2020 Prospectus ..... 51

G. The January 13, 2021 ICR Presentation ..... 58

H. The January 22, 2021 CNBC Interview ..... 61

VII. THE GRADUALLY TRUTH IS REVEALED WHILE DEFENDANTS CONTINUE TO MISLEAD ..... 62

A. March 15, 2021 ..... 62

B. May 10, 2021 ..... 66

C. May 26, 2021 ..... 69
VIII. LOSS CAUSATION/ECONOMIC LOSS ..... 70
IX. SCIENTER ..... 72
A. Defendants had Actual Knowledge that Statements in the Prospectus and Investor Presentations were Misleading at the Time they were Made ..... 72
B. Defendants had Financial Incentives to make False and Misleading Statements ..... 74
C. Additional Indicia of Scienter ..... 75
X. PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY ..... 77
XI. STRICT LIABILITY/NEGLIGENCE CLAIMS UNDER SECTIONS 11, 12, AND 15 OF THE SECURITIES ACT ..... 78
XII. THE REGISTRATION STATEMENT OMITTED MATERIAL INFORMATION REQURED TO BE DISCLOSED THEREIN UNDER ITEMS 303 AND 503 ..... 81
XIII. CLASS ACTION ALLEGATIONS ..... 82
XIV. CLAIMS FOR RELIEF ..... 85
XV. PRAYER FOR RELIEF ..... 91
XVI. JURY TRIAL DEMANDED ..... 92

1. Lead Plaintiff David Berger ("Lead Plaintiff") and additional Plaintiff Craig Bailey (collectively, "Plaintiffs") on behalf of all other persons similarly situated, by and through Plaintiffs' undersigned attorneys, allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and upon information and belief as to all other matters. This investigation included, but was not limited to, a review and analysis of: (i) court records; (ii) public filings of CarLotz, Inc. ("CarLotz" or the "Company") and its parent company Acamar Partners Acquisition Corp. ("Acamar") with the U.S. Securities and Exchange Commission ("SEC"); (iii) transcripts and investor presentations; (iv) CarLotz' press releases; (v) analyst reports and independent media reports regarding the used vehicle sector, CarLotz, its stock price movement, pricing and volume data; (vi) other publicly available material and data; and (vii) interviews of persons with personal knowledge of the allegations contained herein, including former employees of CarLotz and relevant third parties. Counsel's investigation into the factual allegations contained herein is continuing, and many of the relevant facts are known only by Defendants and/or are exclusively within their custody or control. Plaintiffs believe that additional evidentiary support will exist for the allegations set forth herein after further investigation and after a reasonable opportunity to conduct discovery.

## I. OVERVIEW

2. Plaintiffs bring this federal securities class action against Defendants (defined below) asserting violations of:

(i) Sections 10(b) and 20(a) of the Exchange Act, 15 U.S.C. §§ 78j(b) and 78t(a), and Rule10b-5 promulgated thereunder by the U.S. Securities Exchange Commission (the "SEC") (17 CFR § 240.10b-5) (the "Fraud Claims"), on behalf of themselves and all others who purchased the securities of CarLotz (formerly Acamar) during the period from October 22, 2020 through May 25, 2021, inclusive (the "Class Period");

(ii) Sections 11, 12 and 15 of the 1933 Securities Act, 15 U.S.C. §§ 77k, l, and o (the "Securities Act") (the "Securities Act Claims"), on behalf of

> themselves and all others who purchased or otherwise acquired CarLotz securities traceable to the CarLotz (formerly Acamar) Registration Statement/Prospectus/Proxy and the SEC filings incorporated therein by reference.

3. CarLotz purports to be a consignment-to-retail used vehicle marketplace which operates both online and at a series of retail "hubs" around the country. By consigning vehicles, compared to the traditional model of purchasing and re-selling, CarLotz claimed to operate an "asset-light" company – in other words, it did not own its inventory. Instead, it claimed to source vehicles through individual consumers as well as a "deep pool" of corporate partners, including fleet leasing companies, rental car companies, banks, wholesalers, and original equipment manufacturers ("OEM"s). CarLotz would either sell the consigned vehicle for a fee or, if the vehicle could not be sold within a contractual "consignment period," return it to the partner. CarLotz claimed their method would net the seller several thousand dollars more than selling the vehicle to a dealership or at auction, and, since CarLotz did not have capital tied up in inventory, the business model would be very low risk.

4. In the latter half of 2020, CarLotz took steps to effectuate a quick and lucrative merger with a special-purpose acquisition company ("SPAC"), Acamar Partners Acquisition Corp. Acamar conducted extremely limited diligence on CarLotz in order to close the merger before running up to the deadline at which time the SPAC would dissolve and its funds would be returned to shareholders. Defendants Bor, Stoltz, and Polak, as well as other CarLotz executives, collected large stock grants and cash bonuses upon the closing of the merger. The Acamar Individual Defendants also received monetary benefits from merger, and two of the directors were given seats on the Board of Directors for the newly combined company.

5. Starting with the announcement of the prospective merger on October 22, 2020, the beginning of the Class Period, and continuing through the next few months, the CarLotz

Defendants conducted a series of investor presentations to drum up shareholder support for the merger. In these presentations, Defendant Bor made a number of material misstatements and omissions. He touted CarLotz' "capital efficient" and "asset light" business model, stating that it had "virtually no dollars at risk"; claimed that, due to its flat fee agreement with customers, "our unit economics are superior to our peers"; touted that "60%" of the Company's total inventory was "consigned corporate inventory" made up of a "deep pool" of corporate sourcing partners; and explained that, in response to increased demand for used cars due to the Covid-19 pandemic, "our inventories are at historically high levels," such that the pandemic was "net-net" a "slight positive for us."

6. In reality, CarLotz struggled to find corporate consigning partners. In fact, according to former employees working for CarLotz during the Class Period, "not a lot of people were consigning" vehicles at all, which caused the Company to make up for the inventory shortfall by purchasing vehicles for resale – deviating from its publicly conveyed business plan. While these inventory and sourcing issues existed prior to 2020, the Covid-19 pandemic created increased demand for used vehicles, causing corporate and consumer used vehicle sellers to derive more profits from selling at auction rather than through CarLotz' consignment model.

7. On December 30, 2020, Acamar published a Form 424B3 Prospectus with the SEC (the "Prospectus") containing details about its merger with CarLotz. The Prospectus reiterated many of the same misstatements and omissions as the aforementioned investor presentations, materially misrepresenting the current state of CarLotz' business, reiterating that "60% of our total inventory originat[es] from our growing partnerships with corporate vehicle partners," and emphasizing the lack of risk in its "asset light" business model. On the back of these material misrepresentations and omissions, shareholders voted to approve the de-SPAC business

combination, and on January 21, 2021, CarLotz merged with Acamar. The new entity was named CarLotz, Inc. and it traded on the NASDAQ exchange under the symbol "LOTZ" with warrants trading under the symbol "LOTZW". Buoyed by Defendants' false and misleading statements and omissions, the initial stock price was over $12 per share.

8. On March 15, 2021, the Company released its financial results for the fourth quarter ("4Q:2020") and year ended December 31, 2020, [1] *one day after the filing of the Prospectus*, revealing that CarLotz' business was very different from what Defendants had represented in pre-merger statements. Rather than 60% of CarLotz' total inventory deriving from a "deep pool" of corporate partners, as the Company previously represented, CarLotz revealed that only "one of our corporate partners has accounted for over 60% of our vehicles sourced." Moreover, instead of the low-risk fee model the Company had underscored whereby "any reconditioning dollars are passed through to our seller," CarLotz explained that it had an "alternative fee arrangement" with this partner, according to which "we [CarLotz] are responsible for the expenses we have incurred with respect to the vehicle, including shipping costs and any refurbishment costs we have incurred." Even worse, CarLotz revealed that it "took too many of their units" and could not effectively process its inventory of vehicles, creating a "log jam" that resulted in lower-than-expected gross profit, and "lower retail unit profitability" for 4Q:2020. In other words, at the very same time that Defendants hyped CarLotz' high inventory levels, its "rapidly scalable" model, and "top half of the class" unit profitability during the lead-up to the shareholder vote, CarLotz, by the Company's own admission, was experiencing (and indeed, because the Prospectus was filed just one day before the end of 4Q:2020, *had already experienced*) a "log jam" crisis that had negatively impacted its financial condition.

[1] CarLotz' fiscal quarters coincide with the calendar year, such that the fiscal 2020 ended on December 31, 2020.

9. Given the disparity between how Defendants described the state of CarLotz' business leading up to the shareholder vote and the revelation of the Company's actual business performance as of that time, the disclosure caught investors by surprise. On the news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume.

10. Analysts asked for "a deeper explanation of the inventory hangover" and further elaboration regarding the Company's plan to ensure inventory issues would be better managed in the future. The CarLotz Defendants assured investors that they were "selling cars like crazy right now," and that "[t]oday our inventory, as I mentioned, is lower than the peaks we saw earlier this year, uh, which is reflective of the sales momentum that we've seen over the last few weeks." Moreover, the CarLotz Defendants set GPU guidance for the next quarter, which would end in only two weeks' time, at $1,300 - $1,500, just below the GPU for 4Q:2020, and said GPU was on track to bounce back in the latter half of the year to $1,800 – $2,000.

11. But on May 10, 2021, when CarLotz released its first quarter 2021 ("1Q:2021") financial report, the Company revealed that the situation had not, in fact, improved. CarLotz revealed that it continued to source 60% of its total vehicles for the single corporate sourcing partner, and continued to have issues with its inventory, forcing the Company to purge its inventory with "aggressive pricing," which in turn led to an over $1.1 million loss on wholesale vehicles and a much lower than expected Gross Profit per Unit ("GPU"). Moreover, GPU for the quarter was only $1,182, far below what the CarLotz Defendants had previously indicated when the quarter was nearly over.

12. The market was again surprised the revelation, and the Company's stock price fell $0.94, or 14%, to close at $5.57 per share on May 11, 2021, on unusually heavy trading volume.

13. Once again, the CarLotz Defendants assured investors that the Company was turning the corner, explaining that "[w]e are seeing good progress with our sourcing partners," "we have a lot of levers to pull when it comes to inventory," and that CarLotz was "seeing significant improvement in GPU," leading the Company to maintain its guidance.

14. But just 16 days later, on May 26, 2021, before market open, CarLotz announced that – due, in part, to market conditions CarLotz admitted to knowing about from before the time the Prospectus was filed – the partner from whom CarLotz sourced "more than 60% of the cars sold" during 4Q:2020 and 1Q:2021 had "paused" its relationship with CarLotz. The Company also revised its 2021 GPU guidance, lowering it by several hundred dollars. This announcement caused the stock price to decline precipitously, closing at just $4.51 on May 26, 2021.

15. According to Confidential Witness ("CW") 5, Defendant Bor directly addressed these stock drops with employees during a companywide address, admitting that "investors don't trust us," because, in part, CarLotz owned (*i.e.*, did not consign) far more inventory than they publicly represented.

16. These disclosures revealed that – as with many other SPAC transactions – Defendants misrepresented the fundamental nature of CarLotz' business as a means of drumming up investor support for the Company's public debut.

17. Recently, in the Company's November 8, 2021 earnings call in connection with CarLotz' third quarter 2021 ("3Q:2021") results, Defendant Bor conceded he needed to "elaborate on sourcing, given its importance to our business model," acknowledging that CarLotz had resorted to "auction sourcing," rather than consignment sources, the Company's so-called "traditional sources" that CarLotz had falsely touted as the Company's "key differentiator" and driver of the Company's "asset-light" business model.

18. As a result of Defendants' wrongful acts and omissions, which led to a steep decline in the market value of CarLotz securities, Plaintiffs and other Class members have suffered significant damages.

## II. JURISDICTION AND VENUE

19. The federal law claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act (15 U.S.C. §§ 78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. § 240.10b-5) and Sections 11, 12, and 15 (15 U.S.C. §§ 77k, l, and o) of the Securities Act.

20. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1331, Section 27 of the Exchange Act (15 U.S.C. §78aa) and Section 22 of the Securities Act (15 U.S.C. § 77v).

21. This Court has jurisdiction over each Defendant named herein because each Defendant has sufficient minimum contacts with this district so as to render the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

22. Venue is proper in this District pursuant to Section 27 of the Exchange Act, 28 U.S.C. § 1391(b), and Section 22 of the Securities Act. Substantial acts in furtherance of the alleged fraud and/or the effects of the fraud have occurred in this Judicial District. Many of the acts charged herein, including the dissemination of materially false and/or misleading information and the solicitation of purchasers of CarLotz securities, occurred in substantial part in this District.

23. In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of the NASDAQ Global Select Market ("NASDAQ"), a national securities exchange.

## III. PARTIES

### A. Plaintiffs

24. Lead Plaintiff David Berger, as set forth in the certification filed on December 14, 2021 (ECF No. 47-1), incorporated by reference herein, purchased CarLotz securities during the Class Period, and suffered damages as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

25. Additional Plaintiff Craig Bailey, as set forth in the certification filed on December 14, 2021 (ECF No. 47-2), incorporated by reference herein, purchased Acamar securities during the Class Period, after the filing of the proxy statement/prospectus/registration, but before the consummation of the merger. Pursuant to the Acamar charter, Mr. Bailey had a right to redeem his shares for cash equal to his pro rata share of the aggregate amount on deposit in the Trust Account, which held the proceeds of Acamar Partners' IPO, as of two business days prior to the consummation of the CarLotz merger upon the closing of the transaction. According to the proxy statement/prospectus/registration statement filed with the SEC on December 30, 2020, "based on the funds in the Trust Account of approximately $310.9 million as of September 30, 2020, the estimated per share redemption price would have been approximately $10.174."

### B. The CarLotz Defendants

26. Defendant CarLotz was incorporated under the laws of the State of Delaware on March 14, 2011. CarLotz' principal executive offices are located at 611 Bainbridge Street, Suite 100, Richmond, Virginia 23224. After going public through a SPAC merger, CarLotz' Class A common stock trades on the NASDAQ exchange under the symbol "LOTZ" and its redeemable warrants on the NASDAQ exchange under the symbol "LOTZW."

27. Defendant Michael W. Bor ("Bor") was the Chief Executive Officer ("CEO") of CarLotz at all relevant times. As CEO, Bor participated in quarterly earnings calls, investor presentations, and media appearances and signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX Certifications") attached to CarLotz' financial statements. Bor received a $450,000 cash transaction bonus when the Acamar merger closed, and Bor and his related entities received approximately 11.5 million units of stock and options for the new CarLotz entity.

28. Defendant Thomas W. Stoltz ("Stoltz") was the Chief Financial Officer ("CFO") of CarLotz From November 30, 2020 through the remainder of the Class Period. As CFO, Bor participated in quarterly earnings calls and other investor presentations and signed SOX Certifications attached to CarLotz' financial statements. Stoltz received a $150,000 cash bonus at the close of the Acamar merger, as well as "a number of restricted stock units equal to 574,500 times the excess, if any, of the exercise price of his stock options over $10.00 divided by the option exercise price and a number of stock options equal to 574,500 minus the number of his restricted stock units."

29. Defendant Rebecca Polak ("Polak") was the Chief Commercial Officer and General Counsel of the Company from October 30, 2020 through the remainder of the Class Period. Ms. Polak signed several SEC filings on behalf of CarLotz, including the March 15, 2021 8-K which attached CarLotz' financial guidance for Q4 and full-year 2020. Polak received a $120,000 cash bonus upon the close of the Acamar merger, as well as "a number of restricted stock units equal to the sum of (i) 344,700 times the excess, if any, of the exercise price of her options over $10.00 divided by the option exercise price and (ii) 86,175, and a number of stock options equal to 344,700 minus the number of restricted stock units described in clause."

30. Defendants Bor, Stoltz, and Polak (collectively the "CarLotz Individual Defendants"), because of their positions with the Company, possessed the power and authority to control the contents of the Company's reports to the SEC, press releases and presentations to securities analysts, money and portfolio managers and institutional investors, *i.e.*, the market. The CarLotz Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Because of their positions and access to material non-public information available to them, the CarLotz Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were then materially false and/or misleading.

31. Each of the CarLotz Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) participated in earnings calls and other presentations to the public;

(f) was directly or indirectly involved in the oversight or implementation of the Company's internal controls; and/or

(g) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company.

32. CarLotz, Bor, Stoltz, and Polak are referred to collectively as the "CarLotz Defendants." The Company is liable for the acts of the CarLotz Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

**C. The Acamar Defendants**

33. Acamar Partners Acquisition Corp. ("Acamar Partners") was a Delaware corporation with its principal executive offices located at 1450 Brickell Avenue, Suite 2130, Miami, Florida 33131. Acamar Partners was a blank check company incorporated in November 2018 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with one or more businesses.

34. Acamar Partners Sponsor I LLC ("Sponsor") is a Delaware limited liability company, with its business address located at 1345 Avenue of the Americas 11th Floor, New York, New York 10105. Sponsor held a 20% ownership interest in Acamar Partners, with 7,639,330 shares of the Class B common stock, which were converted into Class A common stock upon consummation of the merger on a one-for-one basis. The Sponsor also purchased an aggregate of 6,000,000 Private Placement Warrants for $1.50 per warrant. Post-merger, each warrant was exercisable to purchase one share of Class A common stock at a price of $11.50 per share.

35. The term "Acamar" herein may refer to Acamar Partners, and/or the Sponsor, or any combination of these two entities.

36. Defendant Luis Ignacio Solorzano Aizpuru ("Solorzano") was the Chief Executive Officer of Acamar. Solorzano was a managing member of the Sponsor, and as stated by the Prospectus, had beneficial ownership of the securities held directly by the Sponsor. After the merger was completed, Solorzano joined the Board of Directors of CarLotz. Solorzano signed the Prospectus on behalf of Acamar and the Merger Sub (described below), as well as other pre-merger SEC filings.

37. Defendant Juan Carlos Torres Carretero ("Torres") was the Chairman of the Board of Acamar. Torres was a managing member of the Sponsor, and as stated by the Prospectus, had beneficial ownership of the securities held directly by the Sponsor.

38. Defendant James E. Skinner ("Skinner") was a director of Acamar. While Skinner did not have voting or dispositive control over the Sponsor, he had an indirect pecuniary interest in the securities held by the Sponsor through his membership interest. After the merger was completed, Skinner joined the Board of CarLotz.

39. Defendant Domenico De Sole ("De Sole") was a director of Acamar. While De Sole did not have voting or dispositive control over the Sponsor, he had an indirect pecuniary interest in the securities held by the Sponsor through his membership interest.

40. Defendant Teck H. Wong ("Wong") was a director of Acamar Partners. While Wong did not have voting or dispositive control over the Sponsor, he had an indirect pecuniary interest in the securities held by the Sponsor through his membership interest.

41. Solorzano, Torres, Skinner, De Sole, and Wong are collectively referred to herein as the Acamar Individual Defendants.

42. The CarLotz Individual Defendants and Acamar Individual Defendants are referred to collectively as "Individual Defendants."

43. CarLotz, Acamar, Bor, and the Acamar Individual Defendants are referred to collectively as the "Securities Act Defendants." Defendant Bor and the Acamar Individual Defendants are referred to collectively as the "Section 11 Individual Defendants."

### D. Non-Defendant Relevant Entity

44. Acamar Partners Sub, Inc. ("Merger Sub") was a wholly-owned subsidiary of Acamar, incorporated in Delaware by Acamar on October 16, 2020, in order to facilitate the Merger. Merger Sub's principal executive office were located at 1450 Brickell Avenue, Suite 2130, Miami, Florida 33131. On January 21, 2021, Merger Sub merged with and into the pre-merger CarLotz, Inc. ("Old CarLotz"), with Old CarLotz surviving the merger as a wholly-owned subsidiary of Acamar Partners. After the merger, Acamar Partners changed its name to CarLotz, Inc., which is Defendant CarLotz. On this same day Acamar changed its NASDAQ ticker symbol for its common stock from ACAM to LOTZ, and its redeemable warrants from ACAMW to LOTZW.

## IV. CONFIDENTIAL WITNESSES

45. CW1 worked at CarLotz as a Commercial Sales Executive from September 2019 to April 2020. CW1 and another individual, Tony Marques, were hired to develop a commercial program by which CarLotz acquired cars from commercial sources such as credit unions, banks and other businesses that had commercial fleets, as opposed to CarLotz' customary sourcing of vehicles form individuals. CW1 was primarily responsible for the Virginia region, while Marques was responsible for the Charlotte, North Carolina area. When CarLotz "cut the program," Marques was first terminated, and shortly thereafter, CW1 was laid off, as well. CW1 was initially told that CW1 would report directly to Defendant Bor, but CW1 instead reported to Brent Garrett, Director of Commercial Sales, who reported to Defendant Bor.

46. CW2 worked as a Customer Service Team Lead from April 2017 to June 2020. As a Team Lead, CW2 oversaw warranty administration and CarLotz' "traffic program," which was a team responsible for picking up vehicle inventory intended to be sold on consignment at CarLotz' various hubs, as well as transport for disposing vehicles that CarLotz could not sell from its hubs. CW2 worked out of CarLotz' "customer call center," about "50 feet away" from Defendant Bor's office, and they interacted regularly. CW2 initially reported to Chad Whitten, a Shared Services Manager, but then began reporting to Rachel Schley, a Customer Service Manager who reported to Whitten. Whitten Reported to COO John Foley, who in turn reported to Defendant Bor. In total, the customer service department for the entire company was comprised of 15 people, including Whitten, Schley, CW2, and the four people working under CW2. CW2, along with all four people CW2 oversaw, were all laid off in June 2020.

47. CW3 was a Title & Compliance Manager at CarLotz from July 2018 to December 2020, ensuring compliance of vehicle registrations and other regulatory matters pursuant to the sale of cars at CarLotz' Illinois hub, as well as ensuring that CarLotz personnel, particularly Sales Coaches, adhered to internal company policies. CW3 reported various general managers during this time frame, the last one being Jim Vollant, who reported to John Foley, who oversaw every General Manager throughout the Company, and who reported to Defendant Bor. CW3 interacted with Defendant Bor whenever he came into the Illinois hub.

48. CW4 worked as a Shared Services Coach at CarLotz from February 2021 to May 2021. CW4's role was predominantly in customer service, working on a team that handled "merchandising cases," or issues with vehicle warranties. CW4, like CW2, reported to Whitten and Schley.

49. CW5 worked at CarLotz in the Company's corporate headquarters as a Corporate Recruiter from October 2020 to October 2021. For the last six months or so of that time period, CW5's responsibilities focused on recruiting General Managers to lead CarLotz' new hubs that the Company opened in 2021. Prior to that time, CW5 was responsible for recruiting all types of positions for the Company. CW5 reported to Director of Talent Acquisition, Alison Parrish, who reported to Liz Sanders, Chief Administration Officer.

## V. FACTUAL BACKGROUND AND SUBSTANTIVE ALLEGATIONS

### A. CarLotz' Business Models

50. CarLotz purports to be a consignment-to-retail used vehicle marketplace which operates both online and through a series of retail "hubs" around the country. According to the Company, CarLotz obtained its inventory during the Class Period through individuals trying to sell their used cars as well as through corporate sourcing partners such as fleet leasing companies, rental car companies, banks, and OEMs. Under the consignment-to-retail model, CarLotz did not own the inventory – rather, the original owner retained the title until CarLotz could sell it. CarLotz provided shipping and reconditioning services, (for which they purportedly would be reimbursed by the seller), marketing and financing services, and would broker the sale of the vehicle to an individual consumer in a retail transaction. CarLotz claimed selling at retail (*i.e.*, to an individual consumer) versus at wholesale (*i.e.*, at auction) would net the seller several thousand dollars more, which it referred to as "lift." Under the consignment model, if the vehicle could not be sold, it would be returned to the individual or sourcing partner. CarLotz claimed that the consignment-to-retail model allowed them to operate with "virtually no dollars at risk."

51. While CarLotz initially operated its first few hubs with a consignment-to-retail model, this model was simply not scalable or sustainable for the growing business, especially in

light of the macro-economic conditions discussed further, *infra*. Instead, around the third quarter of 2020 ("3Q:2020") (before the start of the Class Period) and continuing to the present day, CarLotz began relying on a number of other business models, including consignment-to-wholesale, purchased-to-retail, and purchased-to-wholesale. These other models generated a significantly lower gross profit than the consignment-to-retail model, and they all carried substantially more risk.

52. On the supply side, CarLotz stated:

> At our mature retail hubs (year three or later of operation), we generally source approximately 60% of our inventory non-competitively from our corporate vehicle sourcing partners, 15% non-competitively from consumers, 15% non-competitively from other sources and 10% is competitively sourced, meaning other buyers have the ability to purchase the same vehicle.

53. For corporate sourcing partners, there are pros and cons to CarLotz' consignment-to-retail business model. Vehicles sold at retail historically net the seller several thousand dollars more than at wholesale. CarLotz also arranges for shipping and reconditioning, taking this burden off the partner, while allowing the partner to track the progress of the vehicle online through CarLotz' technology suite. However, on the other hand, auctions are immediate: the car is sold and the seller gets their money in a matter of days. CarLotz' process takes 30-45 days at best, sometimes up to 90 days or more. Additionally, CarLotz is a small business (and was even smaller during the Class Period) and can only process a finite amount of inventory. CarLotz could not guarantee it would sell vehicles consigned by a partner at a premium to wholesale, or even that it could sell the vehicles at all.

54. CW1, who worked at CarLotz as a Commercial Sales Executive from September, 2019 to April, 2020, gave further insight into these purported corporate vehicle sourcing partners– or lack thereof. CW1 stated that he had been hired to develop a commercial program by which CarLotz acquired cars from commercial sources such as credit unions, banks, and other businesses

that had vehicle fleets. While CW1 developed "some pretty small" commercial accounts, he was largely unsuccessful. He said these customers were "set in their ways" and preferred to sell their vehicles quickly at auction, rather than letting them "sit" with CarLotz for uncertain durations before they were sold. In the end, he only brought in "perhaps 50 vehicles" through these commercial sources. CW1 was laid off in April 2020, during the height of the Covid-19 pandemic, as a cost cutting measure.

55. Consumers (*i.e.*, non-corporate sources) generally were charged a flat fee; $299 up front to list the car and a further $799 if the vehicle was successfully sold. Some corporate sourcing partners also paid a flat fee, but generally they had "alternative fee arrangements" – for example, fees based on a return above a wholesale index or based on a profit share program. These alternative arrangements rendered the Company's GPU uncertain and speculative, as CarLotz' fee would be based on its ability to sell the car for a high price. Sometimes, the alternative fee arrangements also provided that CarLotz would be responsible for reconditioning and shipping costs, not the partner, as the CarLotz Defendants often misrepresented. These contracts were particularly risky for CarLotz, because if it could not sell the vehicle at a high retail price, its gross profit would be much lower.

56. For most of 4Q:2020 and 1Q:2021, CarLotz sourced 60% of its inventory from one single sourcing partner, with whom it had a profit-sharing arrangement. Under this agreement, CarLotz provided all shipping and reconditioning costs. CarLotz was subject to a significant amount of risk in this arrangement because it had to sell the vehicles at a high enough price to cover the costs, and also generate enough gross profit to make the arrangement attractive for the corporate partner.

57. If CarLotz could not sell the vehicles within a contractual "consignment period," which could be anywhere from 30-90 days depending on the partner, the inventory would "age out." Under a traditional consignment model, at this point, the consigned good would be returned to the seller. However, CarLotz did not appear to return consigned cars to its partner, and rather chose to reduce and further reduce the price of the car until it was sold, even if the selling price eliminated any profit margin.

58. In an interview on the Eversprint Podcast on January 12, 2019, Defendant Bor had the following exchange with the interviewer:

> **Bor**: What they typically do is they will say, I want you to sell my car for me, and if it doesn't sell within X days then I would like for you to make me a wholesale offer. So typically, that's 45-60 days is when they start getting angsty that the car isn't sold. The vast majority of the cars sell in the first month, our average is typically in the 20-day period…***if the car hasn't sold then we will buy the vehicle from the account and continue to sell it at wholesale***.
>
> **Interviewer**: Or you might offer to return the vehicle to them…?
>
> **Bor**: Yeah, we don't do that. Once it's deemed to be attractive for retail, its attractive for retail…
>
> **Interviewer**: So if a car is slow, it's not selling, you just simply reduce the price every week until it sells, regardless of what you paid for the car, just to get it off your lot?
>
> **Bor**: …we will continue to reduce the price.
>
> (emphasis added).

And in the December 30, 2020 Prospectus, CarLotz management stated, "We support our corporate vehicle sourcing partners by offering a ***100% sell-through rate***…" (emphasis added).

59. These statements guaranteeing its partners a sale, and explaining that "if the car hasn't sold then we will buy the vehicle from the account," indicate that CarLotz would ultimately purchase aged-out vehicles or sell them at a loss rather than return them to the seller. In this case, their business would not truly be a consignment model – more like a traditional buyer-seller

relationship, just with a longer wait time before the purchase. Further, if CarLotz guaranteed its partners a "100% sell-through rate," it would contradict Defendants' statements that CarLotz operated "asset-light." That is, CarLotz actually did have inventory, it just used the semantics of the consignment model to delay recording this inventory on its books.

60. On the other hand, sometimes the CarLotz Defendants also stated or implied that vehicles were returned to partners. For example, in the 1Q:2021 Earnings Call, Bor stated that the wholesale loss sustained in the quarter was because "after 90 days, ***we have to return those vehicles to [our sourcing partner]*** and we've put some reconditioning costs and we have shipping costs to give back to them." (emphasis added). It is unclear what percentage of the inventory obtained from CarLotz' main sourcing partner in 4Q:2020 and 1Q:2021 was returned to the partner, what was sold, and what was ultimately purchased by CarLotz. However, CarLotz' financial statements show that inventory rose from about $7.6 million at year end 2019 to about $11.2 million at year end 2020, suggesting that CarLotz ultimately did purchase at least a portion of these vehicles.

61. The fact that CarLotz sold certain vehicles at auction was confirmed by CW2, a Customer Service Team Lead who worked at CarLotz from April 2018 through June 2020. CW2 stated that one of his duties was to handle "Citrus Clients" – in other words, clients who provided vehicles that CarLotz could not sell at retail. CW2 stated these vehicles would be taken to auctions, such as Manheim, and would be disposed of for a low value.

62. CarLotz also purchases some vehicles competitively at auctions. If CarLotz is unable to source its inventory on consignment from corporate sourcing partners, it is forced to purchase more cars at auction so that the retail hubs will have sufficient inventory.

63. CW1 explained that prior to the start of the Class Period, CarLotz had difficulty attracting corporate partners for consignment, as those partners preferred to sell through auction. CW2 also noted that a lot of the vehicles at the Illinois hub were purchased at auction during CW2's tenure, between July 2018 and December 2020. CW4, a Shared Services Coach from February 2021 to May 2021, indicated that vehicle inventory was a "huge issue" during CW4's tenure, and that "not a lot of people were consigning" vehicles to CarLotz. CW4's boss, Chad Whitten, a Shared Services Manager, and his boss, Rachel Schley, Director of Shared Services, "talked openly" about the inadequate inventory levels during CW3's employment at CarLotz.

64. After the partner from whom CarLotz sourced 60% of its inventory "paused" the relationship in May 2021, CarLotz was forced to drastically increase the number of cars it purchased at auction – in fact, for 2Q:2021, CarLotz sourced 80% of its inventory from auction. For vehicles that are purchased at auction and sold at retail hubs, CarLotz operates no differently than the thousands of other used car dealerships across the United States.

**B. The Macro Effects of Covid-19 on the Used Car Sector**

65. Like almost every other sector, the used vehicle market experienced significant and continuing effects from the Covid-19 pandemic, some negative and some positive.[2] For a few weeks in March and April 2020, as the whole country shut down, dealerships and auction houses were closed, individuals stayed home, and there was neither supply nor demand for used cars.

66. Once the economy began opening up again, consumer demand for used cars skyrocketed. Individuals who previously relied on mass transportation and ride sharing

---

[2] *See, e.g.*, Eric Rosenbaum, *The Used Car Boom is One of the Hottest, And Trickiest, Coronavirus Markets For Consumers*, CNBC (October 15, 2020), https://www.cnbc.com/2020/10/15/used-car-boom-is-one-of-hottest-coronavirus-markets-for-consumers.html; Jim Henry, *Seller's Market For Used Cars And Trucks Is Good News At Trade-In Time*, FORBES (March 30, 2021), https://www.forbes.com/sites/jimhenry/2021/03/30/sellers-market-for-used-cars-and-trucks-is-good-news-at-trade-in-time/; Tom Krisher and Mike Householder, *Car and truck prices—new and used— are soaring during the pandemic. Here's why*, THE CHICAGO TRIBUNE (February 23, 2021).

applications no longer felt comfortable doing so because of the virus. As work-from-home became more normalized, individuals moved away from cities and into rural environments, where vehicles are a necessity. Additionally, many Americans received stimulus checks, which could be used as a down payment. Less spending on commodities such as vacations and restaurants also freed up additional funds which could be used toward a vehicle. The pandemic also changed the way consumers purchased used cars, as many preferred the safety of contact-less online services like CarMax or Carvana to purchasing the traditional way, in-person at a dealership.

67. At the same time that demand for vehicles heightened, supply tightened. Many new vehicle manufacturers either closed down for months or were re-tasked to produce respirators. This, combined with a shortage of microchips necessary to make technology-integrated new vehicles[3], caused a massive shortage in new vehicles which continues to this day. With new vehicles scarce and expensive, consumers turned to used vehicles, causing used car prices up to historically high levels. CNN reported in July 2021 that "some used cars and trucks are worth even more than they cost when they were new."[4] There was especially high demand for pick-up trucks and SUVs. The same CNN article reported, "[a] Ram 2500, for instance, is worth about $5,200 more even as a trade-in than its average purchase price [in July, 2020]."

68. For a time, there was also a shortage in used vehicles. Fewer trade-ins and lease turn-ins could happen while dealerships were closed during the pandemic. Additionally, a moratorium on repossessions in some states prevented repossessed vehicles to return to the market. However, as restrictions loosened, and individuals selling their cars sought to take advantage of higher prices, used cars became readily available. In an article on CNBC, the CEO

---

[3] *See* Alan Adler, *Chip shortage pushing capacity-starved fleets to used equipment*, FREIGHTWAVES.COM (March 4, 2021) https://www.freightwaves.com/news/chip-shortage-pushing-capacity-starved-fleets-to-used-equipment

[4] Peter Valdez-Dapena, If you bought a car last year, it could now be worth more than you paid for it, CNN (July 2, 2021) https://www.cnn.com/2021/07/02/business/money/used-car-prices-price-profit-feseries/index.html

of a used car auction stated: "It wasn't just a return back to pre-Covid…We're selling higher units today than we were pre-Covid."[5]

69. The same article reported that the stock price of many online car dealers had seen strong results in the wake of the surge in demand for used vehicles: "Autonation and CarMax have been expanding their used car efforts, and their stocks have rebounded strongly from the Covid-19 stock market bottom in March. Carvana…has seen its stock increase from a $30 low point in March to over $200." Indeed, the price of Carvana's stock rose from $55.09 per share on March 1, 2020 to $337.56 per share on July 1, 2021. Similarly, the price of CarMax's stock rose from $53.83 on March 1, 2020 to $133.95 on July 1, 2021.

70. The chart below compares percent return on investment for CarLotz (previously Acamar), Carvana, Vroom, and CarMax from December 30, 2020 through May 26, 2021.




---

[5] Eric Rosenbaum, *The Used Car Boom is One of the Hottest, And Trickiest, Coronavirus Markets For Consumers*, CNBC (October 15, 2020), https://www.cnbc.com/2020/10/15/used-car-boom-is-one-of-hottest-coronavirus-markets-for-consumers.html

### C. The Lasting Effects of Covid-19 on CarLotz

71. CarLotz' experience during the early stages of the Covid-19 pandemic appeared to mirror the industry at large. During the months of March, April, and May, 2020 – like millions of other business, both in the United States and internationally – CarLotz saw a drop in sales. In an interview on Yahoo! Finance Live on December 17, 2020, Defendant Bor explained:

> [T]here was a sharp downturn in March, and that really lasted through about May. And so, there were--due to lockdowns and you know, generally the consumer trying to figure out how exactly to transact on a car purchase during Covid, we saw significant decrease.

He added, "it really snapped back in May and through the summer, but it's largely normalized." In its March 15, 2021 Financial Report on Form 10-K for Q4 and full year 2020, CarLotz revealed that, during this time, CarLotz implemented "aggressive cost cutting measures" such as "limiting marketing expense and inventory purchases in an effort to preserve liquidity." What the 10-K did not reveal, but many of the Confidential Witnesses in this case confirmed, was that CarLotz had laid off or furloughed many of its employees in order to stay afloat.

72. Bor explained in a presentation at the ICR Conference on January 12, 2021 that CarLotz continued to have supply issued throughout mid-2020.

> There were very few vehicles that we could have access to. OEM plants shut down, which is a once-in-a-lifetime type of thing, to create ventilators. In general they were shut because of outbreaks. So, without those new vehicles being manufactured, those new vehicles weren't being delivered to dealers. Our accounts, who much of the way they get their vehicles is by lease returns, and replacing those with new leases. They had fewer vehicles to send to us. There were moratoriums on repossessions, which led to fewer vehicles in the supply chain. So, really from about March to, call it September, we just saw sales were great after the COVID period, but inventory was dramatically lower.

73. However, eventually, inventory began to become available again, as Bor described at a presentation at the Barclays Global Automotive conference on November 19, 2020:

> [B]ecause OEM plants shut down people couldn't swap out their lease, our leasing accounts couldn't get new vehicles to give to drivers to bring in their old vehicles

> but all those leases were expiring. So as soon as the new vehicle plants began making cars again, delivering them, people could start turning in their leases, picking up new vehicles. Additionally, there was all this stimulus money, people were buying vehicles. So, all of a sudden, all that backlog started to unravel around September and we started getting a tremendous amount of inventory.

74. Due to this increase in available used car inventory throughout the industry, CarLotz was able to take on more inventory than it ever had in the past. Bor made the following statements in investor presentations and media appearances through the months of November, 2020-January, 2021:

- We're now running at over 2,000 units which is an absolute record for us. We're at capacity and [the merger with Acamar] will allow us to expand our capacity and drive a lot more volume through our system. So net-net [Covid-19] was a slight positive for us. We wouldn't wish it on the world or on ourselves again but I think it's allowed us to really focus, bring on new accounts, show people what we can do in the midst of disruption in the supply chain. And it's been a positive for us.

- [W]hat we were able to do by the end of the year, is still meet many of our targets by just picking up a ton of new inventory by Q4. Our inventory which had been around 1,200 to 1,400 in steady state, got down to about 600 or 700 at the low point. We were able to get it to over 2,000 units, and we've been running at above 2,000 units ever since. We're seeing very strong demand for our services. We're frankly at full capacity.

- We are--our inventories are at historically high levels. We've got a ton of great cars, we're gaining share.

- Because all that inventory that wasn't coming through the channel in kind of March through September is now coming through us so we have more inventory than we've ever had by thirty five, forty percent, and that's gearing up for a very strong future here.

75. However, as was later revealed, this increase in inventory was not a positive for CarLotz, as it was for competitors such as CarMax and Carvana. Low on personnel and physical space at its hubs, CarLotz was not equipped to handle the number of vehicles it took, as Bor later explained in an earnings call on March 15, 2021:

> [W]e ramped up inventory meaningfully in Q3 and Q4, mostly to enable our strong top line growth, and much of this ramp was with one specific source of inventory that was

> giving us the opportunity to take large quantities of very attractive vehicles. We took we took as much as we could but ***we overshot the mark in terms of matching our sourcing volume with our capacity, which log jammed our processing centers***. It took a long time for the inventory to hit our website in retail ready condition, and it left us with a couple key problems. One, the inventory took so long to get on the site that by the time we got leads and could sell it we had dropped the price a couple times, which impacted GPU, and two, ***many of these units aged out per our agreement with our clients and we have to take wholesale losses as we de-listed them in Q1***. (emphasis added).

Notably, this "log jam" situation was already occurring in the fourth quarter of 2020 – at the same time as Defendants made many of the misleading statements alleged herein and *before* Defendants filed their December 30, 2020 Prospectus.

76. When asked in a May 10, 2021 earnings call why CarLotz opted to take losses on the vehicles versus just returning them to the sourcing partner– as one would expect in a consignment situation– Bor responded:

> [M]ost of that wholesale loss did come from the profit share account that we have. And after 90 days, we have to return those vehicles to them and ***we've put some reconditioning costs and we have shipping costs to give back to them***. And that's where that wholesale loss occurred from. (emphasis added).

77. Selling vehicles wholesale, rather than taking a larger loss on reconditioning and shipping costs, was contrary to the "asset light" consignment-to-retail business model CarLotz described in its presentations to investors.

78. CW3, a Title and Compliance Manager at the CarLotz hub in Downers Grove, IL (just outside of Chicago) from July 2018 to December 2020, left the company because she was unhappy with how the Company handled the Covid-19 pandemic. Among other things, she experienced many issues with the surge in inventory in the later months of 2020. CW3 stated that the volumes of cars coming to the Downers Grove hub in late 2020 had been "a little nuts," that lot was full and there was literally no place to put the vehicles, and that personnel who had been put on leave earlier on the in the pandemic and then brought back to work at the end of 2020 were

not following title and compliance procedures when it came to these vehicles. For example, sometimes customers who came at the end of the day were allowed to drive a vehicle off the lot without completing the financing for the vehicle's sale. Sometimes the financing was completed the following day, but sometimes it was a week or two before it was completed. When financing did not materialize, it was necessary to get the vehicle back and there were sometimes issues with repossessing these vehicles. CW3 called this situation "a giant mess" and stated that there were never repercussions for salespeople who allowed vehicles to be driven off the hub without financing. The Downers Grove hub was still over-inventoried at the time of CW3's departure.

79. CW3 stated that Defendant Bor visited the Downers Grove hub on multiple occasions, and even had several meetings with investors there.

80. CarLotz has still not fully recovered from the effects of the Covid-19 pandemic. A combination of CarLotz' mishandling of their fourth quarter 2020 inventory surge and the industry-wide increase in prices for used vehicles led the partner from whom CarLotz sourced 60% of its inventory in 4Q:2020 and Q1:2021 to "pause" its relationship with the company. As CarLotz did not have other partners to fill this gap, it was forced to source high-priced vehicles from auctions to ensure its hubs were properly stocked. In fact, in 2Q:2021 CarLotz reported that it sourced 80% of its vehicles from auctions. This led to higher-than-expected costs and much lower than forecasted revenue and GPU. In fact, by 3Q:2021, CarLotz' retail GPU for the quarter was just $939 (compared to $2,181 for the same period in 2020).

**D. CarLotz and Acamar Plan Their Merger**

81. Acamar Partners Acquisition Corp. was a "blank check" company – also known as a SPAC – incorporated in November 2018 for the purpose of effecting a merger, capital stock exchange, asset acquisition, stock purchase, reorganization or similar business combination with

one or more businesses. Acamar itself had no business activities; it was formed specifically to acquire an existing operating company.

82. SPACs typically raise capital for an acquisition through an Initial Public Offering ("IPO"), and that capital is held in trust for a specific period of time, usually 24 months, until a merger can be completed. If a merger or acquisition is successfully made within the allocated time frame, founders and managers of the SPAC often reap significant profits from their ownership of the SPAC's securities, as well as other benefits such as the ability to nominate board members to the new company. However, if an acquisition is not effectuated within that time frame, then the SPAC is dissolved and the money in the trust is returned to investors, with no compensation paid to the founders and managers of the SPAC. Accordingly, the founders and management team of a SPAC are highly incentivized to complete an acquisition within their deadline, even if the transaction may be to the detriment of the public shareholders.

83. The strategy of going public by merging with a SPAC has become increasingly popular in the last few years. SPAC transactions are faster than traditional IPOs, the price is determined in advance instead of by the volatile market, and SPAC sponsors often have a network of contacts and management expertise they can offer to the new company. Sometimes SPACs even have celebrity sponsors, creating additional hype for the stock amongst fans and investors alike. However, SPAC mergers also have the potential to be rife with fraud, as the process allows companies to sidestep traditional underwriting and regulatory scrutiny. SEC officials have also expressed concern over the recent surge in SPACS, noting a number of risks to shareholders.[6]

[6] *See* https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws (John Coates, Acting Director, SEC Division of Corporation Finance: "Concerns include risks from fees, conflicts, and sponsor compensation, from celebrity sponsorship and the potential for retail participation drawn by baseless hype, and the sheer amount of capital pouring into the SPACs, each of which is designed to hunt for a private target to take public."); https://www.sec.gov/news/testimony/gensler-2021-05-26 (SEC Chair Gary Gensler testifies in front of

84. On February 26, 2019, Acamar completed its IPO of 30,000,000 units[7] for $10.00 per unit, for a total of $300,000,000 to be held in trust until Acamar could complete a business combination. In their Form S-1 published in advance of the IPO, Acamar stated that, as is common with SPACs, they would be forced to "redeem 100% of our public shares if we do not complete our initial business combination within 24 months from the closing of this offering." In other words, if it could not complete a business combination by February 26, 2021, Acamar would have to give 100% of the money in the trust fund back to the shareholders, and the directors would not receive any benefits themselves. At the time, Acamar had not selected any business combination target. After the IPO, Acamar began searching for a company with which to combine.

85. Meanwhile, on or around November 8, 2019, CarLotz engaged Barclays Capital Inc. ("Barclays") to provide financial advisory services regarding a possible sale of CarLotz to a third party. That search was suspended in March 2020 due to the impact of the Covid-19 pandemic. In August 2020, CarLotz engaged outside legal counsel and an additional financial advisor, Deutsche Bank Securities Inc. ("Deutsche Bank"), in order to explore a potential business combination with a SPAC. For the next several months, Deutches Bank conducted outreach to various SPACs that "may present a strategic fit with CarLotz." CarLotz does not appear to have considered going public on its own, like its competitors Carvana and Vroom.

86. On August 25, 2020, Deutsche Bank suggested CarLotz to Acamar. Acamar was given a confidential information memorandum providing background information about CarLotz, its business model, its recent financial performance and its projected future growth. Acamar management also met with CarLotz executives and requested more detailed financial information

---

the U.S. House Appropriations Committee: "The surge of SPACs raises a number of policy questions. First and foremost, are SPAC investors being appropriately protected?")

[7] A unit consisted of one share of common stock and one third of a redeemable warrant, which entitled the holder to purchase one share of common stock for $11.50 per share.

from CarLotz, "including more detailed descriptions of CarLotz' growth and capital expenditure strategy, detail on the hub expansion plan and hub economics, a breakdown of capital needs that would be satisfied through a business combination with Acamar Partners, and more specific historical and financial projections." As was later revealed, Acamar did not request an opinion on the fairness of the proposed transaction from its bank. Rather, it relied on materials created by CarLotz, including CarLotz' investor presentation and unaudited quarterly financial statements.

87. The SEC later questioned this decision in a letter dated November 25, 2020:

> We note your disclosure that the Boards of Directors of both Acamar Partners and CarLotz ***did not obtain fairness opinions in connection with the business combination***. Please expand your disclosure, where applicable, to include the processes employed by the Boards of Directors of both Acamar Partners and CarLotz to assess the value of the potential transactions outlined in this section, including how each Board determined that the final valuation, and consideration to be received in the transaction, was fair. (emphasis added).

In response to this comment, Acamar added the following language to their draft prospectus:

> Acamar Partners' officers have over 20 years of experience evaluating the financial merits of and investing in companies from a wide range of industries, as well as identifying, valuing and executing potential merger and acquisition opportunities… Acamar Partners' officers and directors determined that the team had sufficient experience and was capable of making the necessary analyses and determinations to evaluate the proposed business combination with CarLotz.

In other words, the Acamar directors – who, as previously mentioned, would suffer significant losses if the merger was not concluded – based the determination of whether the transaction would be fair to their shareholders solely on their own purported judgment and expertise.

88. Notably, this revised language did not describe how CarLotz determined the merger with Acamar was fair. The SEC noted this in another letter dated December 21, 2020, stating:

> We note your disclosure that the Boards of Directors of both Acamar Partners and CarLotz did not obtain fairness opinions in connection with the business combination. Please expand your disclosure, where applicable, to include the

> processes employed by the Boards of Directors of *both* Acamar Partners *and* CarLotz to assess the value of the potential transactions. (emphasis in original).

In response, the draft prospectus was edited to state that the CarLotz transaction committee assessed "a number of factors" including: "relative experience of the SPAC as potential merger partner and the performance of prior business combinations by the SPAC management teams," "[a]mount of cash in trust potentially available to CarLotz following the completion of the proposed business combination," "[t]he speed and certainty with which the proposed business combination could be completed," and the fact that all proposals "were submitted after an extensive market check and through a competitive process." The draft prospectus did not explain how CarLotz obtained and verified any of this information, nor did it state who performed the "extensive market check" or what it entailed.

89. On September 11, 2020, Acamar sent CarLotz a non-binding proposal, and on September 13, 2020, CarLotz sent Acamar a counter-proposal. The parties continued to negotiate for a few weeks more, then began drafting the merger agreement. As of September 30, 2020, there was approximately $310.9 million in the Acamar trust account, and the merger agreement contemplated an additional $125 million cash would be raised prior to closing by offering private investment in public equity shares (the "PIPE Investment").

90. On or about September 25, 2020, representatives of CarLotz and Acamar met with William Blair & Company L.L.C. ("William Blair"), who presented their experience in the auto industry and explained how they could assist CarLotz with generating incremental investor interest between transaction announcement and closing. William Blair is a global financial services company and is widely considered a "market maker" for a wide variety of securities. William Blair initiated coverage of CarLotz soon after the merger and has published multiple analyst reports regarding CarLotz since that time.

91. On October 21, 2020 CarLotz and Acamar executed the merger agreement and on October 22, 2020, the start of the Class Period, CarLotz issued a press release publicly announcing the proposed transaction. Acamar also filed a Form 8-K with the SEC announcing the merger and attaching an Investor Presentation and the transcript of an investor conference call in which Bor and Solorzano gave more details about the planned merger, both containing false and misleading statements about CarLotz' business.

### E. The Fourth Quarter 2020 – As the Business Struggles, Defendants Paint a Rosy Picture to Investors

92. In November and December 2020, the CarLotz Defendants made a number of presentations at investor conferences designed to condition the market in advance of the upcoming merger. At most of these presentations, Defendants used a substantially similar set of slides to the Investor Presentation which was filed with the SEC on October 22, 2020. Other slightly different versions of the presentation were filed with the SEC on Form 425 on November 17, 2020 and December 16, 2020.

93. In these presentations, Defendant Bor touted CarLotz as the "industry's only consignment-to-retail model," explaining how CarLotz was "asset light," had "a very different business model in our sourcing channels" and was "the most capital efficient business model in the space" because "we don't own the inventory that we're selling" and "any reconditioning dollars are passed through to our seller." Bor also repeatedly stated that CarLotz had "superior unit economics" with a GPU that was "at the top half of the class." Further, Bor explained that CarLotz sourced 90% of its inventory "non-competitively" (*i.e.*, not at auction), from a "deep pool of sourcing partners" including big names like US Bank, Advantage Rent-a-Car, ARI Fleet Management, and an unnamed "leading OEM." One slide stated that these sourcing partners provided a "virtually unlimited" source of inventory for CarLotz.

94. As discussed in further detail, *infra*, these investor presentations made CarLotz' business seem novel, stable, and low-risk, when in truth, it was operating very differently.

95. As CarLotz later revealed, in the fourth quarter of 2020, at the same time as these investor presentations were being made:

- "***one of our corporate vehicle sourcing partners*** with whom we have an alternative fee arrangement has accounted for ***over 60%*** of our vehicles sourced" (March 15, 2021 10-K, emphasis added);
- "[u]nder our fee arrangement with this corporate vehicle sourcing partner, ***we are responsible for the expenses we have incurred*** with respect to the vehicle, including ***shipping costs and any refurbishment costs*** we have incurred" (March 15, 2021 10-K, emphasis added);
- "***we overshot the mark*** in terms of matching our sourcing volume with our capacity, ***which log jammed our processing centers***. It took a long time for the inventory to hit our website in retail ready condition… the inventory took so long to get on the site that by the time we got leads and could sell it we had dropped the price a couple times, which impacted GPU" (March 15, 2021 Investor Call, emphasis added); and
- the excess vehicles were sold "***with aggressive pricing*** rather than absorbing, shipping and reconditioning costs on vehicles returned to the client." (May 10, 2021 Investor Call, emphasis added).

96. The CarLotz Defendants knew this "log jam" was occurring at the very same time as they touted their asset-light business model, "deep pool" of sourcing partners, and "top of the class" GPU to investors. Additionally, the CarLotz Defendants admitted that at the time they knew the situation was not merely temporary, and anticipated that it would continue to "reduce our gross profit during the first quarter of 2021 and for subsequent periods" (March 15, 2021 10-K). Despite this bleak outlook, Defendants continued to paint a misleadingly rosy picture of their business, conditioning the market ahead of the merger.

97. Importantly, the Prospectus was filed on December 30, 2020 – ***one day before the end of the quarter***. This means that the facts above – many of which were revealed in the 4Q:2020 Financial Statement and Investor Call – were known to Defendants ***before*** the Prospectus was

filed, but were not revealed to investors until months later – after the merger with Acamar had been successfully closed.

**F. The Prospectus and Shareholder Actions**

98. On December 28, 2020, Acamar sent a short letter to the SEC requesting, pursuant to Rule 461 of the Securities Act of 1933, that the effective date of its Registration Statement on Form S-4 "be accelerated so that the Registration Statement may become effective at 11:00 a.m. New York time on December 30, 2020, or as soon as possible thereafter." The SEC later sent a letter to the Company reminding it that, due to this request for acceleration:

> ***[W]e have not reviewed and will not review your registration statement***… We remind you that ***the company and its management are responsible for the accuracy and adequacy of their disclosures***, notwithstanding any review, comments, action or absence of action by the staff. (emphasis added).

99. On December 30, 2020, Carlotz and Acamar published a Form 424B3 Prospectus with the SEC. The SEC published a notice of effectiveness that same day. The Prospectus contained a number of false and misleading statements and omissions about the CarLotz' business, including: 1) its inventory levels and ability to process inventory; 2) the number of sourcing partners and the nature of CarLotz' relationship with these partners; 3) its gross profit and GPU; and 4) an adequate warning about the risks inherent in its business model. Moreover, while the Prospectus recited potential risks that could arise in connection with the merger, it provided no reasons to suspect that Acamar failed to reasonable investigate such risks or that many of these potential risks had already materialized in substantial part. These statements and omissions, which will be discussed at length *infra*, were designed to garner support for the merger, solicit votes from stockholders necessary to complete the business combination, and create investor interest in the new company.

100. On January 13, 2021, CarLotz and Acamar gave a presentation at the ICR Conference, at which they reiterated and reaffirmed many of the false and misleading statements in the prospectus and the pre-class period investor presentations.

101. Even though the two lawsuits were still pending at the time, shareholders voted to approve the merger on January 20, 2021. The next day, on January 21, 2021, the merger was effectuated and CarLotz became a public entity, trading on the NASDAQ exchange under the symbol "LOTZ" with registered warrants trading as "LOTZW." The merger announcement on January 21, 2021 stated "The Business Combination was funded by a combination of Acamar Partner's $311 million cash-in-trust and $125 million of PIPE proceeds, which was fully committed by a pool of institutional and strategic investors." Buoyed by Defendants' false and misleading statements and omissions in the Prospectus and investor presentations, the stock price of the new entity closed at $12.30 on the first day of trading.

**G. The Truth Gradually Emerges**

102. Over the next few months, through a series of corrective disclosures, Defendants' false misleading statements and omissions were revealed. On March 15, 2021, CarLotz announced its fourth quarter and full year 2020 financial results. During an earnings call on the same day, Bor reported that CarLotz had acquired so much excess inventory that it was unable to effectively process all of the vehicles, which "created a logjam that resulted in slower processing and higher days to sell." Stoltz revealed that, due to this "log jam" – which the CarLotz Defendants admittedly knew about before the Prospectus was filed – gross profit and GPU "were softer than . . . expected."

103. CarLotz also revealed that, contrary to previous statements about CarLotz' "deep pool" of sourcing partners:

> [F]or the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, ***one of our corporate vehicle sourcing partners has accounted for over 60% of our vehicles sourced***. (emphasis added).

104. On this news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume. The stock price continued to decline over the next two consecutive trading sessions by $0.62, or 7.3%, to close at $7.83 per share on March 18, 2021, on unusually heavy trading volume.

105. Then on May 10, 2021, CarLotz held an earnings call regarding its 1Q:2021 financial results, revealing that it had cleared the aforementioned "log jam" of inventory by selling the units with "aggressive pricing" "rather than absorbing shipping and reconditioning costs on vehicles returned to the client." This statement revealed that CarLotz, not the sourcing partner, had paid for the reconditioning costs on these vehicles, and therefore had much more capital tied up in inventory than previously represented. CarLotz Form 10-Q filed on the same day revealed that its gross profit and GPU fell far below expectations. While the Company had announced on March 15, 2021 – *just two weeks before the end of the quarter* – that they expected a retail GPU between $1,300 and $1,500 for 1Q:2021, CarLotz reported a GPU of only $1,182. One of the factors noted repeatedly in the Prospectus and Defendants' investor presentations was that CarLotz' GPU was "in the top half of the class," however, the "aggressive pricing" strategy led to a GPU far below that of most of CarLotz' peers. The CarLotz Defendants continued to insist that all would be well, that they "continue[d] to onboard several new sourcing relationships" and that they had "a lot of levers to pull when it comes to inventory."

106. On this news, the Company's stock price fell $0.94, or 14%, to close at $5.57 per share on May 11, 2021, on unusually heavy trading volume. The stock price continued to decline $0.45, or 8%, to close at $5.12 per share on May 12, 2021, on unusually heavy trading volume.

107. Then, just 16 days later, on May 26, 2021, before the market opened, CarLotz announced that the partner from whom CarLotz sourced "more than 60% of the cars sold" in 4Q:2020 and 1Q:2021 had "paused" its relationship with CarLotz. This decision could not have come as a surprise to the Company – CarLotz' inability to successfully and timely sell the vehicles to the retail market, combined with the macro-economic situation at the time, where used car prices were steadily climbing, would have made continuing the relationship with CarLotz a poor business decision for the partner. Additionally, CarLotz stated in the Prospectus that sourcing partners had to give "30 to 90 days' notice" before cancelling their agreements, so CarLotz must have known at the time of the May 10, 2021 Earnings Call that the partner would be cancelling and chose to omit this vital information from shareholders.

108. On this news, the Company's stock price fell $0.70, or 13.4%, to close at $4.51 per share on May 26, 2021, on unusually heavy trading volume.

109. Below is a timeline of these events:



## VI. DEFENDANTS' MATERIALLY FALSE AND MISLEADING STATEMENTS AND OMISSIONS

### A. The October 22, 2020 Announcement of the Merger Agreement

110. On October 22, 2020, CarLotz and Acamar announced their planned merger.

111. CarLotz published a press release titled, "CarLotz, Inc., One Of The Largest Privately-Held Used Vehicle Retail Disruptors With The Industry's Only Consignment-To-Retail Sales Platform, To Become A Public Company." The Press Release, which contained quotations from both Bor and Solorzano, stated:

> With the industry's only consignment-to-retail sales model and its asset-light inventory sourcing model, CarLotz offers a compelling value proposition for both vehicle buyers and sellers… The industry's only asset-light consignment sales model, with 90% of CarLotz' vehicles non-competitively sourced and 60% sourced from its corporate vehicle sourcing partners, enables CarLotz to operate without the need for significant capital or capital at risk to support traditionally owned inventory.

112. This statement was false and misleading. At the time this statement was made, as was revealed in the March 15, 2021 10-K, CarLotz obtained 60% of its inventory from just one sourcing partner – not multiple partners. Pursuant to its agreement with this partner, CarLotz paid shipping and refurbishing costs. Contrary to the statements above, this tied up significant amounts of capital, which was at risk if CarLotz could not sell the vehicles at high retail prices. The statement also omits that, at the time, CarLotz was experiencing a "log jam" of inventory, resulting in higher processing times to list and sell the vehicles. Eventually, CarLotz sold the vehicles wholesale, not retail, a risk that was similarly absent from the statement above.

113. On the same day, October 22, 2020, Acamar filed a Form 8-K with the SEC attaching CarLotz' October 22, 2020 Press Release and a copy of the October 21, 2020 merger agreement between CarLotz and Acamar. The 8-K also attached a transcript of an investor call

conducted earlier that day by Defendants Bor, on behalf of CarLotz, and Solorzano, on behalf of Acamar, as well as a copy of an Investor Presentation slide deck.

114. In the Investor Call, Solorzano stated:

> Our team at Acamar partnered with CarLotz not only because we believe the Company offers the highest growth prospects in the industry in the coming years, but also because ***it is disrupting the used vehicle industry in ways that no one else is – it is a true pioneer in the space*** and we see a tremendous opportunity for growth, profitability and further disruption... CarLotz's ***one-of-a-kind sourcing and its asset light inventory business model*** results in a higher return on capital and stronger future cash flow conversion [than competitors Carvana and Vroom]. (emphasis added).

115. These statements were materially false and misleading for a number of reasons. First, CarLotz did not have "one-of-a-kind sourcing." As CWs 1, 2, 3, and 4 all explained, and as the Company eventually conceded when it revealed that 60% of CarLotz' total inventory (and the same percentage that the Company represented came from corporate consigning partners) came from just one consigning partner, CarLotz struggled to find people and business to consign their vehicles. Otherwise, CarLotz purchased and sold many of its vehicles at wholesale, operating no differently than any other used car dealer – hardly the "disruptor" or "pioneer in the space" described by Solorzano. Second, the purportedly "asset-light" consignment-to-retail model was only one of several business models CarLotz employed, and under its agreement with its one corporate consigning partner, CarLotz was responsible for paying reconditioning costs – not the seller. Accordingly, CarLotz would have to eat those costs if the Company could not sell the vehicles before their consignment period expired, leaving CarLotz in the position to either purchase the vehicle itself, or aggressively price the vehicle and jeopardize its margins. Furthermore, according to CW2, CarLotz was sourcing many of its vehicles for the Illinois hub during this time by purchases at auction, not on any consignment basis. In other words, CarLotz had quite a bit more capital tied up in its inventory than "asset-light" conveyed.

116. Defendant Bor stated:

> As the only consignment-to-retail service provider in the industry, ***CarLotz serves many of the largest corporate vehicle remarketers*** in banking, rental, fleet management, OEM and other markets... By creating a retail channel for sellers, now a seller is able to make more money than is possible in an auction and do it all ***in a reasonable amount of time***. (emphasis added).

117. This statement was materially false and misleading because, at the time it was made, CarLotz was sourcing 60% of its inventory from only one corporate vehicle remarketer, not "many of the largest" remarketers. Additionally, CW1 stated that many corporate accounts preferred to sell vehicles at auction rather than through CarLotz due to the amount of time it took CarLotz to sell the vehicles, suggesting that these accounts did not find the amount of time CarLotz took to sell vehicles "reasonable."

118. Bor also stated, "Our asset-light model means we own very little of our inventory, most of which is on consignment, and therefore have limited capital risk." However, this statement was materially false and misleading because, under the agreement CarLotz had with the partner from whom it sourced 60% of its inventory in 4Q:2020 and 1Q:2021, CarLotz was responsible for paying shipping and reconditioning costs. The capital expended on these costs was at risk if CarLotz could not sell the vehicles before the end of the consignment period. Moreover, as stated above, CW2 explained that much of the inventory at the Illinois hub was purchased at auction, and was not on consignment.

119. Further, Bor stated, "We have best-in-class unit economics driven by our asset-light business model. Our gross profit per unit is at the top of our industry." This statement was materially false and misleading because at the time it was made, CarLotz was struggling to process its inventory, leading to the Company selling vehicles at aggressive prices to avoid being saddled with reconditioning fees associated with vehicles sourced from the sourcing partner that

represented 60% of its inventory. These issues were driving down the Company's GPU below what the Company had previously experienced and below others in the industry. Nevertheless, CarLotz did not even have "best in class" unit economics historically. CarLotz' last audited financial statement before this Investor Call, for the year ending December 31, 2019, listed retail GPU as just $1,393. This was not, as Bor described, "at the top of the industry." By comparison, Carvana, one of CarLotz' main competitors, reported a GPU of $2,852 for the same period.

120. The slides in the Investor Presentation, which was also filed by Acamar as an attachment to their October 22, 2020 8-K, contained similar misrepresentations. For example, the presentation contained the following slide:




This graphic is misleading because, at the time of the presentation, CarLotz did not have a "deep pool" of sourcing partners. In fact, according to the March 15, 2021 10-K, for 4Q:2020 and most of 1Q:2021, CarLotz sourced 60% of its inventory from only one corporate sourcing partner.

121. Regarding sourcing partners, the presentation also contained the following slide:

**VIRTUALLY UNLIMITED SUPPLY FROM EXISTING AND PROSPECT ACCOUNTS**

| | Company | Fleet Size[1] | Estimated Annual Remarketing Volume[2] |
|---|---|---|---|
| ★ | element | 486,245 | 97,249 |
| ★ | | 257,629 | 51,526 |
| ★ | | 240,692 | 48,138 |
| | wheels | 212,000 | 42,400 |
| | DONLEN A Hertz Company | 130,000 | 26,000 |
| | EMKAY | 95,500 | 19,100 |
| ★ | Merchants | 55,772 | 11,154 |
| ★ | UNION | 29,845 | 5,969 |
| ★ | MIKE ALBERT FLEET SOLUTIONS | 22,000 | 4,400 |
| | SUTTON | 20,403 | 4,081 |
| ★ | motorlease | 6,100 | 1,220 |

★ Existing CarLotz Customer

**Massive opportunity to penetrate 12 million vehicles passing through North American used vehicle auctions annually, of which 6 million vehicles are consigned by corporate vehicle sourcing partners**

Numbers in table represent fleet leasing companies only and exclude several major current and prospective clients, such as:

- Banks
- Rental car companies
- Original equipment manufacturers
- Captive finance companies
- Third-party remarketers

***CarLotz' 2021 and 2025 projected volumes represent <0.1% and <1%, respectively, of total remarketing volume of 12 million per year***

Source: Automotive Fleet, Bobit Fleet Group
1 As of December 31, 2019.
2 Estimated as one-fifth of fleet size annually.

28 carlotz

122. Not only did this slide depict a number of companies who, by CarLotz' own admission, were not CarLotz accounts, the graphic is misleading because the fleet size of the listed companies did not correlate with a "virtually unlimited" supply of consignment vehicles for CarLotz. Even assuming the accuracy of the turnover volume estimated by CarLotz on the slide, most companies chose to sell unwanted vehicles at auction rather than through consignment, as CW1 attested to. Further, it was misleading for CarLotz to claim so many of the companies listed were "Existing CarLotz Customers," as CarLotz only had one corporate sourcing partner in 4Q:2020.

123. Additionally, the presentation contained the following slide:




124. This slide was misleading because CarLotz' GPU was not consistently anywhere near $1,866. CarLotz' last audited financial statements before this presentation, for the year ending in 2019, retail GPU was $1,393 – below any of the competitors in the chart above. Additionally, as noted in the small print at the bottom, the GPU and Customer Acquisition Cost ("CAC") figures excluded vehicles sold at wholesale. When the wholesale GPU was factored in, CarLotz' overall GPU was much lower. For example, CarLotz' overall GPU for the year ending in 2019 was only $1,146. CarLotz' unaudited statements for the nine months ending September 30, 2020 showed retail GPU was $1,900 when overall GPU was just $1,690. As CarLotz struggled to sell vehicles in 4Q:2020, it was forced to sell more vehicles at wholesale, making the disparity between its retail GPU and overall GPU even greater. By not including the wholesale units, CarLotz was able to make itself seem more profitable than it actually was. This also made

it impossible to accurately compare CarLotz to its competitors, whose wholesale losses were proportionally less.

125. After the merger announcement, Bor made a number of investor presentations where he reiterated these false and misleading statements in order to condition the market in advance of the shareholder vote on the merger. These presentations were often accompanied by a substantially similar slide deck to the one attached to Acamar's October 22, 2020 8-K.

**B. The November 2, 2020 Gabelli Automotive Symposium Investor Presentation**

126. At the Gabelli Automotive Symposium on November 2, 2020 (transcript filed with the SEC on Form 425 on November 12, 2020), Defendant Bor made the following statements:

> [As compared to Carvana and Vroom] we are growing faster, ***our GPU (Gross Profit per Unit) is at the top half of the class,*** but when combined with our industry leading customer acquisition costs, we end up with a contribution margin per unit that is best in class… ***[O]ur unit economics are superior to our peers***… (emphasis added).

127. These statements were accompanied by the slide referenced in ¶ 123, *supra*. The statements were misleading because CarLotz' GPU was not consistently anywhere near the "top half of the class." As discussed above, this statement was materially false and misleading because at the time it was made, CarLotz was struggling to process its inventory, leading to the Company selling vehicles at aggressive prices, which had negatively affected its GPU. Moreover, CarLotz' last audited financial statements before this presentation, for the year ending in 2019, retail GPU was $1,393 – below any of the competitors in the chart on the slide. Additionally, the slide excluded wholesale GPU. This also made it impossible to accurately compare CarLotz to its competitors, whose wholesale losses were proportionally less.

128. Further, Bor stated:

> With our consignment model ***any reconditioning dollars are passed through to our seller***. And so we're not afraid to sell vehicles that might require more

> reconditioning to make perfect, because ultimately ***it's a cost borne by our seller***. (emphasis added).

129. These statements were materially false and misleading. At the time this statement was made, CarLotz was sourcing 60% of its inventory from one sourcing partner. As the Company later admitted in its March 15, 2021 financial disclosures, under its agreement with this partner, contrary to Bor's statement, CarLotz was responsible for paying reconditioning costs– not the seller. This meant that CarLotz had substantial capital tied up in its inventory at the time this presentation was made. Moreover, because CarLotz could not, by their own admission, effectively process the number of vehicles in its inventory at this time, such that vehicles CarLotz had spent money to recondition were aging out, CarLotz was forced to sell this inventory at wholesale or with "aggressive pricing," to avoid returning the vehicles back to the seller and losing the money spent reconditioning them. These sales caused CarLotz' GPU to fall far below that of its peers– certainly not the "superior" unit economics Bor touted. Accordingly, the foregoing statement misled investors to believe there was little risk associated with reconditioning vehicles under CarLotz's business model, when, in fact, the costs borne by CarLotz of reconditioning vehicles was at that very time negatively impacting CarLotz's business.

130. When asked about the effects of Covid-19 on CarLotz' business, Bor replied:

> [T]here was the sales story and the sourcing story. So the sales drop was quick. It was March, April, half of May. The sourcing story, the whole supply chain was disrupted, OEM plants shut down, there were moratoriums on repossessions. So just the volume of vehicles that were coming through the wholesale channel dropped precipitously, and as a result, we saw our inventories drop precipitously. So even though sell-through was through the roof, there was less inventory to sell. But what was happening during that period is all those vehicles were just backlog. So all the lease turn-ins didn't happen. But they have to happen eventually. And so we started seeing that in September, and ***we've never before seen as much inventory in our facilities, on our website as we're seeing now.*** Because all that inventory that wasn't coming through the channel in kind of March through September is now coming through us so ***we have more inventory than we've ever had by thirty five, forty percent, and that's gearing up for a very strong future here.*** (emphasis added).

131. These statements were materially misleading because the increase in inventory was not a positive for CarLotz, or an indication of a "very strong future" as Bor implied. As CarLotz later admitted in its 4Q:2020 financial results, at the time the foregoing statement was made, CarLotz did not have the resources to process the increased amount of inventory it took, most of which came from a single sourcing partner, and was currently experiencing a "log jam" of inventory that was negatively impacting the Company. Because CarLotz was responsible for paying shipping and refurbishing costs on the vehicles from its large corporate sourcing partner, the Company was forced to sell the inventory with "aggressive pricing" in order to avoid taking massive losses. This was not a positive for CarLotz' business, and because these inventory issues were not disclosed, the foregoing statements were materially misleading to the market.

132. Further, in reference to graphic below, Bor stated:

> Sixty percent of our inventory, as I mentioned, is consigned from our corporate vehicle sourcing partners. And ***these are some of the names you see below, some of the largest fleet management businesses in the world: ARI, LeasePlan, Rental businesses, car-buying services, banks, third party remarketers, floor planning businesses***. (emphasis added).




133. These statements were misleading because, at this time in the fourth quarter of 2020, 60% of CarLotz' total inventory came from only one sourcing partner – hardly a "deep pool." Indeed, while the slide lists fourteen different companies in this "deep pool," by the Company's own admission, only one of these companies made up the approximately 60% of corporate consigned inventory at this time. These statements are also contrary to the statements

of CW1, who explained that CarLotz struggled to onboard commercial accounts because the customers were "set in their ways" and preferred to sell their vehicles quickly at auction, rather than letting them "sit" with CarLotz. Moreover, according to CW2, who worked at CarLotz during this time, stated that much of the inventory at the Illinois hub was purchased at auction, rather than through consignment, which contradicts the Company's statement that 90% of the inventory is non-competitively sourced.

### C. The November 19, 2020 Barclays Global Automotive Conference Presentation

134. Defendant Bor made similar statements at the Barclays Global Automotive conference on November 19, 2020 (transcript filed with the SEC on Form 425 on December 1, 2020). For example, he stated:

> [W]e have a very different business model in our sourcing channels. And it has led to ***leading growth, GPU (gross profit per unit) and contribution margin per unit that's at the top half of the class***, and customer acquisition costs that is best in class… (emphasis added).

135. As discussed above, this statement was materially false and misleading because at the time it was made, CarLotz was struggling to process its inventory, leading to the Company selling vehicles at aggressive prices, which had negatively affected its GPU. Additionally, CarLotz' GPU was not consistently in the "top half of the class." CarLotz' last audited financial statements before this presentation, for the year ending in 2019, retail GPU was $1,393– below many of its competitors.

136. Further, Bor stated:

> [W]e've got the industry's only consignment to retail sales model that makes us a very asset-light business… With our unique consignment model, ***all those expenses, reconditioning, etcetera are passed to our seller, at a mark-up***. And so we're able to bring these vehicles into our inventory with no risk to us of excess reconditioning costs… (emphasis added).

137. These statements were materially false and misleading. The "asset-light" consignment-to-retail model was only one of several business models CarLotz employed. Moreover, at the time this statement was made, CarLotz was sourcing 60% of its inventory from one sourcing partner, and under its agreement with this partner, contrary to Bor's statement above, CarLotz was responsible for paying reconditioning costs – not the seller. This meant that, contrary to Defendant Bor's statement, CarLotz did not have "no risk" associated with "excess reconditioning costs," because CarLotz would have to absorb the reconditioning costs if the vehicles were not sold in the consignment period. And because CarLotz, at this very time, could not process the vehicles that the Company had in inventory creating what CarLotz itself characterized as a "log jam," CarLotz was forced to use aggressive pricing to sell its inventory to avoid losses associated with expenses and reconditioning. These currently existing conditions, not disclosed to the market, contradicted Defendant Bor's foregoing statements regarding costs and expenses.

138. Additionally, Bor made the following statements while referencing the graphic below:




> 60% of our inventory is consigned to us from corporate sourcing partners, many of the logos you see below. You'll see ***banks like U.S. Bank. You'll see fleet management companies like ARI, LeasePlan, Merchants. You'll see car buying services, rental businesses, floor planning companies. We serve an OEM.*** Really anybody who otherwise would sell a vehicle at an auction is either our client or our prospective client. (emphasis added).

139. This statement and graphic were misleading because, in the fourth quarter of 2020 (the time these statements were made), CarLotz was not sourcing vehicles from "many of" the companies whose logos appeared on the slide. At the time the statement was made, 60% of CarLotz' inventory was sourced from only one partner.

140. In regards to the Covid-19 pandemic, Bor stated:

> [A]round September… we started getting ***a tremendous amount of inventory***. We're now running at over 2,000 units which is an absolute record for us. We're at capacity and this transaction will allow us to expand our capacity and drive a lot more volume through our system. ***So net-net [the Covid-19 pandemic] was a slight positive for us***. (emphasis added).

141. These statements were materially false and misleading for several reasons. First, the "tremendous amount of inventory," was not, in fact, a positive for CarLotz. By the Company's admission, at the time this statement was made, CarLotz took too much inventory from its one corporate sourcing partner that made up 60% of CarLotz's inventory, and was unable to process it. This "log jam" forced the Company to sell the vehicles with "aggressive pricing," which led to a lower GPU for its vehicles, negatively impacting the financial condition of the Company. Furthermore, as discussed above through accounts of former employees and through CarLotz's own statements, because the Covid-19 pandemic impacted the availability of new and used vehicles and, in turn, increased the sales price of vehicles sold at wholesale or auction, businesses elected to sell their used vehicles through those channels as opposed to consignment through CarLotz. Therefore, not only could CarLotz not find consigning partners, which formed the basis for its purportedly differentiated business model, when CarLotz itself had to source vehicles for sale at its hubs, the Company was forced to buy at auction at elevated prices. Where CarLotz's competitors, such as Carvana and CarMax, were benefiting from pandemic conditions, CarLotz, by contrast to its foregoing statement and the Company's later admissions, was not.

**D. The December 2, 2020 Wells Fargo TMT Summit Presentation**

142. Bor made another presentation at the Wells Fargo Technology, Media, Telecom ("TMT") Summit on December 2, 2020 (transcript filed with the SEC on Form 425 on December 4, 2020), where he once again made similar statements. For example, he reiterated: "We have a ***gross profit per unit that's at the top half of the class***." (emphasis added). However, CarLotz' GPU was not consistently in the "top half of the class," and in fact, was at this time being negatively impacted by the Company's inability to process its inventory of vehicles.

143. Additionally, Bor stated:

> It could be very expensive to recondition a truck. It makes it a risky vehicle to carry in your inventory. But because of our consignment model and the fact that ***we're able to pass on the reconditioning cost to our sellers***, we are very comfortable taking trucks. In fact, we actually make more money by selling trucks because ***we pass along the reconditioning*** at a slight margin. (emphasis added).

144. This statement is false and misleading because, as described above, under its agreement with the sourcing partner from whom CarLotz sourced the majority of its inventory at the time this statement was made, CarLotz paid for the reconditioning costs. This means that it was equally "risky" for CarLotz to take trucks, and that CarLotz did not "pass along the reconditioning at a slight margin" for the majority of the vehicles it sold.

**E. The December 17, 2020 Yahoo! Finance Live Interview**

145. In an interview on Yahoo! Finance Live on December 17, 2020 (transcript filed with the SEC on Form 425 on the same day), the interviewer asked about the effects of the Covid-19 pandemic on CarLotz. Bor replied:

> [W]e saw significant decrease. But then ***it really snapped back in May and through the summer, but it's largely normalized***. And one of the things we love about the used car market is its generally remarkably steady… It's pretty steady every year, and it's actually pretty steady throughout the year except for times during the year when people find themselves a little more flush, which is, you know, generally around tax time. And so, that's typically when we see spikes. And

> we've seen--you know, we saw that just get delayed from March due to COVID to really more May through the summer. Part of it was tax refund spending that was pushed back due to COVID, but also the stimulus dollars that started feeding its way through the economy really helped kind of mid-year and end of year sales. Right now, we're seeing very strong numbers for us, but not necessarily for this sector. ***We are--our inventories are at historically high levels. We've got a ton of great cars, we're gaining share.*** You know, our profile has been raised as a part of this transaction we're doing in the public markets. And so, ***we're just seeing really good strength in our business***, but not necessarily market related. (emphasis added).

146. These statements were materially false and misleading for several reasons. First, CarLotz' business had not "normalized." CarLotz was still struggling to find sourcing partners for consignment, and 60% of the Company's total inventory came from a single partner. Second, while Defendant Bor touted that CarLotz's "inventories are at historically high levels," he failed to disclose that at this very time (two weeks before the end of 4Q:2020), the Company was unable to effectively process that inventory, creating what he would later describe as a "log jam" that was negatively impacting the Company's business. This increase in inventory did not add "really good strength" to CarLotz' business. Rather, when CarLotz was forced to sell the vehicles with "aggressive pricing" to avoid losses associated with reconditioning and shipping expenses that the Company agreed to bear under its agreement with its corporate sourcing partner, its GPU dropped precipitously.

147. When asked how CarLotz' business was different from competitors like Vroom, Bor replied:

> [T]here's nobody else who's doing the consignment model, we're the only ones… So, ***we work with banks, we work with fleet management companies, leasing companies, rental businesses***, any corporations that have companies [sic] that they would otherwise sell at an auction… Where it's different is how we source our vehicles, and the fact that we're able to offer our vehicles at a lower price due to the way we source them. And that has led to a faster-growing business, very low customer acquisition costs, very high contribution margin per unit. And that's what's kind of driven us toward the public markets and growing as we will through 2021 and beyond. (emphasis added).

148. This statement was misleading because, at the time the statement was made, CarLotz was sourcing 60% of its inventory from only one sourcing partner. As CW1 explained, CarLotz had difficulty attracting other corporate partners because they preferred to sell their cars immediately at auction rather than wait the lengthy time it took for CarLotz to consign the car. Moreover, the agreement with its one sourcing partner did not resemble the "consignment model" Defendant Bor was describing, or how the business was pitched to investors. First, the agreement was not the flat-fee arrangement that the Company had pitched in its investor presentation of the past two months, but rather a fee-sharing agreement that would not lead to lower prices and higher GPU. Second, CarLotz was responsible for costs of reconditioning and other expenses with vehicles from this sourcing partner, and because of its inability to timely process its inventory prior to the expiration of the consignment period, was either forced to buy the vehicles itself or sell the vehicles at aggressive prices to avoid massive losses. In other words, CarLotz was not operating at a true consignment model where the unsold item could be returned to the sourcing partner without risk.

**F. The December 30, 2020 Prospectus**

149. The December 30, 2020 Prospectus also contained a number of false and misleading statements and omissions. The Prospectus was filed one day before the end of 4Q:2020, thus, all the adverse fourth quarter events described in the March 15, 2021 10-K and Investor Conference had already occurred, and the CarLotz Defendants had knowledge of them.

150. Defendants made the following statement regarding the impact of the Covid-19 pandemic on their business (emphasis added):

> Covid-19 impacted both sales and inventory count from March through September 2020. Unit volumes hit a trough in April 2020, with 40% year-over-year declines. We implemented proactive cost-structure optimization measures that helped

ensure we maintained sufficient liquidity and we implemented a number of measures to protect the health and safety of our customers and our workforce. Our May 2020 sales grew over 40% month-over-month as travel restrictions began to ease. ***As wholesale prices skyrocketed, we used our asset-light, non-competitive vehicle sourcing model to defend and grow our margins. With our maintained focus, we delivered our most profitable months since our inception and we believe we are poised to return to industry-leading growth***. Our retail vehicle units sold were 583 in October and 624 in November, with our starting inventory increasing to 2,172 vehicles as of November 1, 2020 and 2,273 as of December 1, 2020 as compared to 1,567 vehicles available for sale as of September 30, 2020, as we accelerated intake from a rapidly growing national OEM account.

(emphasis added).

151. These statements were materially misleading for several reasons. Labor and microchip shortages caused by Covid-19 led to a shortage in new vehicles, which drove up the price of used cars. This made CarLotz' consignment model less attractive to many of the corporate sourcing partners, who sought to take advantage of the higher prices by selling quickly at wholesale. While CarLotz did have "accelerated intake" from one sourcing partner in 4Q:2020, as described above, it omitted the material information that it was unable to process the amount of inventory it took, and later admitted was "higher than ideal". This forced CarLotz to sell the vehicles with "aggressive pricing" to avoid taking a loss on shipping and refurbishing expenses, which expenses, under the Company's agreement with this partner, CarLotz was responsible, not the partner. In this respect, CarLotz was not operating in an "asset-light" manner, as its responsibility for expenses put the Company in the position of either selling the vehicles at minimum profit or purchasing the vehicles themselves to avoid returning the vehicles to the sourcing partner after refurbishing them for free. Rather than leading to "industry-leading growth" and increased "margins," selling the excess inventory in this way sank CarLotz' GPU far below that of its competitors.

152. Similarly, Defendants made numerous statements regarding CarLotz' "asset-light" business model and limited capital at risk, for example (all emphasis added):

- Acamar Partners believes that CarLotz' unique and differentiated value proposition to both buyers and sellers of used vehicles, together with ***its asset-light business model, which limits the inventory risk and financial burden on the company***… offer a very attractive way to participate in the disruption of the very large ($841 billion) and fragmented U.S. used vehicle market.

- Acamar Partners believes that CarLotz represents a compelling investment opportunity given… CarLotz' ***unique asset-light consignment-based sales model, which limits the inventory risk and financial burden on the company***.

- CarLotz is one of the largest privately-held used vehicle retail disruptors in the U.S. and the industry's only consignment-to-retail sales platform. The company's ***unique asset-light consignment-based sales model limits inventory risk*** and allows the company to grow in a capital efficient way.

- Our ***asset-light inventory sourcing model*** allows us to source 90% of our vehicles through non-competitive channels, ***which leads to limited capital risk*** and best-in-class unit economics with multiples that represent a meaningful discount to key peers.

- And because we source non-competitive inventory, our vehicle prices are, on average, up to $1,000 less than traditional dealership prices, while ***our asset-light approach leaves CarLotz with limited risk***.

- We source vehicles from both corporate and consumer sellers. Through the industry's only ***consignment to retail sales model***, we have access to non-competitively sourced inventory, with ***little to no capital tied up or at risk***.

153. These statements were materially false and misleading for several reasons. First, as discussed above, in 4Q:2020 (which ended the day after this Prospectus was filed), CarLotz sourced 60% of its vehicles from one partner with whom it had a profit-sharing agreement, which was not disclosed in the Prospectus. Under its arrangement with this partner (and also not disclosed), CarLotz was responsible for paying shipping and reconditioning costs, which would not be reimbursed by the partner.[8] Contrary to the statements above that emphasized the "little to no capital tied up or at risk," CarLotz risked taking sizable losses on these expenses where it could

[8] *See* August 13, 2021 10-Q (discussing that decreased GPU arising from "an alternative fee arrangement with a corporate sourcing partner that ***does not reimburse repair and shipping expenses***.").

not sell the vehicles within the designated consignment period, which, at this time had already happened. CarLotz was unable to process the inventory in a timely way, leading it to sell the vehicles at wholesale – not retail – for a much lower profit margin. By paying refurbishing costs and selling the vehicles at wholesale prices, CarLotz' business had essentially the same amount of risk as its competitors (or more risk, as CarLotz dealt with more trucks and SUVs than its competitors, for which refurbishment costs can be significantly higher than sedans).

154. The statements above also omit another material fact. CarLotz's inability to find and retain consigning source partners forced the Company to acquire inventory from the same place as its competitors: wholesale, at auctions. According to CWs, the Company had difficulty attracting partners to consign their vehicles with CarLotz and, CW2, for example, stated that CarLotz was sourcing significant inventory through the Company's own purchases at auction. In contrast to the foregoing statements that touted 90% of Company vehicles sourced through non-competitive means, by June 30, 2021, it was almost the exact opposite: 80% of CarLotz' inventory was sourced at auctions. The purportedly differentiated "asset light" business model described in the foregoing statements was not being followed, and accordingly, CarLotz was subject to the same capital risks of its competitors.

155. The Prospectus also contained a number of statements about CarLotz' "deep pool" of sourcing partners (several of which were repeated multiple times throughout the Prospectus), for example:

- CarLotz has multiple near-term revenue growth opportunities, including… growth from further account penetration within the company's main corporate vehicle sourcing partners…

- Our corporate vehicle sourcing partners include fleet leasing companies, rental car companies, banks, captive finance companies, third-party remarketers, wholesalers, companies that manage their own fleets and original equipment manufacturers, or OEMs.

- We maintain stable long-term relationships with numerous key blue-chip national accounts with a robust sales pipeline of potential new accounts.

- [A]pproximately 60% of our total vehicles sales originat[e] from our growing relationships with corporate vehicle sourcing partners.

156. These statements are materially misleading because they omitted that, at this time, CarLotz sourced 60% of its inventory from only one sourcing partner. The number of partners was not growing, in fact, it was decreasing – for the nine months ending September 30, 2020 CarLotz sourced 49% of its vehicles from three sourcing partners. Additionally, CW1 stated that CarLotz struggled to onboard new sourcing partners, as companies preferred to sell their vehicles immediately at auction rather than wait for the consignment period to be over before reaping the profits from the sale.

157. Additionally, the Prospectus repeats many times that CarLotz has "best-in-class" and "superior" unit economics, for example (all emphasis added):

- CarLotz ***is expected to achieve best-in-class unit economics***, including one of the ***highest gross profit margins***, lowest customer acquisition costs and highest net contribution margin, highest expected EBITDA margin (by 2023) and greatest expected return on invested capital.

- *Superior unit economics and capital efficiency*: Our asset-light inventory sourcing model allows us to source 90% of our vehicles through non-competitive channels, which leads to limited capital risk and ***best-in-class unit economics***…

- In view of, among others, the due diligence and financial analysis done by the Acamar Partners team, CarLotz' business plan, CarLotz' ***superior expected revenue and gross profit growth*** and financial return metrics… Acamar Partners' directors assessed that the valuation offered for CarLotz was fair.

158. These statements were materially false and misleading because CarLotz did not have "best-in-class" or "superior" unit economics. Its GPU for the nine months ending September 30, 2020, which it stated was a "record" for the company, was in line with or below that of most of its peers. Importantly, at the time these statements were made, the Company, as it later

admitted, was experiencing significant negative impacts to its GPU. In order to clear the "logjam" of vehicles sourced in 4Q:2020 (which concluded the day after this Prospectus was filed), and to avoid losses on reconditioning and other expenses the Company had incurred and had agreed it could not seek reimbursement for, CarLotz sold the vehicles with "aggressive pricing," which led to unit economics that were not anywhere near "best-in-class" or "superior." Moreover, the Company was forced to purchase a number of vehicles at elevated prices at auction due to its failure to attract consigning partners, which further impacted its GPU and capital risk. These conditions that were already in place at the time the Prospectus was filed, had no signs of disappearing, and continued into 1Q:2021, where CarLotz' GPU fell several hundred dollars short of even its weakest competitor, Shift.

159. The Prospectus also contained a number of materially misleading risk statements. For example, it stated:

> [I]f we are unable to operate our processing centers efficiently, we ***could*** experience delivery delays, a decrease in the quality of our reconditioning services, delays in listing our inventory, additional expenses and loss of potential and existing corporate vehicle sourcing partners and retail sellers and subsequent revenues, which ***may*** materially and adversely affect our business, financial condition and results of operations. (emphasis added).

160. This statement is materially misleading because the situation described was not just a hypothetical risk – it was one that had already materialized. During 4Q:2020, CarLotz ***was*** unable to operate its processing centers efficiently, which ***did*** lead to delays in listing inventory, and ***did*** materially and adversely affect CarLotz' business. Framing the risk as a hypothetical did not properly apprise investors of CarLotz's current state of business.

161. Similarly, the risk statement of the Prospectus also stated:

> In addition to our flat fee pricing model, we enter into alternative fee arrangements with certain of our corporate vehicle sourcing partners, which can include arrangements where we share a percentage of vehicle sale proceeds and/or customer fees with our corporate sourcing partners. ***Under these sharing***

> ***arrangements, our gross profit for a particular unit could be higher or lower than the gross profit per unit we would realize under our flat fee pricing model*** depending on the unit's sale price and fees we are able to charge in connection with the sale. (emphasis added).

162. Once again, Defendants omitted material information which made this statement more than just a hypothetical risk, namely, that CarLotz' largest sourcing partner– from whom it sourced 60% of its inventory for 4Q:2020– had such an alternative fee agreement. Under this agreement CarLotz did not merely share a percentage of fees with the partner, it was responsible for all the refurbishment and shipping costs. Eventually, the vehicles sourced from this partner in 4Q:2020 were sold with "aggressive pricing," which did lead to a lower GPU.

163. Despite the section of the Prospectus devoted to risks (many of which had, as outlined above, already materialized), there were several risks that Defendants did not warn investors about, despite many factors that suggested the risks were imminent. For example, Defendants did not include a risk statement about what would happen if they could not sell the vehicles obtained from their largest sourcing partner within the consignment period. CarLotz paid the shipping and refurbishing expenses on these vehicles, so there was a significant risk that, if the vehicles could not be sold and were returned to the sourcing partner, CarLotz would experience significant losses (which had, in fact, already happened and would continue to happen in subsequent quarters). There was also a risk that, in order to avoid such losses, CarLotz would sell the vehicles at very low prices, which would materially affect CarLotz' GPU (which also already happened and would continue to happen in subsequent quarters). Further, there was a risk that, if CarLotz could not sell the vehicles or sold them at wholesale prices, the sourcing partner would no longer wish to continue the relationship with CarLotz, which happened soon after.

164. These false and misleading statements and omissions misrepresented the nature of CarLotz' business, CarLotz' unit economics, the number of sourcing partners CarLotz worked

with and the nature of its arrangements with these partners, and the effects of the Covid-19 pandemic on the business. These misrepresentations misled investors about the amount of risk inherent in CarLotz' business model.

**G. The January 13, 2021 ICR Presentation**

165. On January 13, 2021, Acamar and CarLotz presented at the 2021 ICR Conference, a conference where public and private company management teams, institutional investors, sell-side research analysts, and media discuss consumer trends. The presentation was moderated by Sharon Zackfia of William Blair, the same analyst that had previously reached out to enquire how to assist in generating investor interest in the merger. In this presentation, Defendant Bor repeated and reasserted many of the misleading statements contained in the Prospectus and the previous investor presentations.

166. For example, Bor stated:

> Ultimately, we have a higher growth rate, ***our GPU (Gross Profit per Unit) is at the top half of the class***, but when combined with our industry leading customer acquisition costs, we end up with a very attractive contribution margin per unit, which is really where we like to focus. (emphasis added).

167. This statement was materially false and misleading. The highest GPU CarLotz had ever achieved was, at best, average for the industry, and the GPU from the last audited financial statement before Defendants made this claim was significantly below that of most of CarLotz' competitors. Moreover, as the Company later revealed in its financial report for 4Q:2020, which ended approximately two weeks before this statement was made, CarLotz's GPU was negatively impacted by the Company's inability to process its inventory, which led to aggressive pricing of its vehicles.

168. Defendant Bor also stated:

> 90% of our inventory is sourced non-competitively, meaning our clients, whether they be the consumer or corporation, bring us vehicles to sell for them. ***60% of those are consigned by a corporation.*** You'll see some logos below. These are banks, fleet management companies, rental businesses, we have an OEM (Original Equipment Manufacturer) that we serve, there are car buying services, floor planning businesses, rental truck businesses and third-party remarketers… ***There's a deep pool of sourcing partners that we pull from***, and it's important to have a wide pool of inventory because frankly, ***any one of these clients, if they were our only client, would have very homogenous inventory***. It's important for us to be able to pick and choose from these clients' pool of inventory to create the greatest inventory mix that will move the fastest. (emphasis added).

The statement was made accompanied by the same slide Bor used in previous investor presentations:




169. This statement was materially false and misleading because, at the time the statement was made, CarLotz sourced 60% of its inventory from one single corporate sourcing partner – the exact "homogenous inventory" situation Defendant Bor told investors that it was "important" for CarLotz to avoid. Moreover, as stated above, CWs indicate that the Company

was having difficulty attracting consignment partners and had already started to purchase vehicles at auction (i.e., competitively), undermining Bor's statements regarding the source of CarLotz' current inventory.

170. Further, Bor stated:

> With our model, where ***a lot of the reconditioning is billed back to our clients***, we're not averse to selling trucks or taking trucks in, because the cost of reconditioning those trucks, for the most part, ***is borne by our clients***. (emphasis added).

171. However, this statement was materially misleading, as CarLotz' agreement with the partner from whom it sourced 60% of its inventory provided that CarLotz – not the partner – would be responsible for reconditioning costs. As the majority of CarLotz' inventory was sourced from this partner at the time this statement was made, the statement that these costs "for the most part" were borne by CarLotz' clients was materially false and misleading

172. When asked about the impact of the Covid-19 pandemic on CarLotz' business, Bor stated:

> For us, Covid was really two stories. There was the sales story, which we were hit pretty dramatically in March, April and May, but one of the things we love about the used vehicle market, is that it is remarkably steady at the consumer demand side… ***The longer term impact to us was what you mentioned, the supply chain***. There were very few vehicles that we could have access to… But, what was happening during that time was ***we picked up some great new accounts***. We had access to a lot more inventory from some of our existing accounts, so what we were able to do by the end of the year, is still meet many of our targets by just picking up a ton of new inventory by Q4. Our inventory which had been around 1,200 to 1,400 in steady state, got down to about 600 or 700 at the low point. We were able to get it to over 2,000 units, and we've been running at above 2,000 units ever since. ***We're seeing very strong demand for our services. We're frankly at full capacity***, and we announced on Monday we're opening in Seattle, we're opening in Orlando very soon, within the next several weeks. Those openings couldn't come any sooner. We have so many vehicles, we've got to spread them out in a broader way. Frankly some of the guest experience, if people are visiting us, is difficult because there's barely a parking space there to find. (emphasis added).

173. The foregoing statement were materially false and misleading, because while Defendant Bor phrased the 4Q:2020 surge of inventory as a positive for CarLotz, the increased intake actually caused a "logjam" such that CarLotz was unable to process all the vehicles in a timely way. Defendants later revealed that the excess inventory was not sent to the new hubs in Seattle and Orlando, it was sold with "aggressive pricing" so CarLotz could avoid taking losses on the refurbishment and shipping costs it had paid.

174. Buoyed by the statements in the Prospectus and the ICR Conference Presentation, LOTZ experienced a very successful first day of trading on January 21, 2021. The stock price rose from $11.35 (on the last day under the symbol ACAM) to $12.30, more than an 8% increase.

### H. The January 22, 2021 CNBC Interview

175. On Friday, January 22, 2021, the day after the merger was complete and Acamar's stock began trading as LOTZ, Defendant Bor was interviewed on CNBC. He stated:

> We are the only consignment-to-retail used car retailer, so what we do is we sell vehicles for people, instead of being a merchant which buys vehicles low and sells them high, so ***we're a service provider to the car seller***, either a consumer car seller or a corporation that has vehicles to sell, and we sell those through our omni-channel platform to used car buyers, the retail public… ***most of our clients are on a flat fee model***, so whether you're selling a $4,500 car or a $90,000 car, our fee is the same. And it is because it's the same amount of work to sell a $4,500 vehicle and a $90,000 vehicle, and we want to offer the same value to every type of car seller. (emphasis added).

176. These statements were materially false and misleading because CarLotz actually had a number of business models, including consignment-to-wholesale, purchased-to-retail, and purchased-to-wholesale. Additionally, Bor omitted to mention that for 4Q:2020, 60% of CarLotz' inventory had come from only one sourcing partner. This partner was not on a flat fee model, rather, it had a profit-sharing arrangement with CarLotz, and the GPU on these units were much lower than in a flat fee arrangement.

177. When the interviewer asked about the long-term effects of the pandemic on CarLotz, Bor replied:

> [S]o one of the things we love about this industry is it actually is remarkably stable, if you go back several decades there are about 40 million used cars that are sold every year… it is actually a very very very stable market. What does change in pricing, but ***because of out flat fee model, pricing doesn't necessarily impact us like it does the rest of the industry*** – so whether we sell a 20,000 car in good times or a 10,000 car when people are struggling a little more, for us, we're providing the same value to the seller, we're providing a great vehicle to the buyer, and ***it really doesn't matter what part of the economic cycle we're in***. (emphasis added).

178. This statement was materially false and misleading because CarLotz was not, in fact, insulated from the "economic cycle." First, as mentioned above, CarLotz had a profit-sharing arrangement with its largest sourcing partner, not a flat fee agreement. Second, the post-pandemic change in pricing did affect CarLotz. As used car prices rose, CarLotz' model became less attractive to its sourcing partners who preferred to sell their vehicles themselves at wholesale, and, indeed, the Company was sourcing 60% of its vehicles from just one partner. Eventually, this partner also paused its relationship with CarLotz, which had to begin sourcing more and more vehicles at auction in order to stock its retail hubs, causing CarLotz' GPU to plummet.

## VII. THE GRADUALLY TRUTH IS REVEALED WHILE DEFENDANTS CONTINUE TO MISLEAD

179. The artificial inflation caused by the CarLotz Defendants' misstatements and omissions was gradually removed from the stock through a series of corrective disclosures.

### A. March 15, 2021

180. On March 15, 2021 CarLotz filed its first Annual Financial Report on Form 10-K as a public company. Since the Company was still Acamar as of the end of the year 2020, details about CarLotz' business (assets, inventory, gross profit, etc.) were not included in the 10-K. However, CarLotz also published a press release on Form 8-K that attached its unaudited

consolidated balance sheets and contained the Company's 4Q:2020 and full year 2020 financial results. The 8-K was signed by Defendant Polak.

181. In this 8-K, CarLotz stated:

> ***[F]or the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners has accounted for over 60% of our vehicles sourced.*** Such concentrations can result from a variety of factors, some of which are beyond our control, and we may elect to source a higher percentage of our vehicles from one or more corporate vehicle sourcing partners for a variety of reasons***. If a corporate vehicle sourcing partner from which we are sourcing a significant portion of our vehicles was to cease or significantly reduce making vehicles available to us, we would likely need to increase our sourcing of vehicles from other vehicle sourcing partners potentially on less favorable terms and conditions***. Such an effort may take a number of months and may not precisely replicate the variety and quality of vehicles that we have been sourcing from a single source. (emphasis added).

182. This statement revealed, for the first time, that CarLotz did not have a purported "deep pool" of corporate consigning partners as Defendants had consistently misrepresented over the previous several months, but rather had only one that accounted for 60% of the Company's total vehicles sourced.

183. However, this statement continued to mislead investors, because it failed to disclose that if CarLotz could not source vehicles from any sourcing partners, it would have to purchase vehicles in order to stock its growing number of retail hubs, and, in fact, had already started to do so according to CWs.

184. Bor revealed that excess inventory CarLotz had obtained from their sourcing partner in 3Q:2020 and 4Q:2020 had "created a log jam that resulted in slower processing and higher days to sell." Defendant Stoltz explained that GPU for 4Q:2020 was "softer than we expected" due to "the surge in inventory during the quarter and the resulting lower retail unit profitability as a result of slower sell-throughs and more vehicles wholesaled." He further elaborated, "we expect the higher than ideal inventory levels that we saw earlier this year in our

existing hubs to impact our first quarter 2021 gross profit and second quarter to a lesser extent, which impacts our full year gross profit and GPU guidance… ***we expect retail GPU of 1,300 to 1,500*** in the [first] quarter." (emphasis added).

185. While the explanation of the log jam partially corrected previous misstatements regarding CarLotz' "record" levels of inventory, Defendants continued to mislead the public. The March 15, 2021 earnings call took place *just two weeks* before the end of the first quarter – thus, the CarLotz Defendants should have had a good idea of what GPU for the quarter would be when Stoltz stated that they expected retail GPU to be between $1,300 and $1,500 for the quarter. However, in the May 10, 2021 earnings call, the CarLotz Defendants revealed that GPU for 1Q:2021 was just $1,182– significantly below even the lowest end of the expectation Defendant Stoltz shared with investors.

186. When the line was opened for questions, analyst Sharon Zackfia of William Blair asked for "a deeper explanation of the inventory hangover," stating she was confused, "given the consignment model as to kind of what happened in the fourth quarter and how that inventory is bleeding into potentially the first quarter and second quarter."

187. Defendant Bor explained:

> As you know we ramped up inventory meaningfully in Q3 and Q4, mostly to enable our strong top line growth, and much of this ramp was with one specific source of inventory that was giving us the opportunity to take large quantities of very attractive vehicles. ***We took we took as much as we could but we overshot the mark in terms of matching our sourcing volume with our capacity, which log jammed our processing centers.*** It took a long time for the inventory to hit our website in retail ready condition, and it left us with a couple key problems. One, the inventory took so long to get on the site that by the time we got leads and could sell it we had dropped the price a couple times, which impacted GPU, and two, ***many of these units aged out per our agreement with our clients and we have to take wholesale losses as we de-listed them in Q1***. (emphasis added).

188. Ms. Zackfia asked "is there any kind of ramifications from what happened with [] the log jam in the fourth quarter to the[] longer term potential with this partner?" Defendant Bor avoided answering the question directly and instead generally stated that CarLotz' partners understood "the ebbs and flows of sales." In conclusion, he stated "we have found that, you know, in great times [our partners] applaud with us and in times when things are a little slower or days to sell slows down they work with us [] to minimize the impact of that on both parties." Defendant Bor did not give any indication that the situation might cause the partner to "pause" its relationship with CarLotz, or that the Company had been buying vehicles aggressively at auction.

189. Seth Basham from Wedbush securities asked for further elaboration regarding CarLotz' plan to ensure inventory issues would be managed better in the future. Defendant Bor responded that CarLotz' clients had different needs in terms of speed of sale. For clients that required the vehicle be sold in 30-45 days, CarLotz priced aggressively out of the gate. For other clients, lift was more important than days to sale. With regards to the accounts CarLotz sourced the surge in inventory from:

> [W]e ultimately really just took too many of their units and, um, not necessarily too many to sell and, you know, if we had unlimited time- we're selling cars like crazy right now so we would have loved to- to have a bunch of those that ultimately timed out, but because they took much, much longer than- than they should have or than they typically do to work through our processing center, um, they ended up not hitting the website till, in some cases, 30-40+ days from when they showed up, and so at that point, uh, we're a little hamstrung on, you know, being able to sell it in- in an amount of time that's acceptable to them. And so, ***ultimately, we have to de-list many more than we wanted to***… there will always be vehicles that, you know, frankly for, you know, reasons that we can't predict, uh, won't sell in a period and our job is to ensure that that happens as little as possible because those really do impact, uh, GP dollars and GPU, um, and so we, you know, we're- that's what we're focused on. (emphasis added).

190. On this news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume. The stock price continued to

decline over the next two consecutive trading sessions by $0.62, or 7.3%, to close at $7.83 per share on March 18, 2021, on unusually heavy trading volume.

191. While these statements partially revealed the true status of CarLotz' business, correcting some of the misstatements and omissions Defendants made in the Prospectus and investor presentations, Defendants still omitted material information, namely, what happened to the de-listed inventory, the potential effect on CarLotz' GPU, and how the situation affected CarLotz' relationship with its largest sourcing partner, and that the Company was purchasing vehicles aggressively at auction, exacerbating the inventory and GPU issues that the Company had experienced in 4Q:2020.

192. Moreover, Defendants materially misrepresented that the situation for the current (1Q:2021) quarter that would end in two weeks on March 31, 2021, saying that "we expect retail GPU of 1,300 to 1,500 in the quarter," roughly in line with 4Q:2020's GPU of $1,546, even though the Company's inventory and sourcing situation had not improved, and in fact, had further deteriorated. In reality, the GPU for 1Q:2021, which was two weeks from close at the time these statements were made on March 15, 2021, was $1,182, far below the lower end of their range. Moreover, the Company misrepresented that conditions were set for driving even further GPU gains to "$1,800-2,000 – again driven by improvements just mentioned that will significantly impact the second half of the year," when no conditions for such improvement existed at the time.

**B. May 10, 2021**

193. On May 10, 2021, CarLotz released its quarterly report on Form 10-Q for the first quarter 2021, ending March 31, 2021. Along with poorer than expected financials across the board, the 10-Q revealed that CarLotz continued to source 60% of its vehicles from one sourcing partner in 1Q:2021, demonstrating that this was not a temporary divergence, but that CarLotz did

not, in fact, have a "deep pool" of sourcing partners. The 10-Q also revealed that CarLotz' retail gross profit per unit was only $1,182, falling far short of CarLotz' March 15 guidance of $1,300-$1,500. The 10-Q did not divulge CarLotz' overall GPU, but it stated that CarLotz took a loss of over $1.1 million on wholesale vehicles, so the figure would have been significantly lower.

194. In an earnings call on the same day, Defendants Bor and Stoltz both confirmed that retail GPU was $1,182 for the quarter. Bor explained that this lower than expected GPU was because CarLotz had sold its excess inventory from 4Q:2020 "with aggressive pricing rather than absorbing, shipping and reconditioning costs on vehicles returned to the client." This had already happened at the time of Defendants' statements on March 15, 2021, setting the market expectation for GPU at $1,300-$1,500.

195. While Stoltz and Bor both expressed belief that GPU would improve in the second quarter, Defendant Bor told Sharon Zackfia of William Blair that CarLotz decided "not to give specific guidance." Karen Short of Barclays Capital asked: "I don't mean to beat a dead horse here, but people care about GPU and you don't want to give us any color on the GPU and the 2Q to date, but I guess I'm wondering if you could give a little cadence on the GPU in during the quarter." Bor responded that CarLotz was "seeing significant improvement in GPU in the month of April." When Ms. Short asked if he would be willing to give a specific number, he stated, "No, I think, we'll just stick with the fact that based on where we are now and what we're seeing we believe the guidance for the full year is achievable." The full year retail GPU guidance was $1,800-$2,000.

196. With regards to sourcing partners, Defendants Bor and Stoltz both confirmed that "sourcing vehicles will continue to be a challenge for the industry and for us." However, Stoltz assured investors that, "We are seeing good progress with our sourcing partners on commitments

they can make to us over the next several months." Defendant Bor also assured investors that access to inventory would not be an issue, stating: "Fortunately for us, we have a lot of levers to pull when it comes to inventory, and so in the addition to the commercial consignments [] we can draw from multiple verticals." These statements were materially false and misleading, as CarLotz' relationship with the source partner that accounted for the majority of the Company's inventory had not improved, but was on the verge of discontinuation. CarLotz stated in the Prospectus that sourcing partners had to give "30 to 90 days' notice" before cancelling their agreements, so CarLotz must have known at the time of the May 10, 2021 Earnings Call that the partner would be cancelling the agreement in the coming days.

197. In the question and answer period, Seth Basham of Wedbush Securities asked why CarLotz took such a large wholesale loss – over $1 million, or about $2,500 per vehicle wholesaled– versus just returning the vehicles to the sourcing partner, as one would expect in a consignment model. Bor responded:

> So, most of that wholesale loss did come from the profit share account that we have. And ***after 90 days, we have to return those vehicles to them and we've put some reconditioning costs and we have shipping costs to give back to them***. And that's where that wholesale loss occurred from. Now, most of that occurred in the months of January and February, and in March, we decided to be ***more aggressive at pricing***, and we were able to clear that aged inventory and also benefit when we sell the unit from some backend profit on being able to finance the units or sell product services. So that helped us improve our total GP dollars, but it did impact our GPU. And that was the reason our GPU is down some in the first quarter. (emphasis added).

198. These statements further revealed that CarLotz' consignment-to-retail business model was not as risk-free or capital efficient as Defendants had claimed, that CarLotz paid the reconditioning costs on the vehicles obtained from its largest sourcing partner, that these vehicles had been sold with "aggressive pricing," and that CarLotz' GPU was not actually "best-in-class."

199. On this news, the Company's stock price fell by $0.94, or about 14%, to close at $5.57 per share on May 11, 2021, on unusually heavy trading volume. The stock price continued to decline by $0.45, or about 8%, to close at just $4.12 per share on May 12, 2021, on unusually heavy trading volume.

**C. May 26, 2021**

200. Finally, on May 26, 2021, before the market opened, CarLotz issued a press release, which it published on its website and filed with the SEC on Form 8-K, titled "CarLotz Provides Update on Profit-Sharing Sourcing Partner Arrangement, Timing of New Hub Openings and Updated 2021 Outlook."

201. In the press release, CarLotz revealed:

> [T]he Company's profit-sharing corporate vehicle sourcing partner informed the Company that, in light of current wholesale market conditions, ***it has paused consignments to the Company***. During the three months ended March 31, 2021, this sourcing partner accounted for more than 60% of the cars sold and sourced and, for the second quarter to date, accounted for less than 50% of the cars sold and approximately 25% of cars sourced. (emphasis added).

Defendant Bor elaborated on this statement, stating:

> The surge in wholesale vehicle prices and the continuing new car chip shortage continues to place limitations on inventory sourcing throughout the industry. This fact, combined with the pause of our profit-sharing account, ***has created challenges in obtaining our expected inventory levels***. (emphasis added).

202. In the same press release, CarLotz decreased its 2021 retail GPU guidance from $1,800-$2,000 to $1,650-$1,850. This is especially relevant, as only 16 days earlier, in the May 10, 2021 10-K and earnings call, Defendants had reaffirmed that they expected to meet their target for 2021.

203. On this news, the Company's stock price fell by $0.70, or 13.4%, to close at $4.51 per share on May 26, 2021, on unusually heavy trading volume.

## VIII. LOSS CAUSATION/ECONOMIC LOSS

204. As alleged herein, during the class period, in a series of investor presentations, the CarLotz Defendants made a number of material misstatements and omissions about their business in order to garner investor support for a merger between CarLotz and Acamar, a SPAC that conducted very limited pre-merger due diligence. The CarLotz Defendants hyped their consignment-to-retail business model, telling investors it was "asset-light" and "capital-efficient," that CarLotz drew inventory from a "deep pool" of sourcing partners, and that the unique model gave CarLotz "best-in-class" unit economics. Additionally, the CarLotz Defendants represented that, overall, the Covid-19 pandemic was a "slight positive" for CarLotz' business, that demand for used cars was on the rise, and that it was experiencing "historically high" levels of inventory. Many of these misrepresentations were repeated and reaffirmed in a Prospectus filed with the SEC on December 30, 2020, in which Acamar solicited votes for the merger. After the companies successfully merged, Defendants Bor, Stoltz, and Polak received lucrative closing bonuses and stock and option grants in the new company.

205. Due to these misstatements and omissions, after the merger, the stock of the new combined entity, LOTZ, opened at $12.30 per share.

206. The truth about CarLotz' business was revealed to the public through a series of corrective disclosures. First, on March 15, 2021, the CarLotz Defendants revealed that, in the fourth quarter of 2020, which ended on December 31, 2020, one day before the Company filed its Prospectus with the SEC, CarLotz had sourced 60% of its vehicles from only one sourcing partner – not the "deep pool" it had touted to investors. Defendants also revealed that CarLotz had not been able to effectively process the "historically high" levels of inventory it had obtained in 4Q:2020. Contrary to being a positive for CarLotz' business, this "log jam" negatively affected

CarLotz' GPU for the quarter, and Defendants expected the effects to be felt in future quarters as well. On this news, the Company's stock price fell $0.79, or 8.5%, to close at $8.45 per share on March 16, 2021, on unusually heavy trading volume.

207. CarLotz did not reveal what ultimately happened to this excess inventory until May 10, 2021. At that time, Defendants admitted that CarLotz had paid costly shipping and refurbishing expenses on the vehicles, and therefore returning them to the sourcing partner – as one would expect in a consignment model – would have cause CarLotz to take a massive loss. Instead, CarLotz sold the vehicles at wholesale or with "aggressive pricing." Once again, this led to a significant drop in GPU. However, Defendants insisted that this slump was only temporary, and they reiterated CarLotz' 2021 GPU guidance. On this news, the Company's stock price fell $0.94, or 14%, to close at $5.57 per share on May 11, 2021, on unusually heavy trading volume.

208. Finally, on May 26, 2021, CarLotz revealed that its main sourcing partner, from whom it had sourced 60% of its inventory in 4Q:2020 and 1Q:2021, had "paused" its relationship with CarLotz. Defendants also lowered CarLotz' GPU guidance for 2021, even though they had affirmed the guidance just a few weeks prior. On this news, the Company's stock price fell by $0.70, or 13.4%, to close at $4.51 per share on May 26, 2021, on unusually heavy trading volume.

209. The timing and magnitude of CarLotz' stock price rise and decline negates any inference that the loss suffered by Plaintiffs and the other Class members was caused by changes in market conditions, macroeconomic or industry factors, or other facts unrelated to Defendants' fraudulent conduct. In fact, an analyst report written by William Blair published on May 26, 2021 directly contributed the drop in stock to the news of the previous few weeks, stating: "CarLotz's shares dropped nearly 18% as investors digested the revision to the 2021 outlook and loss of a key corporate account." As is clear from the questions asked from analysts during the earnings

calls on March 15, 2021 and May 10, 2021, the market was surprised by revelations relating to CarLotz's vehicle sourcing, business model, GPU and inventory issues, that the Company had misrepresented over the Class Period. Indeed, according to CW5, Defendant Bor directly addressed these stock drops with employees during a companywide address, admitting that "investors don't trust us," due in part because of the Company's misrepresentations relating to the source of its vehicles.

210. The economic loss suffered by Plaintiffs and the other members of the Class was a direct result of the CarLotz Defendants' fraudulent statements and omissions. The economic loss, *i.e.*, damages suffered by Plaintiffs and other members of the Class, was a direct result of the CarLotz Defendants' misrepresentations and omissions being revealed to investors, and the subsequent significant decline in the value of the Company's shares was also the direct result of the CarLotz Defendants' prior misstatements and omissions being revealed.

## IX. SCIENTER

211. Each of the CarLotz Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and/or misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents in violation of the federal securities laws.

### A. Defendants had Actual Knowledge that Statements in the Prospectus and Investor Presentations were Misleading at the Time they were Made

212. Throughout the fourth quarter 2020, the CarLotz Defendants made a number of presentations at investor conferences, culminating with the filing of Prospectus on December 30, 2020 (one day before the end of 4Q:2020) and the IRC presentation on January 13, 2021 (after

4Q:2020 had concluded). In the presentations and the Prospectus, the CarLotz Defendants made a number of false and misleading statements, including (but not limited to) that CarLotz had a "deep pool" of sourcing partners, that CarLotz was not responsible for paying refurbishing costs on the vehicles it sourced, and the rise in used car prices due to the Covid-19 pandemic was a "positive" for CarLotz.

213. However, the March 15, 2021 financial statement and investor call later revealed that, during the fourth quarter 2020, the CarLotz Individual Defendants knew:

(a) One sourcing partner provided 60% of inventory CarLotz sourced in 4Q:2020;

(b) CarLotz had paid reconditioning and shipping fees on the inventory it obtained from this sourcing partner;

(c) CarLotz was unable to process this inventory in a timely way, causing a "log jam" of inventory;

(d) Due to the length of time it took to process the inventory and the fees spent on shipping and reconditioning costs, CarLotz would need to sell many of the vehicles wholesale, at a loss;

(e) The macroeconomic situation due to the Covid-19 pandemic was causing wholesale used car prices to rise, so the consignment business model was becoming less attractive to commercial sourcing partners; and

(f) If CarLotz lost its main sourcing partner, it would be forced to source the majority of its vehicles at auction, just like any other used car dealership.

214. However, Defendants' numerous material misrepresentations and omissions in the presentations and the Prospectus directly controverted these facts. Because these facts existed at the time Defendants made their inconsistent public statements, the CarLotz Defendants either knew the statements were false at the time they made them, or made them with such recklessness as to be indifferent to whether they were accurate. Either way, the CarLotz Defendants acted with scienter.

215. Additionally, in the March 15, 2021 Earnings Call, the CarLotz Defendants stated that they expected GPU to be $1,300-$1,500 for 1Q:2021. This call was made only *two weeks* before the end of the quarter. The CarLotz Defendants later revealed that GPU for 1Q:2021 was only $1,182 – far short of even the lower end of the target. The timing of this statement suggests that the CarLotz Individual Defendants had actual knowledge that GPU for the quarter – which was nearly over at the time they made the statement – would fall short of their guidance.

**B. Defendants had Financial Incentives to make False and Misleading Statements**

216. Under the merger agreement with Acamar, CarLotz senior management, including the CarLotz Individual Defendants, were subject to a six-month "lockup" where they were unable to sell any of their new CarLotz common stock. Accordingly, as this six months encompassed the entirety of the post-merger Class Period, the CarLotz Individual Defendants did not have any stock sales during the Class Period.

217. However, the CarLotz Individual Defendants still had significant financial incentive to make false and misleading statements in the time leading up to the completion of the merger, namely, the CarLotz Individual Defendants received large cash bonuses and stock grants upon the closing of the transaction. If the transaction had not closed, these bonuses would have been forfeited.

218. Defendant Bor received a $450,000 cash transaction bonus when the Acamar merger closed – over $100,000 more than his total salary for 2019. Bor and his related entities also received approximately 11.5 million units of stock and options for the new CarLotz entity. Further, as CEO of the newly combined entity, Bor received a raise in his annual salary: from $334,793 to $600,000 per annum.

219. Defendant Stoltz received a $150,000 cash bonus at the close of the Acamar merger, as well as "a number of restricted stock units equal to 574,500 times the excess, if any, of the exercise price of his stock options over $10.00 divided by the option exercise price and a number of stock options equal to 574,500 minus the number of his restricted stock units." According to a Form S-4 "Statement of Changes in Beneficial Ownership" filed with the SEC, Stoltz received 68,333 units of restricted stock and 506,167 stock options (to be exercised before January 21, 2031) on January 21, 2021, the date of the merger.

220. Defendant Polak received a $120,000 cash bonus upon the close of the Acamar merger, as well as "a number of restricted stock units equal to the sum of (i) 344,700 times the excess, if any, of the exercise price of her options over $10.00 divided by the option exercise price and (ii) 86,175, and a number of stock options equal to 344,700 minus the number of restricted stock units described in clause." According to a Form S-4, Polak obtained 208,350 units of restricted stock and 303,700 units of stock options (to be exercised before January 21, 2031) on January 21, 2021.

221. These financial incentives contribute to a strong inference of scienter.

**C. Additional Indicia of Scienter**

222. For small companies such as CarLotz, executives tend to be very hands-on. CarLotz was no different. As one of the original founders of the business, Defendant Bor purported to have "intimate knowledge of CarLotz." This is supported by CW2's statements that he frequently saw Defendant Bor at the office and CW3's statement that Bor visited the Downers Grove hub on several occasions.

223. Additionally, according to the Prospectus, Defendant Stoltz was hired specifically as a step to correct the material weaknesses in CarLotz' pre-merger financial reporting. It would

follow logically that he would have taken special care to ensure CarLotz' financial statements and the earnings calls in which he participated were free from such weaknesses.

224. As explained by Defendant Bor in a CarLotz Press Release dated November 10, 2020, Defendant Polak was hired as Chief Commercial Officer to leverage her prior business experience with wholesale vehicle services to help drive growth for CarLotz's business: "On behalf of the entire CarLotz team, I am delighted to welcome Becca to the team…I've known Becca and admired her work at KAR Global and TradeRev for many years. Her experience as an entrepreneurial business leader with deep knowledge of the used vehicle and remarketing industry[] will be instrumental in driving ongoing growth for CarLotz, as we look toward national expansion and the Company's next phase." Prior to CarLotz, Defendant Polak was President of TradeRev, a vehicle appraisal and auctioning system technology company, which was a subsidiary of ADESA, a wholesale vehicle auction solutions company. ADESA, then owned by KAR Global, a leading provider of used car auction services, was recently purchased by CARVANA. According to the Press Release, Polak worked for KAR Global for over 15 years, but while President of TradeRev, "Polak successfully diversified and enhanced TradeRev's product and service offerings, expanded its market footprint coast-to-coast in the U.S. and Canada and increased revenue per vehicle sold all with a customer-focused approach."

225. The Press Release quotes Defendant Polak describing her role with the Company: "I couldn't be more excited to be joining a pioneering company at such a pivotal moment in its growth trajectory….I look forward to working closely with Mike and the exceptionally talented team at CarLotz, to expanding and scaling the business, and to providing commercial consignors with more value for their vehicles together with a frictionless customer-centric experience."

226. Given Ms. Polak's role in CarLotz's business, which drew on her specific background in wholesale vehicle auctioning, CarLotz's March 15, 2021, statement on Form 8-K signed Ms. Polak, that "[i]f a corporate vehicle sourcing partner from which we are sourcing a significant portion of our vehicles was to cease or significantly reduce making vehicles available to us, we would likely need to increase our sourcing of vehicles from other vehicle sourcing partners potentially on less favorable terms and conditions," could not have been made without at least recklessness, when at that time the Company had already started purchasing vehicles on less favorable terms to restock its hubs.

## X. PSLRA STATUTORY SAFE HARBOR DOES NOT APPLY

227. The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly materially false and misleading statements pleaded in this complaint. First, many of the statements were in regards to present or past events–not forward-looking. Second, many of the specific statements pleaded herein, including but not limited to statements made by Defendant Bor in investor presentations and media appearances, were not identified as "forward-looking statements" when made. To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. The SEC has also suggested that the safe harbor provision of the PSLRA does not apply to statements made in the context of a de-SPAC business combination, just as the provision does not apply to a traditional IPO.[9]

228. Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the CarLotz Defendants are liable for those false forward-

[9] https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws

looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer who knew that those statements were false when made.

## XI. STRICT LIABILITY/NEGLIGENCE CLAIMS UNDER SECTIONS 11, 12, AND 15 OF THE SECURITIES ACT

229. Plaintiffs' Securities Act Claims are based in negligence and do not sound in fraud. Accordingly, Plaintiffs expressly disclaim any allegations that could be construed as alleging fraud or intentional misconduct with respect to Plaintiffs' Securities Act Claims. Any allegations of fraud, fraudulent conduct or motive are specifically disclaimed from the following allegations for the purposes of Plaintiffs' claims under the Securities Act Claims, which do not have scienter, fraudulent intent or motive as required elements. To the extent that these allegations incorporate factual allegations elsewhere in this Complaint, those allegations are incorporated only to the extent that such allegations do not allege fraud, scienter or intent of the Defendants to defraud Plaintiffs or members of the Class.

230. Section 11 of the Securities Act provides a cause of action to any person who acquires a security in reliance on a registration statement which "contain[s] an untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary to make the statements therein not misleading." Securities Act Claims may be brought against any person who signs the registration statement or as well as "every person who was a director of… the issuer at the time of the filing of the part of the registration statement."

231. With regards to business combinations involving SPACs, the SEC has acknowledged:

> [A]ny material misstatement in or omission from an effective Securities Act registration statement as part of a de-SPAC business combination is subject to Securities Act Section 11.[10]

232. The rationale for this, as explained by SEC Director Coates, is that while "an 'IPO' is generally understood to be the *initial* offering of a company's securities to the public, and the SPAC shell company *initially* offers redeemable equity securities to the public when it first registers to raise funds in order to for and later acquire a target[,] … it is also commonly understood that it is the de-SPAC – and not the initial offering by the SPAC – that is the transaction in which a private operating company itself 'goes public,' i.e., engages in its initial public offering." (emphasis in original). Underscoring this view is the idea that "[t]he information, including financial statements, relevant to evaluating the investment changes dramatically in the de-SPAC because the private target has operations unlike the SPAC; and the initial SPAC investors commonly have the right to and do sell or have their shares redeemed." In other words, the SEC's position is to treat "the de-SPAC transaction as the 'real IPO'" for purposes of Section 11, 12, at 15 Claims.

233. Accordingly, where Plaintiff Bailey purchased Acamar common stock on January 7, 2021, after the filing of the Proxy/Prospectus/Registration Statement of December 30, 2020, did not redeem those shares, which became CarLotz shares after the merger was consummated, Plaintiff Bailey's CarLotz shares were purchased pursuant to and/or traceable to the applicable prospectus/registration statement for the "real IPO," which was the de-SPAC transaction.

234. The Securities Act Claims in this Action involve materially misleading statements and omissions contained in the Prospectus/Proxy and Registration Statement, or incorporated therein by reference, or which were filed as amendments or exhibits thereto (collectively the

[10] https://www.sec.gov/news/public-statement/spacs-ipos-liability-risk-under-securities-laws

"Registration Statement"). The Securities Act Defendants, who participated in the preparation, review and dissemination of the Registration Statement and the statements contained therein, and were either signatories of the Registration Statement and/or directors of Acamar, the issuer of the Registration Statement, were responsible for ensuring the information in the Registration Statement was true, accurate and reliable and did not contain any untrue statement of a material fact or omit to include material facts necessary to make the statements contained therein not materially false.

235. As alleged herein at ¶¶ 149-164, the Securities Act Defendants made a series of materially untrue statements and omissions of material facts in the Registration Statement. Those statements were materially false and misleading for the reasons set forth in ¶¶ 149-164. The Securities Act Defendants abdicated their duty to file and distribute to Plaintiffs and the Class a Registration Statement that was not misleading. Accordingly, the Securities Act Defendants violated Sections 11, 12 and 15 of the Securities Act.

236. The false and misleading statements of material fact in the Registration Statement, outlined above in ¶¶ 149-164, included, among other things, that:

- CarLotz operated a low-risk, "asset-light" consignment-to-retail business model;
- Due to this business model, CarLotz had "best-in-class" unit economics;
- CarLotz sourced its vehicles from a "deep pool" of corporate sourcing partners; and
- The effects of the Covid-19 pandemic, which had been ongoing for more than 10 months before the Prospectus was filed, would result in "positive long-term trends" for CarLotz' business, and as a result, CarLotz was "poised to return to industry-leading growth."

237. The Securities Act Defendants' representations were materially false and misleading when made, and omitted material facts, including that:

- For the majority of 4Q:2020 and 1Q:2021, CarLotz sourced 60% of its inventory from only one corporate sourcing partner;
- CarLotz had a profit-sharing agreement with this partner, under which it agreed to pay costly shipping and refurbishment expenses;
- In 4Q:2020, CarLotz took more inventory than it could process, causing a "log jam";
- Slower processing times forced CarLotz to sell the vehicles with "aggressive pricing";
- The increased demand for used cars in the wake of the Covid-19 pandemic made Defendants' business model less attractive to customers, who could get equivalent prices from selling cars at auction without the waiting period inherent in the consignment model.

238. Plaintiff Bailey and the Class members who purchased common stock pursuant and/or traceable to the Registration Statement and have sustained damages as a result. The value of the stock has declined substantially subsequent and due to Defendants' violations. At the time of their purchases, the Class was without knowledge of the facts concerning the wrongful conduct alleged herein.

## XII. THE REGISTRATION STATEMENT OMITTED MATERIAL INFORMATION REQURED TO BE DISCLOSED THEREIN UNDER ITEMS 303 AND 503

239. SEC regulations require that a company's registration statement and prospectus comply with Items 303 and 503 of SEC Regulation S-K (17 C.F.R. §§ 229.303, 229.503).

240. Item 303 requires the disclosure of commitments, demands, events, trends, or uncertainties reasonably likely to affect the registrant's financial condition. More specifically, Item 303 requires the disclosure of: "any known trends or any known demands, commitments, events, or uncertainties that will result in or that are reasonably likely to result in the registrant's liquidity increasing or decreasing in any material way"; "any unusual or infrequent events or transactions or any significant economic changes that materially affected the amount of reported

income from continuing operations and…the extent to which income was so affected"; and "any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

241. Item 503 requires disclosure of "the most significant factors that make the offering speculative or risky." Specifically, Item 503(c) requires the issuer to "[e]xplain how the risk affects the issuer or the securities" and to "[s]et forth each risk factor under a subcaption that adequately describes the risk."

242. As described in detail above, the Registration Statement failed to disclose material facts, trends, uncertainties and risks related to CarLotz's business, including, but not limited to the business arrangement with its one corporate consigning source that represented 60% of the Company's inventory and CarLotz inability to process its inventory position resulting in a "log jam" that was affecting sales and revenues and GPU.

## XIII. CLASS ACTION ALLEGATIONS

243. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class consisting of all persons other than Defendants who purchased publicly traded CarLotz securities during the Class Period, and who were damaged thereby (the "Class"). Excluded from the Class are Defendants, the officers and directors of CarLotz and its subsidiaries, members of the Individual Defendants' immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

244. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, CarLotz securities were actively traded on the

NASDAQ. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds, if not thousands of members in the proposed Class.

245. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

246. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

247. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether the Exchange Act and the Securities Act was violated by Defendants' acts as alleged herein;

(b) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

(c) whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the financial condition and business of the Company;

(d) whether the Defendants caused the Company to issue materially false and misleading filings during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing materially false and misleading filings;

(f) whether the prices of CarLotz securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

248. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

249. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) CarLotz shares met the requirements for listing, and were listed and actively traded on the NASDAQ, an efficient market;

(b) As a public issuer, the Company filed periodic public reports;

(c) CarLotz regularly communicated with public investors via established market communication mechanisms, including through the regular dissemination of press releases via major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(d) CarLotz securities were liquid and traded with moderate to heavy volume during the Class Period; and

(e) The Company was followed by a several securities analysts employed by major brokerage firms who wrote reports that were widely distributed and publicly available.

250. Based on the foregoing, the market for CarLotz securities promptly digested current information regarding the Company from all publicly available sources and reflected such information in the prices of the securities, and Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

251. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State*

*of Utah v. United States*, 406 U.S. 128 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information as detailed above.

## XIV. CLAIMS FOR RELIEF

### COUNT I

### For Violations of §10(b) of the Exchange Act and Rule 10b-5 Promulgated Thereunder Against Defendants CarLotz, Bor, Stoltz, and Polak

252. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

253. During the Class Period, CarLotz, Bor, Stoltz, and Polak (the "Fraud Defendants"), individually and in concert, directly or indirectly, (i) employed devices, schemes, and artifices to defraud; (ii) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for CarLotz securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.

254. The Fraud Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. The Fraud Defendants, by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of CarLotz' allegedly materially misleading statements, and/or their associations with the Company which made them

privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

255. CarLotz Individual Defendants, who are or were the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other CarLotz personnel to members of the investing public, including Plaintiffs and the Class.

256. As a result of the foregoing, the market price of CarLotz securities was artificially inflated during the Class Period. Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of CarLotz securities during the Class Period in purchasing CarLotz securities at prices that were artificially inflated as a result of Defendants' false and misleading statements.

257. Had Plaintiffs and the other members of the Class been aware that the market price of CarLotz' securities had been artificially and falsely inflated by Defendants' misleading statements and by the material adverse information which Defendants did not disclose, they would not have purchased CarLotz' securities at the artificially inflated prices that they did, or at all.

258. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

259. By reason of the foregoing, Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchase of CarLotz' securities during the Class Period.

## COUNT II

### For Violations of §20(a) of the Exchange Act against the CarLotz Individual Defendants

260. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

261. The CarLotz Individual Defendants acted as controlling persons of CarLotz within the meaning of Section 20(a) of the Exchange Act as alleged herein. By virtue of their high-level positions, agency, ownership and contractual rights, and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs contend are false and misleading. The Individual Defendants provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

262. In particular, each of these Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

263. As set forth above, CarLotz, the Individual Defendants each violated Section 10(b), and Rule 10b-5 promulgated thereunder, by their acts and omissions as alleged in this Complaint.

264. By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act. As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

## COUNT III

### For Violation of Section 11 of the Securities Act Against the Securities Act Defendants

265. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except in that this Count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

266. This count is asserted against Defendants Acamar, CarLotz, Bor, and the Acamar Individual Defendants for violations of Section 11 of the Securities Act, 15 U.S.C. § 77k, on behalf of Plaintiffs and all members of the Class who purchased or otherwise acquired CarLotz securities pursuant or traceable to the Registration Statement.

267. CarLotz, formerly Acamar, is the issuer of the stock issued *via* the false Registration Statement. As such, CarLotz is strictly liable for each false and misleading statement contained therein.

268. Defendants Bor, Solorzano, and Torres were signatories to the Registration Statement, and all other Acamar Individual Defendants were Directors of Acamar at the time the Registration Statement was filed. Therefore, each of these Defendants had a duty to make a reasonable investigation into the statements contained in the Registration Statement to ensure that said statements were true and that there was no omission to state any material fact required to be stated in order to make the statements contained therein not misleading. In the exercise of

reasonable care, Defendants should have known of the material misstatements and omissions contained in the Registration Statement. As such, each of these Defendants are liable to Plaintiffs and the Class.

269. Plaintiffs and other members of the Class acquired CarLotz securities without knowledge of the untruths and/or omissions alleged herein. Plaintiffs and the other members of the Class were thus damaged by Defendants' material misstatements and omissions.

270. This action was brought within one year after the discovery of the untrue statements and omissions and within three years of the offering date.

**COUNT IV**

**For Violation of Section 12(a)(2) of the Securities Act
Against CarLotz/Acamar**

271. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except in that this Count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

272. This count is asserted against Defendant Carlotz, formerly Acamar, for violations of Section 12(a)(2) of the Securities Act, 15 U.S.C. § 771.

273. For the purposes of this Count, Plaintiffs do not allege that CarLotz had scienter, which is not an element of a Section 12(a)(2) claim.

274. By means of the defective Prospectus, CarLotz promoted and sold CarLotz common stock to Plaintiffs and the Class.

275. The Prospectus contained untrue statements of material fact, and concealed and failed to disclose material facts, as detailed above. Defendant CarLotz owed Plaintiffs and the other members of the Class who purchased CarLotz securities pursuant to the Prospectus the duty

to make a reasonable and diligent investigation into the statements contained in the Prospectus to ensure that such statements were true and that there was no omission to state a material fact required to be stated in order to make the statements contained therein not misleading. The seller of securities, in the exercise of reasonable care, knew or should have known of the misstatements and omissions contained in the Prospectus as set forth above.

276. Plaintiffs did not know, nor in the exercise of reasonable diligence could have known, of the untruths and omissions contained in the Prospectus at the time Plaintiffs purchased or otherwise acquired CarLotz securities.

277. By reason of the conduct alleged herein, CarLotz violated Section 12(a)(2) of the Securities Act. As a direct and proximate result of such violations, Plaintiffs and the other members of the Class who purchased CarLotz securities pursuant to the Prospectus sustained substantial damages in connection with their purchases of the securities.

278. Plaintiffs and members of the Class hereby tender their securities to the sellers and seek rescission to the extent that they continue to own such securities. Class members who have sold their CarLotz securities seek damages to the extent permitted by law.

**COUNT V**

**For Violation of Section 15 of the Securities Act**
**Against the Individual Securities Act Defendants**

279. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein, except in that this Count is based on negligence and strict liability and does not sound in fraud. Any allegation of fraud or fraudulent conduct and/or motive are expressly excluded from this Count.

280. This count is asserted against the Individual Securities Act Defendants and is based upon Section 15 of the Securities Act. As alleged herein, a primary violation of the

Securities Act occurred, in that Defendants engaged in conduct in violation of Section 11 of the Securities Act.

281. The Individual Securities Act Defendants, by virtue of their offices, directorship, and specific acts were, at the time of the wrongs alleged herein and as set forth herein, Controlling Persons of CarLotz and/or Acamar within the meaning of Section 15 of the Securities Act. Defendants had the power and influence and exercised the same to cause CarLotz to engage in the acts described herein.

282. Plaintiffs and the Class did not know, nor in the exercise of reasonable diligence could have known, of the untrue statements of material fact and omissions of material facts in the Registration Statement when they purchased or acquired CarLotz securities.

283. By virtue of the conduct alleged herein, the Individual Securities Act Defendants are liable for the wrongful conduct alleged herein and are liable to Plaintiffs and the Class for damages.

## XV. PRAYER FOR RELIEF

284. **WHEREFORE**, on behalf of himself and the Class, Plaintiffs pray for relief and judgment as follows:

(a) declaring this action to be a proper class action, designating Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and designating Plaintiffs' counsel as Lead Counsel;

(b) Awarding damages in favor of Plaintiffs and the other members of the Class against all Defendants, jointly and severally, including interest thereon;

(c) Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d) Such other and further relief as the Court may deem just and proper.

## XVI. <u>JURY TRIAL DEMANDED</u>

Plaintiffs hereby demand a trial by jury.

DATED: March 4, 2022

Respectfully Submitted,

**KAHN SWICK & FOTI, LLC**

<u>*/s/ Kim E. Miller*</u>
Kim E. Miller (KM-6996)
250 Park Avenue, 7th Floor
New York, NY 10177
Telephone: (212) 696-3730
Facsimile: (504) 455-1498
E-Mail: kim.miller@ksfcounsel.com

-and-

Lewis S. Kahn
1100 Poydras Street, Suite 3200
New Orleans, LA 70163
Telephone: (504) 455-1400
Facsimile: (504) 455-1498
E-Mail: lewis.kahn@ksfcounsel.com

*Counsel for Lead Plaintiff David Berger,*
*Additional Plaintiff Craig Bailey,*
*and the Class*