UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| IN RE CARLOTZ, INC. SEC. LITIG. | 21-cv-5906 (AS) <br><br> <u>OPINION AND ORDER</u> |

ARUN SUBRAMANIAN, United States District Judge:

Plaintiffs in this securities-fraud class action say that CarLotz and its officers misrepresented the fundamental nature of CarLotz's business, falsely portraying the company as having a unique, asset-light, low-risk, consignment model when it really operated like any other used-car dealership. Some of these allegations are sufficient to state a Rule 10b-5 claim. So the motion to dismiss is granted in part and denied in part. The motion to strike is denied.

## BACKGROUND

### I.    Factual background

Because the facts of this case are detailed extensively in a prior opinion, *see In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d 71, 73–76 (S.D.N.Y. 2023), the Court gives only a brief recap here.

CarLotz is a used-car marketplace. For many years, it was a private corporation, which this opinion refers to as CarLotz Group. Third Am. Compl. ¶ 3, Dkt. 90. But in October 2020, CarLotz Group announced that it had executed a merger agreement with a Special Purpose Acquisition Company (SPAC) called Acamar, which would take CarLotz Group public. ¶ 113. As a SPAC, Acamar was a public company, but it "did not conduct any sort of business itself; its sole purpose was 'effecting a merger … or similar business combination.'" ¶ 3 (alteration in original).

On December 30, 2020, Acamar published a Form 424B3 Prospectus with the Securities and Exchange Commission (SEC), detailing the proposed merger. ¶ 99. About a month later, Acamar shareholders gave the merger the green light. ¶ 101. On January 21, 2021, the merger (also known as a "de-SPAC transaction") was consummated, with CarLotz Group becoming a subsidiary of Acamar. ¶ 4. Upon consummation of the merger, Acamar (the parent company) changed its name to CarLotz, Inc. *Id.*

Between announcement of the merger and its consummation, CarLotz Group and Acamar made various investor presentations that Plaintiffs say were misleading. ¶ 6. In their view, the companies misrepresented fundamental aspects of CarLotz Group's business. *Id.* For example, they described CarLotz Group as the "industry's only consignment-to-retail model," meaning that it was "asset light" and had "limited capital risk." *See, e.g.*, ¶¶ 93, 113, 122, 126, 147. If a car didn't sell within a period set by contract, CarLotz Group could simply return the car to the seller. ¶ 5. They also said that reconditioning costs were passed on to the sellers and that CarLotz Group had a "deep pool" of corporate sourcing partners. *See, e.g.*, ¶¶ 93, 138, 147, 168. CarLotz, Inc. made similar statements after the merger was consummated. *See, e.g.*, ¶¶ 185, 189, 201, 203.

Gradually, the truth came out. On March 15, 2021, CarLotz, Inc. revealed that "for the fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of [its] corporate vehicle sourcing partners has accounted for over 60% of [its] vehicles sourced." ¶¶ 209–10. In other words, CarLotz, Inc. did not have a "deep pool" of corporate sourcing partners but was instead heavily dependent on just one. ¶ 211. The same day, CarLotz, Inc. also revealed that a surge of inventory from this partner had "created a log jam." ¶ 213. As a result, CarLotz, Inc. had to sell more vehicles at wholesale, which was less profitable. *Id.* On this news, the company's stock price tumbled 8.5%. ¶ 219.

Then, on May 10, 2021, CarLotz, Inc. revealed that it was responsible for the reconditioning and shipping costs on cars sourced from the 60% corporate sourcing partner. ¶ 232. CarLotz, Inc. explained that as a result, it made more sense to buy and then resell unsold cars from this partner instead of returning them. *Id.* And because of the logjam, more and more cars were going unsold. *Id.* So in effect, CarLotz, Inc. was operating most of its business not on a unique consignment model but was instead buying and selling cars just like any other used-car dealer. This revelation also showed that CarLotz, Inc. did not have "limited capital risk" or an "asset-light" model. ¶ 233. On this news, the company's stock price fell 14%, and an additional 8% by May 12, 2021. ¶ 234.

Finally, on May 26, 2021, CarLotz, Inc. announced that the 60% partner had "paused" its relationship with the company. ¶ 236. The company's stock price fell 13.4%. ¶ 238.

Plaintiffs, suing on behalf of a putative class, allege violations of both the Securities Act and the Exchange Act. Lead plaintiff David Berger bought shares of CarLotz, Inc. after the merger was consummated. ¶ 26. Craig Bailey, the other named plaintiff, bought shares of Acamar after the registration statement was filed but before the merger was consummated. ¶ 27. The class period is defined as October 22, 2020 (the day the merger was announced) to May 25, 2021 (the day before CarLotz, Inc. announced the partnership's pause). ¶ 2. As defendants for the Exchange Act claims, Plaintiffs name:

- CarLotz, Inc.;
- Acamar;
- Michael W. Bor, Chief Executive Officer (CEO) of CarLotz Group and CarLotz, Inc.;
- Thomas W. Stoltz, Chief Financial Officer (CFO) of CarLotz Group and CarLotz, Inc.;
- Rebecca Polak, Chief Commercial Officer (CCO) and General Counsel of CarLotz Group and CFO of CarLotz, Inc.; and
- Luis Ignacio Solorzano Aizpuru ("Solorzano"), CEO of pre-merger Acamar and board member of CarLotz, Inc.

¶¶ 28–36. As defendants for the Securities Act claims, Plaintiffs name various directors of Acamar. ¶¶ 37–42.

2

## I.   Procedural background

This case is a consolidation of several related actions. The consolidated amended complaint was filed on December 14, 2021, and a second amended complaint was filed on March 4, 2022. Dkts. 47, 54. Defendants then moved to dismiss, and Judge Abrams, to whom this case was previously assigned, granted the motion. *In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d 71, 83 (S.D.N.Y. Mar. 31, 2023). Judge Abrams held that Plaintiffs did not have statutory standing to challenge pre-merger statements about CarLotz Group because they had not purchased shares in CarLotz Group. *In re CarLotz*, 667 F. Supp. 3d at 78–79. Judge Abrams also held that Plaintiffs lacked statutory standing for their Securities Act claims because they failed to allege that their shares could be traced to the challenged registration statement or that they purchased their shares in an initial public offering. *Id.* at 79–83. Judge Abrams did not address the post-merger statements in Plaintiffs' complaint, instead granting them leave to amend. *Id.* at 79.

On May 1, 2023, Plaintiffs filed a third amended complaint. Dkt. 90. Plaintiffs did not amend their Securities Act claims but instead realleged them untouched "for the purpose of preserving their rights on appeal." ¶ 2 n.2. But Plaintiffs made many other amendments—217 paragraphs' worth, by Defendants' count—adding:

- Acamar as a Section 10(b) defendant;
- Solorzano as a Section 10(b) defendant;
- Allegations related to statutory standing;
- Allegations related to scheme liability;
- Alleged misstatements; and
- Scienter allegations.

Defendants moved to strike, arguing that Plaintiffs exceeded the scope of the permitted amendments. Dkt. 98. Defendants also moved to dismiss. Dkt. 95.

On October 9, 2023, CarLotz, Inc. filed for bankruptcy, triggering an automatic stay of this case as it relates to CarLotz, Inc. and Acamar (which the parties agree are now a single entity). Dkt. 106; Dkt. 86 at 1–2. So the saga continues only with respect to the individual defendants. Dkt. 125. Because of the stay, any arguments unique to the liability of CarLotz, Inc. and Acamar are not addressed in this opinion.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). "In making this determination," courts "may consider 'any written instrument attached to [the complaint] as an exhibit or any statements or documents incorporated in it by reference, as well as public disclosure documents required by law to be, and that have been, filed with the SEC, and documents that the plaintiffs either possessed or knew about and upon which they relied in bringing this suit.'" *Id.* (alteration in original) (quoting *Rothman v. Gregor*,

220 F.3d 81, 88 (2d Cir. 2000)). When, as here, the plaintiffs' claims sound in fraud, "the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies, requiring that the circumstances of the alleged fraud be set forth in the complaint with particularity." *Id.* at 183.

## DISCUSSION

Defendants argue that Plaintiffs lack statutory standing under Rule 10b-5 to challenge pre-merger statements and conduct. Defendants also say that Plaintiffs fail to show that any statements or actions were misleading, made with scienter, or caused their losses. And they challenge whether certain individuals were the "makers" of certain statements.

### I.    The motion to strike is denied.

Before getting to the substance of Defendants' arguments, we must make a quick pitstop: Defendants take issue with the scope of Plaintiffs' amendments and move to strike many of the new allegations. Because leave to amend should be "freely give[n]," Fed. R. Civ. P. 15(a)(2), motions to strike are "generally disfavored and should be infrequently granted," *GEOMC Co. v. Calmare Therapeutics, Inc.*, 2016 WL 6122930, at *2 (D. Conn. Oct. 19, 2016), *aff'd*, 918 F.3d 92 (2d Cir. 2019). Motions to strike "will be granted only where there is a strong reason for so doing." *Schoolcraft v. City of New York*, 299 F.R.D. 65, 67 (S.D.N.Y. 2014) (internal quotation marks omitted).

There is no strong reason here. Defendants say that Plaintiffs' amendments exceed the leave they were given by Judge Abrams. That isn't clear, but in any event, Defendants fail to show that permitting the new allegations would prejudice them. *See GEOMC*, 2016 WL 6122930, at *4. These allegations do not materially change the scope of this litigation. And though this case has been pending for several years, it is still in its early stages. *Cf. id.* (finding no prejudice where case had been pending for years but discovery had not been completed). Discovery is stayed. There has been no schedule set beyond the motion to dismiss. So the motion to strike is denied.

### II.    The Court will not reconsider Plaintiffs' Securities Act claims.

As discussed, Plaintiffs' Securities Act claims were previously dismissed "without prejudice, to the extent Plaintiffs can plead any additional facts that would cure the deficiencies identified" in the Court's opinion. *In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d at 83. Plaintiffs did not add facts in the third amended complaint, instead restating their original allegations verbatim with a footnote that they "respectfully allege their Securities Act [c]laims … for the purpose of preserving their rights on appeal." Dkt. 90 at 2 n.2.

However, in one page of their (64-page) brief on the present motion and at oral argument, Plaintiffs urged the Court to reconsider Judge Abrams's dismissal of these claims.[1] The Court declines to do so.

_____

[1] At oral argument, Plaintiffs also raised a recent SEC rule change as a reason to reconsider Judge Abrams's ruling, and the Court allowed the parties to submit supplemental letters on the issue.

First, the time has long passed for Plaintiffs to seek reconsideration of Judge Abrams's order, which issued on March 31, 2023. *See* Local Civ. R. 6.3 (requiring motions for reconsideration to be filed within 14 days). Second, Plaintiffs represented to the Court in the third amended complaint that they realleged these claims for preservation purposes only. Third Am. Compl. ¶ 2 n.2. Reflecting this intent, Plaintiffs did not add factual allegations to bolster these claims, even though Judge Abrams specifically invited them to do so. *In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d at 83. Having made the tactical choice to stand on their prior allegations and having declined to move for reconsideration before Judge Abrams, Plaintiffs have forfeited a fresh review of these claims at this juncture. *See, e.g.*, *United States v. Quintieri*, 306 F.3d 1217, 1225 (2d Cir. 2002) ("[W]hen a court has ruled on an issue, that decision should generally be adhered to by that court in subsequent stages in the same case."). So these claims are dismissed with prejudice.

### III.    Plaintiffs lack statutory standing for the pre-merger statements.

Before this case was reassigned, Judge Abrams also held that under the Second Circuit's decision in *Menora Mivtachim Insurance Ltd. v. Frutarom Industries Ltd.*, 54 F.4th 82 (2d Cir. 2022), Plaintiffs lack statutory standing to challenge pre-merger statements. Judge Abrams reasoned that those statements were explicitly "about" CarLotz Group (the pre-merger target company), and Plaintiffs never bought shares in CarLotz Group. Instead, they bought shares in Acamar and CarLotz, Inc. (the SPAC and post-merger parent company). *In re CarLotz, Inc. Sec. Litig.*, 667 F. Supp. 3d at 78–79. With the third amended complaint, Plaintiffs give additional context and insist that the challenged statements were also "about" Acamar and CarLotz, Inc. But Plaintiffs' arguments are foreclosed by *Frutarom*.

####     A.  Legal background

In the Rule 10b-5 context, what is called "statutory standing" is a matter of neither statute nor standing. It is not a matter of "statute" because there is no express cause of action in either Section 10(b) or Rule 10b-5. *See Blue Chip Stamps v. Manor Drug Stores*, 421 U.S. 723, 748–49 (1975) ("No language in either [Section 10(b) or Rule 10b-5] speaks at all to the contours of a private cause of action for their violation."). And as the Second Circuit has explained, "'statutory standing' … is not a standing issue, but simply a question of whether the particular plaintiff has a cause of action." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (internal quotation marks omitted).

Still, the Supreme Court has said that the concept of statutory standing is relevant in the Rule 10b-5 context. In *Blue Chip Stamps*, a retailer was offered shares in a new corporation but passed on the opportunity. 421 U.S. at 726. When the value of those shares later skyrocketed, the retailer, regretting its choice, sued. *Id.* at 726–27. The retailer claimed that it was misled by

Even if this rule change were relevant to Plaintiffs' standing, it is not retroactive, as Plaintiffs themselves admit in their supplemental letter. Dkt. 141 at 1.

statements made in connection with the offer and would have bought shares had it known the truth. *Id.* at 727. But the Supreme Court held that as a mere offeree, the retailer lacked statutory standing. *Id.* at 755. Plaintiffs in Rule 10b-5 actions are "limited to actual purchasers and sellers of securities." *Id.* at 730.

In coming to this conclusion, the Court relied on the "congressional scheme" reflected in the Securities and Exchange Acts, as well as "practical factors." *Id.* at 733, 749. After all, if mere offerees could sue, the class of potential plaintiffs would be indeterminate, and proof that they relied on a given misstatement would depend entirely on oral testimony. *Id.* at 743, 746–57. With the so-called "purchaser-seller rule," the class of potential plaintiffs is more limited and the proof objective: As evidence that the misstatement mattered, plaintiffs can point to their actual purchase or sale of the security. *Id.* at 747.

Exactly *what* security a plaintiff must have bought or sold is the subject of a line of more recent Second Circuit cases. In *Ontario Public Service Employees Union Pension Trust Fund v. Nortel Networks Corporation*, 369 F.3d 27 (2d Cir. 2004), the plaintiffs, who were shareholders in JDS Uniphase, sued Nortel Networks for false statements Nortel had made about Nortel's financials. *Id.* at 29, 33. The plaintiffs alleged that because of Nortel's misstatements, they bought JDS stock at inflated prices. *Id.* After all, the two companies were related in various ways: Nortel was JDS's biggest customer, and Nortel was set to acquire JDS's laser business in exchange for Nortel stock. *Id.* at 29. The plaintiffs argued that they had statutory standing as JDS shareholders to sue Nortel because they had purchased the securities of a company "affected in some way by [Nortel's] misrepresentation." *Id.* at 32. The Second Circuit rejected this suggestion, though it left open the possibility that shareholders of one company could sue a second company if there was a "much more direct relationship" between the two. *Id.* at 34. While expressing no opinion on the matter, the court in *Nortel* said that a "potential merger might require a different outcome." *Id.*

But the door that *Nortel* left open was closed in *Frutarom*. That case involved a merger between two public companies, IFF and Frutarom. 54 F.4th at 84. In the lead-up to the merger, Frutarom allegedly made "materially misleading statements about its compliance with anti-bribery laws and the sources of its business growth, most of which were incorporated into IFF's Form S-4 Registration statement." *Id.* The plaintiffs, who had purchased IFF securities, sued Frutarom. *Id.* at 84–85. Seizing on *Nortel*'s dictum, they argued that they had statutory standing to sue Frutarom "because there was a sufficiently 'direct relationship' between Frutarom's misstatements about itself and the price of IFF's shares." *Id.* at 86. The court, however, rejected the "direct relationship" test, reasoning that it would trigger a "case-by-case erosion" of the purchaser-seller rule. *Id.* (citation omitted). Instead, the Second Circuit held that "[u]nder the purchaser-seller rule, standing to bring a claim under Section 10(b) is limited to purchasers or sellers of securities about which a misstatement was made." *Id.* at 84. The plaintiffs lacked statutory standing to sue "based on alleged misstatements about Frutarom because they never bought or sold shares of Frutarom." *Id.*

B.  Underline Application

Plaintiffs say that they have statutory standing under *Frutarom* because they purchased the "securities about which a misstatement was made." 54 F.4th at 84. Plaintiffs admit that the statements were explicitly "about" CarLotz Group, a company whose shares they never purchased. *See* Dkt. 101 at 18. But they argue that, read in context, the statements were also "about" the securities of Acamar and CarLotz, Inc., which they did purchase. *Id.* And they point to numerous factual allegations to back that up. For example, they point to the fact that the statements were made after the merger was announced, directed to Acamar shareholders, included in a joint CarLotz Group and Acamar press release, and incorporated into Acamar's own SEC filings with the disclosure that they were "being made in respect of the proposed merger transaction." Third Am. Compl. ¶¶ 6, 112–187; ¶ 114.

The problem is that this is precisely the argument that *Frutarom* foreclosed. Saying that misstatements about CarLotz Group are also "about" the securities of Acamar and CarLotz, Inc. is just another way of saying that there is a "direct relationship" between misstatements about CarLotz Group and the share price of Acamar and CarLotz, Inc. Indeed, the *Frutarom* plaintiffs relied on the same kind of facts to prove that there was a "direct relationship" between misstatements about Frutarom and IFF's share price. There, as here, the plaintiffs emphasized that the challenged statements were made in the lead-up to the merger, incorporated into joint press releases, included in the acquiring company's own SEC filings, and directed and distributed to the acquiring company's shareholders. *See id.* at 87; Brief and Special Appendix for Plaintiffs-Appellants at *4, 8, 13–15, 17, 25–26, *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022) (No. 21-1076). But these facts did "not change the analysis." *Frutarom*, 54 F.4th at 89. Instead, *Frutarom* rejected the notion that statutory standing hinges on a "functional," "fact-oriented" inquiry, warning that such an inquiry would erode the purchaser-seller rule. *See Frutarom*, 54 F.4th at 87 (quoting *Fin. Sec. Assurance, Inc. v. Stephens, Inc.*, 500 F.3d 1276, 1283 (11th Cir. 2007)).

*Frutarom*'s rejection of Plaintiffs' argument is also reflected in its broad holding that "purchasers of a security of an acquiring company *do not have standing* under Section 10(b) to sue the target company for alleged misstatements the target company made about itself prior to the merger." *Id.* at 88 (emphasis added). This holding does not leave open the possibility that the acquiring company's shareholders might have statutory standing to sue for a misstatement "about" the target company under certain circumstances, such as when the misstatement, read in context, was also "about" the acquiring company. As another court has held, "Read as a whole … *Frutarom* concluded that pre-merger statements by an acquisition target 'about itself' are not 'about' the securities of the acquiring company, and as such, purchasers of those securities do not have standing under the purchaser-seller rule." *See* Opinion & Order at 11–17, *Kusnier v. Virgin Galactic Holdings, Inc.*, No. 21 Civ. 3070 (E.D.N.Y Aug. 7, 2023).

It might seem that *Frutarom*'s holding simply doesn't apply here because it addressed statutory standing "to sue *the target company* for alleged misstatements *the target company made about itself.*" *Frutarom*, 54 F.4th at 88 (emphasis added). Here, Plaintiffs are suing the acquiring

company (and various individuals), not the target. And at least some of the misstatements were "made" by the acquiring company, whose shares Plaintiffs did purchase. But *Frutarom* makes clear that the relevant question for statutory standing is not which company plaintiffs are suing or which company made the statement, but which company the statement is "about." *See id.* at 88 ("Plaintiffs may be able to sue entities other than the issuer of a security if those entities made material misstatements about the security, as long as the plaintiffs purchased or sold the securities about which the misstatements were made."); *id.* ("[T]he question is whether the plaintiff bought or sold the securities about which the misstatements were made."). Of course, to be liable under Rule 10b-5, the defendant "must have 'made' the material misstatements." *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 135 (2011). But statutory standing concerns a different question: who is the proper plaintiff, not who is the proper defendant. *See Am. Psychiatric Ass'n.*, 821 F.3d at 359; *see also Frutarom*, 54 F.4th at 87 n.5 (distinguishing "who may *bring suit*" from "who may be *sued* under the statute" (emphasis in original)).[2]

*Frutarom* also didn't indicate that the analysis might be different for SPACs, despite several warnings about how this analysis would play out in that context. At oral argument, the *Frutarom* plaintiffs stressed that precluding them from suing would also preclude SPAC shareholders from suing. Oral Argument at 10:54, 30:17, *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022) (No. 21-1076). If the *Frutarom* majority wanted to clarify that things might be different for SPACs, it could have easily said so. It didn't.

And after *Frutarom* was originally decided, the Second Circuit was given a second chance to make this clarification: a group of securities-law scholars wrote a brief supporting the plaintiffs' petition for rehearing *en banc*, warning that the decision would create an exception to Section 10(b)'s coverage for "important categories of securities, such as SPACs." *See* Brief for Amici Curiae Securities Law Scholars in Support of Plaintiffs-Appellants, *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022) (No. 21-1076) ("*Amici* Br."). Though rehearing *en banc* was denied, the Second Circuit did amend its opinion. But it did not address the SPAC issue. The amended opinion mainly just removed language indicating that statutory standing is limited to purchasers or sellers of securities "issued by the company" about which a misstatement is made. This change appears to have addressed *amici*'s concern that the original opinion would preclude purchasers and sellers of securities like "options and derivatives" from suing because such securities are not "issued by the issuer of the underlying stock." *Amici* Br. at 7–8 ("*Blue Chip* made clear that 'holders of puts, calls, options, and other contractual rights or duties to purchase and sell securities have been recognized as "purchasers" or "sellers" of securities for purposes of Rule 10b-5.'" (quoting *Blue Chip Stamps*, 421 U.S. at 751)).

---

[2] The language in *Frutarom*'s holding about "su[ing] the target company for alleged misstatements the target company made" is better understood to reflect the simple fact that the plaintiffs in that appeal were in fact pursuing claims against just the target company. 54 F.4th at 88.

To be clear, the Court agrees with Plaintiffs that as a practical matter, there are compelling reasons why *Frutarom*'s holding should not be applied in the SPAC context. *See Amicus* Br. at 9–11 ("Foreclosing SPAC investors from bringing Rule 10b-5 actions could have disastrous consequences."); Michael Klausner et al., *A Sober Look at SPACs*, 39 Yale J. Reg. 228, 247 (2022) (explaining how a SPAC sponsor's overwhelming incentive to merge "creates a situation in which the sponsor may be disinclined to be fully forthcoming"). The Court also shares the securities-law scholars' view that *Frutarom* narrows the class of plaintiffs who can sue for Rule 10b-5 violations in a way that is not justified by either the statutory language or Supreme Court precedent. *See Amici* Br. 3–7. But this Court is bound by *Frutarom*. And allowing the pre-merger statements to survive would contravene *Frutarom*'s broad holding. So Plaintiffs' claims are dismissed to the extent that they rely on pre-merger statements.

### IV.   Plaintiffs state a Rule 10b-5(b) claim for many of the statements.

When it comes to the post-merger statements, Defendants concede that there is no statutory standing issue. But they say Plaintiffs' Rule 10b-5(b) claim fails anyway. To state a claim under Rule 10b-5(b), a plaintiff must prove "(1) a material misrepresentation or omission by the defendant; (2) scienter; (3) a connection between the misrepresentation or omission and the purchase or sale of a security; (4) reliance upon the misrepresentation or omission; (5) economic loss; and (6) loss causation." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 267 (2014) (citation omitted). Defendants say the alleged misstatements and omissions were not misleading, were not made with scienter, and did not cause Plaintiffs' losses. For the most part, Defendants' arguments fail.

#### A.  The alleged misstatements and omissions

The alleged misstatements fall into four buckets: misstatements about (1) corporate sourcing partners; (2) reconditioning costs; (3) business model; and (4) unit economics.[3] As detailed below, the Court holds that Plaintiffs have plausibly alleged that most misstatements in most buckets are misleading. In addition, the Court holds that Plaintiffs plausibly allege that Defendants failed to disclose certain required information.

At the outset, the Court acknowledges that CarLotz Group and CarLotz, Inc. did make many relevant disclosures, including disclosures about sourcing concentration and the use of alternative business models.[4] For example, CarLotz Group disclosed in December 2020 that

---

[3] There is one statement about the overall used-car market that doesn't fall neatly into any bucket. Third Am. Compl. ¶ 196. Plaintiffs do not address this statement in their brief nor does the Court see anything misleading about it, so Plaintiffs' claim is also dismissed to the extent that it relies on this statement.

[4] The fact that Defendants rely on disclosures made by CarLotz Group highlights an issue raised by *Frutarom*. Defendants want to have it both ways: they want to avoid liability for any pre-merger misstatements because Plaintiffs didn't buy shares in the pre-merger entity while also using any

"during the nine months ended September 30," it had "sourced 49% of [its] vehicles from three of [its] corporate vehicle sourcing partners." Dkt. 97-16 at 34. However, as explained below, Defendants fail to show disclosure of the precise information that Plaintiffs say was omitted. To follow up on the same example, Defendants do not point to where the company disclosed that it was currently sourcing 60% of its vehicles from just one corporate partner.

As this case moves forward, Defendants can argue that because of these disclosures,[5] any misstatements or omissions were not material. But materiality is a "mixed question of law and fact." *IBEW*, 553 F.3d at 197. A complaint "may not properly be dismissed" on materiality grounds unless the alleged misstatements or omissions "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *Id.* (internal quotation marks omitted). That high standard is not met here.

### i.   Corporate sourcing partners

First, Plaintiffs challenge several statements that describe CarLotz, Inc. as having multiple corporate sourcing partners. *See* Third Am. Compl. ¶¶ 199, 201, 203, 223. Indeed, a reasonable investor could plausibly read one statement to suggest that CarLotz, Inc. had at least sixteen of them. *See* ¶ 199 ("Our corporate vehicle sourcing partners include fleet leasing companies, banks, captive finance companies, rental car companies, third-party remarketers, wholesalers, corporations managing their own fleets and OEMs."). But CarLotz, Inc. had just one, Plaintiffs say. *See, e.g.*, ¶¶ 202, 211. Defendants insist that this allegation is untrue as a matter of fact. Dkt. 126 at 10. But such an argument is premature. *See Lynch v. City of New York*, 952 F.3d 67, 74–75 (2d Cir. 2020). Plaintiffs plausibly allege that CarLotz, Inc. had a single corporate sourcing partner: The company said that 60% of its inventory came from its corporate sourcing partners. Third Am. Compl. ¶ 8. Then, presumably discussing the same period, it disclosed that 60% of its inventory came from a single corporate sourcing partner. ¶ 10; Dkt. 97-25 at 59.

Defendants also counter that it was "obvious that most of the corporate-consigned cars" came from a single corporate partner because CarLotz Group disclosed on an earnings call that it had doubled its vehicle inventory and that most of this surge came from one corporate partner. Dkt. 126 at 10–11. But the conclusion that CarLotz, Inc. had a single corporate partner (or even one main partner) does not "obvious[ly]"—or even necessarily—follow from the statement Defendants have identified. *See Va. Bankshares, Inc. v. Sandberg*, 501 U.S. 1083, 1097 (1991) ("If it would take a financial analyst to spot the tension between the [misleading statement] and the [true one], whatever is misleading will remain materially so, and liability should follow."). So

---

pre-merger disclosures to avoid liability for post-merger misstatements. The Court need not resolve whether they can do so at this juncture because Plaintiffs plausibly allege that the post-merger misstatements were misleading even considering these pre-merger disclosures.

[5] As noted in footnote 3, the Court leaves open the question of whether CarLotz, Inc. can rely on disclosures made by CarLotz Group.

Plaintiffs plausibly allege that the statements describing CarLotz, Inc. as having multiple corporate sourcing partners were misleading.

Plaintiffs, however, try to dump some statements into this bucket that are different in kind and thus require separate treatment. First, Plaintiffs challenge statements about the logjam's effect on sourcing. CarLotz, Inc. revealed on a March 15 earnings call that it had "overshot the mark" on inventory, which "log jammed" its processing centers. ¶ 216. When an analyst followed up to ask whether the logjam would affect CarLotz, Inc.'s relations with its 60% sourcing partner (which the company had disclosed at this point), CFO Stoltz avoided answering, instead saying generally that its partners understood "the ebbs and flows of sales." ¶ 217.[6] In a later call, CEO Bor and Stoltz acknowledged that sourcing inventory was difficult but said that the company was "seeing good progress with [its] sourcing partners on commitments they can make to [CarLotz, Inc.] over the next several months." ¶ 231.

In reality, Plaintiffs say, the logjam had damaged the company's relationship with its 60% sourcing partner and the partnership would soon be put on pause, requiring CarLotz, Inc. to find inventory elsewhere. ¶¶ 217, 231. Plaintiffs plausibly allege that CarLotz, Inc.'s statements were misleading because those statements suggest that the company's relationship with its main corporate sourcing partner was unaffected by the logjam and that the partner had already committed to providing the company with some inventory over the next several months when in fact the opposite was true.

Plaintiffs also challenge several statements Defendants made about the sourcing challenges CarLotz, Inc. faced after the temporary logjam. CarLotz, Inc. warned that if its main corporate sourcing partner reduced its supply, the company would "likely need to increase [its] sourcing of vehicles from other vehicle sourcing partners." Third Am. Compl. ¶ 210. Plaintiffs say that this was misleading because CarLotz, Inc. would also need to buy vehicles at auction—just like any other used-car dealer—and was in fact already doing so. This statement is not misleading. If the statement said that the company wouldn't go the auction route, that would be one thing. But it doesn't say anything about auctions, or even suggest that the only thing the company would do if supply from the 60% partner dried up would be to get vehicles from other partners. And as Defendants point out, CarLotz, Inc. repeatedly disclosed that it purchased (rather than consigned) some vehicles. *See, e.g.*, Dkt. 97-25 at 7 (explaining that consigned vehicles represent 75% of the company's inventory).

---

[6] Plaintiffs also list out a handful of other material facts that were omitted from this call, such as what happened to inventory that was delisted because of the logjam. Third Am. Compl. ¶ 220. Plaintiffs fail to specifically allege why each of these omissions made the information that was disclosed misleading, and there is no general duty to disclose information just because a reasonable investor would want to know it. *See In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993). As such, Plaintiffs' claim is dismissed to the extent it relies on the allegations in this paragraph.

Similarly, CarLotz, Inc. stated that while "sourcing vehicles will continue to be a challenge," the company had "a lot of levers to pull when it comes to inventory." Third Am. Compl. ¶ 231. Plaintiffs say that this statement is misleading because it suggests that sourcing would not be an issue when in fact the company would lose its main corporate sourcing partner just a few weeks later. Dkt. 101 at 54. But this statement does not suggest anything about the company's relationship with its main sourcing partner. Rather, it is a "[g]eneric, indefinite statement[] of corporate optimism," and so not actionable. *Abramson v. Newlink Genetics Corp.*, 965 F.3d 165, 173 (2d Cir. 2020).

### ii.  Reconditioning costs

Plaintiffs next challenge a statement indicating that the costs of reconditioning cars were passed along to the seller. Third Am. Compl. ¶ 201. According to Plaintiffs, CarLotz, Inc. paid these costs under its contract with its one corporate sourcing partner if the car did not sell within a specified period. ¶ 202. Defendants say this statement was not misleading because it referred to the company's "general practices and arrangements or the truck segment, not its arrangement with the [corporate sourcing partner] in particular." Dkt. 96 at 32. But if that partner accounted for 60% of CarLotz, Inc.'s inventory, then it could be misleading to suggest that passing along these costs was the company's general practice. Plus, the statement specifically refers to "reconditioning fees charged to [CarLotz, Inc's] *corporate vehicle sourcing partners*." Third Am. Compl. ¶ 201 (emphasis added). According to Plaintiffs, CarLotz, Inc.'s one corporate sourcing partner did not pay reconditioning fees. ¶ 202.

Defendants also say that this information was disclosed: On a 2020 earnings call, CarLotz Group said that it had "developed an important new relationship with a rapidly growing strategic national account" and that "a unique element of this collaboration is a profit-sharing program that shares the risk and reward of the value we provide." Dkt. 97-13 at 3. And in many of the documents discussing reconditioning costs, CarLotz, Inc. also disclosed that it sometimes used a profit-sharing model. *See, e.g.*, Dkt. 97-25 at 38, 58. Neither of these disclosures mentions that CarLotz, Inc. was on the hook for the reconditioning costs of unsold cars, though. And regardless, because CarLotz, Inc. did not disclose how much of its inventory came from that partner, statements that CarLotz, Inc. passed along reconditioning costs could still be misleading to the reasonable investor. Of course, Plaintiffs will have to show "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the total mix of information made available." *Basic Inc. v. Levinson*, 485 U.S. 224, 231–32 (1998) (internal quotation marks omitted).

### iii.  Business model

Plaintiffs also challenge several statements touting CarLotz, Inc.'s business model. CarLotz, Inc. routinely described itself as being a "consignment-to-retail used vehicle marketplace" and used its "consignment model" and "flat fee" to distinguish itself from traditional dealers that bought cars outright and then resold them. *See* Third Am. Compl. ¶¶ 189, 191, 194, 203, 223. CarLotz, Inc. explained that this model allowed the company to be "asset light," with

"limited capital risk" and insulation from pricing fluctuations. *See, e.g.*, ¶¶ 191, 205. Plaintiffs say this description of CarLotz, Inc.'s business model was misleading in several respects. To start, Plaintiffs say that CarLotz, Inc. did not return unsold vehicles to its corporate sourcing partner (which accounted for the majority of the company's inventory). ¶¶ 204, 229. Instead, CarLotz, Inc. would buy any vehicles from this partner that did not sell within the contractual period. *Id.* This meant that in practice, CarLotz, Inc. operated not on a consignment model but on the traditional model of buying and reselling cars: Though CarLotz, Inc. did not immediately take ownership of the cars it sourced, it did so eventually. ¶ 57. And with car ownership came assets, capital risk, and vulnerability to pricing fluctuations. Plaintiffs also say that CarLotz, Inc.'s statements about its "flat fee" were misleading because the company sourced 60% of its inventory from a partner with whom it had a profit-sharing rather than flat-fee arrangement. ¶ 190.

Defendants counter that it is "black letter law that 'business model' or 'business plan' statements are not actionable unless the company 'stated its intention to adhere exclusively to a particular strategy and then changed its strategy without informing investors.'" Dkt. 96 at 24 (quoting *Friedman v. Endo Int'l PLC*, 2018 WL 446189, at *6 (S.D.N.Y. Jan. 16, 2018), *aff'd sub nom.*, *Steamfitters' Indus. Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494 (2d Cir. 2019)). But that line of cases addresses when a company can be held liable for changing its business strategy without advance warning. *See, e.g.*, *San Leandro Emergency Med. Grp. Profit Sharing Plan v. Philip Morris Cos., Inc.*, 75 F.3d 801, 810 (2d Cir. 1996) (considering whether company "was under a duty to disclose the possibility of the implementation of an alternative pricing strategy"); *Friedman*, 2018 WL 446189, at *6 (finding that rather than mislead investors about its plans for business division, company "clearly signal[ed] that changes … were likely to occur"). Here, Plaintiffs allege that CarLotz, Inc. hyped a specific business model *at the same time* that most of its business was allegedly being conducted pursuant to an entirely different one.

Defendants also argue that CarLotz, Inc. disclosed that it "purchased some portion of its inventory," so a reasonable investor would have known that CarLotz, Inc. did not have a pure consignment-to-retail model. Dkt. 96 at 24–25. But a reasonable investor could still be misled because the complaint plausibly alleges that the majority of CarLotz, Inc.'s business was effectively operating on a traditional buy-and-resell model during the class period. Defendants counter that CarLotz, Inc.'s eventual purchase of some vehicles does not negate the fact that it had a "consignment model." After all, even many purchased vehicles were originally consigned. CarLotz, Inc. bought them only if it couldn't sell them within the contractual period. Still, the Court finds it plausible that the reasonable investor, focusing on the substance, would find these statements misleading.[7] This is especially so considering their context: CarLotz, Inc. explained

---

[7] Indeed, the complaint suggests that at least one financial analyst was misled by CarLotz, Inc.'s depiction of itself as having a consignment model. *See* Third Am. Compl. ¶ 215 (analyst asked why inventory issues from prior quarter were bleeding into current quarter "given the consignment model").

that the consignment model meant that it was "asset-light," had "limited capital risk," and was immune to pricing fluctuations, suggesting that CarLotz, Inc. was operating a consignment model not just in form but in substance. Third Am. Compl. ¶ 205.

### iv.   Unit economics

Plaintiffs next challenge several statements about CarLotz, Inc.'s unit economics. First, they challenge the description of CarLotz, Inc. as having "best-in-class unit economics." Third Am. Compl. ¶ 205. According to Plaintiffs, CarLotz, Inc.'s gross profit per unit (GPU) was best in class neither historically nor when the statement was made. Historically, the company's GPU "was in line with or below that of most of its peers." ¶ 171; *see* ¶ 206. And when this statement was made, things had only gotten worse. ¶ 206. For the first quarter of 2021, CarLotz, Inc.'s GPU "fell several hundred dollars short of even its weakest competitor." ¶ 171. Defendants say that "best-in-class unit economics" is mere puffery. In this context, the Court agrees. Plaintiffs equate "unit economics" with "GPU," but as the complaint itself demonstrates, there are numerous measures of "unit economics." *See* ¶ 132 (displaying measures of "gross profit per unit," "customer acquisition cost per unit," and "contribution margin per unit" on slide discussing "superior unit economics" (capitalization omitted)). Indeed, the same statement referencing "best-in-class unit economics" also references "contribution margin per unit." ¶ 205. It is also unclear how to define CarLotz, Inc.'s "class"; as Plaintiffs themselves allege, the company routinely touted its unique business model. *See, e.g.*, ¶¶ 147, 240. In sum, this is not the sort of "determinate, verifiable" statement on which a reasonable investor would rely. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 183 (2015).

Plaintiffs also challenge several statements CarLotz, Inc. made about its expected GPU. Third Am. Compl. ¶ 213. In an earnings call just two weeks before the end of the first quarter in 2021, CFO Stoltz stated that the company expected GPU for that quarter to be between $1,300 and $1,500. ¶ 214. A reasonable investor would interpret that projection, made by the company's CFO, to have some factual basis. *See Omnicare*, 575 U.S. at 188–89. That is especially so because the company often indicated that it had real-time insight into its GPU. *See, e.g.*, ¶ 214; *see also Omnicare*, 575 U.S. at 190–91 (explaining that whether an opinion statement is misleading "always depends on context"). As such, a reasonable investor would likely think that at the time the CFO made the statement, the GPU for the first quarter to date fell somewhere within that range or close to it. But GPU for the quarter was later revealed to be just $1,182. Third Am. Compl. ¶ 214. Because GPU was likely to be close to its final tally when the statement was made, Plaintiffs plausibly allege that the fact implied by Stoltz's statement (that GPU for the first quarter to date was somewhere close to or between $1,300 to $1,500) was untrue.

Finally, Plaintiffs challenge a March 17 statement about CarLotz, Inc.'s stock price. ¶ 225. When asked why the company's shares had fallen by 8.5% following the company's first earnings call, Bor said it was due to the company's "very aggressive growth strategy" and "additional corporate expenses." ¶ 225. Plaintiffs complain that Bor omitted any mention of the logjam. ¶ 227. But he did refer to the company's aggressive growth strategy, which at least gestures at the difficulties presented by the logjam. And the question posed was about the market's reaction to a

prior earnings call, and not what the company was facing or not facing. Under the circumstances, Bor's alleged failure to dig deeper in responding to the question is not actionable.

> *v.  Items 101, 303, and 503*

Plaintiffs also premise their Rule 10b-5(b) claim on violations of Items 101, 303, and 503 of Regulation S-K. Regulation S-K "imposes disclosure requirements on companies filing SEC-mandated reports," including registration statements. *Stratte-McClure v. Morgan Stanley*, 776 F.3d 94, 103 (2d Cir. 2015); *see* 17 C.F.R. § 229.10. Though the question is currently under review at the Supreme Court, Defendants do not contest that violations of Regulation S-K's requirements can sustain a claim under Section 10(b). *See also Stratte-McClure*, 776 F.3d at 102–03 (holding that "Item 303 imposes the type of duty to speak that can, in appropriate cases, give rise to liability under Section 10(b)").

Item 101 requires disclosure of "[a]ny material changes to a previously disclosed business strategy." 17 C.F.R. § 229.101(a)(1)(i). As discussed, Plaintiffs plausibly allege that the majority of CarLotz, Inc.'s business was not on the consignment-to-retail model it had repeatedly emphasized, suggesting a disclosure was necessary. Because none was made, Plaintiffs plausibly allege an Item 101 violation.

Item 303 requires disclosure of "any known trends or uncertainties that have had or that are reasonably likely to have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." 17 C.F.R. § 229.303(b)(2)(ii). Disclosure is required where the trend or uncertainty is both "[1] presently known to management and [2] reasonably likely to have material effects on the registrant's financial conditions or results of operations." *Litwin v. Blackstone Grp., L.P.*, 634 F.3d 706, 716 (2d Cir. 2011) (alterations in original) (citation omitted). Item 303 requires that Defendants had "actual knowledge" of the trend when it filed the relevant report with the SEC. *Indiana Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 95 (2d Cir. 2016). "It is not enough that [Defendants] should have known of the existing trend, event, or uncertainty." *Id.*

Plaintiffs say that CarLotz, Inc. violated Item 303 by failing to disclose in its February 11, 2021 registration statement that the company was sourcing 60% of its inventory from a single corporate sourcing partner. Defendants say that this is not a trend because it was not long enough: "[A]s of June 30, [2020,] four corporate partners accounted for 51% of cars sold, and as late as November 30, [2020,] two accounted for just over 50%." Dkt. 126 at 17. But this argument backfires. It shows that over the seven months leading up to the February statement, the number of corporate sourcing partners had steadily declined, making plausible the allegation that CarLotz, Inc.'s increasing dependence on fewer partners for much of its inventory was a trend rather than a temporary fluctuation and distinguishing this case from those cited by Defendants. *Cf. Pearlstein v. BlackBerry Ltd.*, 93 F. Supp. 3d 233, 245 (S.D.N.Y. 2015) (finding two- and five-month periods too short to show reportable trend); *Blackmoss Invs. Inv. v. ACA Cap. Holdings, Inc.*, 2010 WL 148617, at *10 (S.D.N.Y. Jan. 14, 2010) (two months not a trend). Plus, CarLotz, Inc. said it "maintain[ed] stable long term relationships" with its "national accounts," which could suggest

that fluctuations in sourcing partners were not the norm. Third Am. Compl. ¶ 203; *cf. Pearlstein*, 93 F. Supp. 3d at 245 (holding that it was "implausible to allege that there was as recognizable trend" given the "pleaded volatility of the smartphone market"). Though Defendants point to evidence indicating that the contrary was true, at this stage, the Court must view the complaint in the light most favorable to Plaintiffs.

Finally, Defendants point out that Item 503 was repealed in 2019 and as such, can't give rise to liability. Dkt. 96 at 57 (citing FAST Act Modernization and Simplification of Regulation S-K, Securities Act Release No. 33-10618 (Mar. 20, 2019), www.sec.gov/rules/final/2019/33-10618.pdf). Plaintiffs don't respond, *see* Dkt. 101 at 34, so they have abandoned any claim premised on an Item 503 violation. *See Willard v. UP Fintech Holding Ltd.*, 527 F. Supp. 3d 609, 619 n.4 (S.D.N.Y. 2021) (deeming plaintiffs to have abandoned any claim premised on an Item 503 violation because they "do not even advert to [Item 503] in their memorandum of law").

### B. The inference of scienter

"To establish liability under § 10(b) and Rule 10b-5, a private plaintiff must prove that the defendant acted with scienter, a mental state embracing intent to deceive, manipulate, or defraud." *Tellabs, Inc. v. Makor Issues & Rts.*, Ltd., 551 U.S. 308, 325 (2007) (internal quotation marks omitted). The complaint must "state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind." 15 U.S.C. § 78u-4(b)(2)(A). To decide whether an inference is "strong," the Court "must consider the complaint in its entirety" and "must take into account plausible opposing inferences." *Tellabs*, 551 U.S. at 322–23. A "complaint will survive … only if a reasonable person would deem the inference of scienter cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

Scienter may be established by showing "either (1) that defendants had the motive and opportunity to commit fraud, or (2) strong circumstantial evidence of conscious misbehavior or recklessness." *ECA, Local 124 IBEW Joint Pension Tr. Of Chi. v. JP Morgan Chase Co.*, 553 F.3d 187, 198 (2d Cir. 2009). The inquiry is holistic; courts must consider "the cumulative effect of the circumstantial allegations of intent together with the pleaded facts relating to motive and opportunity." *In re Hain Celestial Grp., Inc. Sec. Litig.*, 20 F.4th 131, 138 (2d Cir. 2021).

### i. Motive and opportunity

"In order to raise a strong inference of scienter through motive and opportunity to defraud, Plaintiffs must allege that [Defendant companies] or [their] officers benefitted in some concrete and personal way from the purported fraud." *IBEW*, 553 F.3d at 198 (internal quotation marks omitted). "Motives that are common to most corporate officers, such as the desire for the corporation to appear profitable and the desire to keep stock prices high to increase officer compensation, do not constitute 'motive' for purposes of this inquiry." *Id.* "[T]he inquiry is an extremely contextual one." *Id.* at 201 n.6 (internal quotation marks omitted).

There is no dispute that the individual defendants, who were executives at Acamar and CarLotz, Inc., had the opportunity to defraud. *Van Dongen v. Cninsure Inc.*, 951 F. Supp. 457, 468 (S.D.N.Y. 2013) ("The opportunity to commit fraud is generally assumed where the defendant

is a corporation or corporate officer."). The disagreement is whether they had a motive to do so. The Court holds that Plaintiffs have plausibly alleged motive as to some of the Defendants based on their expectation of "concrete and personal" benefits from making sure that Carlotz, Inc.'s stock maintained its value during the six-month lock-up period after the merger. *IBEW*, 553 F.3d at 198.[8]

Start with Solorzano. Solorzano held a beneficial interest in shares that at the time of the merger were valued at tens of millions of dollars. Third Am. Compl. ¶¶ 27, 30; Dkt. 97-17 at 70. If the merger failed, those shares would be worthless. Third Am. Compl. ¶ 82. So Solorzano clearly had a strong incentive to push the merger through. ¶ 278; *see also* Klausner et al., *A Sober Look at SPACs*, *supra*, at 247 (explaining that a SPAC sponsor's incentive to merge is "overwhelming"). Indeed, Plaintiffs allege that there is separate evidence that this pressure created anomalies in the merger process: Acamar did not get a fairness opinion but instead relied solely on its directors' evaluation of CarLotz Group, even drawing scrutiny from the SEC. Third Am. Compl. ¶ 245. Plaintiffs plausibly allege that Solorzano's motive to lie persisted throughout the post-merger period because the lock-up provision meant that he couldn't sell his shares during that time. ¶ 269.

As to the CarLotz defendants, Bor got a $450,000 bonus upon consummation of the merger, doubled his salary, and got about $15.3 million in stock and options. ¶ 271. Rewards of that size might be customary for some corporate executives and thus not evidence of a motive to commit fraud. But relative to Bor's normal compensation, the rewards he got from the merger's consummation were significant. *See IBEW*, 553 F.3d at 201 n.6 (noting that the motive inquiry is "extremely contextual"); *In re Vivendi Universal, S.A.*, 381 F. Supp. 2d at 185 (bonus "amounting to two and [a] half times [the executive's] normal salary" is "concrete and personal benefit"). These benefits were also directly tied to Bor's alleged misstatements because shareholder support for the merger depended on CarLotz Group's ability to present its business model as "unique and differentiated." Third Am. Compl. ¶ 165; *see IBEW*, 553 F.3d at 201 (suggesting that motive allegations could be sufficient where there was a "direct link between the compensation package and the fraudulent statements"); *Sec. & Exch. Comm'n v. Shapiro*, 2018 WL 2561020, at *7 (S.D.N.Y. June 4, 2018) (same). As with Solorzano, Plaintiffs plausibly allege that Bor's motive to lie persisted after the merger because the $15.3 million in stock and options he received couldn't be cashed out during the lock-up period. ¶ 269.

However, the motive allegations related to Stoltz and Polak are weak. Both got stock and options, which were also subject to the lock-up period. Third Am. Compl. ¶¶ 272, 273. But the complaint gives no indication of how much the stock and options were worth or how this compensation measures up to what they would otherwise make. As such, the Court holds that the allegations contribute little to the inference of scienter.

---

[8] Defendants challenge many of the factual allegations on financial motive. *See* Dkt. 126 at 21 (arguing that Solorzano "beneficially owned shares in Acamar (not the Sponsor) and not any founder shares"). Those arguments are premature. *See Lynch*, 952 F.3d at 74–75.

Finally, Defendants argue that Plaintiffs' motive allegations "make no sense" because Defendants disclosed the truth before selling any shares and so did not benefit from the inflated price. Dkt. 96 at 48. As mentioned, Defendants' shares were subject to a six-month lock-up period, meaning that they could not be sold until July, months after Defendants allegedly came clean. Third Am. Compl. ¶ 269. But there is at least some evidence suggesting that Defendants did not come clean willingly. For instance, the key disclosure, that CarLotz, Inc. paid reconditioning costs on vehicles sourced from its corporate sourcing partner, did not come until an analyst directly asked Bor why the company wasn't just returning consigned vehicles to its partners instead of selling them wholesale at a loss. ¶ 232.

And in any event, Defendants might have thought that they could efficiently process and sell their inventory at normal retail prices. It was only because of the unexpected logjam that the inventory went unsold, CarLotz, Inc. had to buy and resell the unsold cars at a loss, and the company's earnings plummeted. In other words, if the logjam hadn't happened, CarLotz, Inc. might have been able to keep up the appearance that it was operating on a unique consignment-to-retail model. "The fact that a gamble—concealing bad news in the hope that it will be overtaken by good news—fails is not inconsistent with its having been a considered, though because of the risk a reckless, gamble." *Makor Issues & Rts., Ltd. v. Tellabs Inc.*, 513 F.3d 702, 710 (7th Cir. 2008). None of this has been proved, but at this stage the Court is required draw all reasonable inferences in Plaintiffs' favor.

### ii. *Conscious misbehavior and recklessness*

Allegations of motive must be analyzed together with those of conscious misbehavior and recklessness. Plaintiffs can show conscious misbehavior and recklessness by alleging that Defendants "knew facts or had access to information suggesting that their public statements were not accurate" or "failed to check information they had a duty to monitor." *IBEW*, 553 F.3d at 199 (internal quotation marks omitted). For Bor and Stoltz, the cumulative effect of these allegations, along with those concerning motive, supports a strong inference of scienter. For Polak, it does not.

Plaintiffs say that Polak had the requisite scienter because she was hired "specifically for her expertise in wholesale vehicle services," which "suggests that she would have intimate knowledge of CarLotz'[s] wholesale business." Dkt. 101 at 49. But "generalized allegations about … Individual Defendants' 'educational backgrounds' and 'extensive experience' in the [relevant] industry do not raise an inference that the Individual Defendants were aware of [the relevant information]." *Bd. of Trustees of City of Ft. Lauderdale Gen. Employees' Ret. Sys. v. Mechel OAO*, 811 F. Supp. 2d 853, 873 (S.D.N.Y. 2011), *aff'd sub nom. Frederick v. Mechel OAO*, 475 F. App'x 353 (2d Cir. 2012). Plaintiffs do not allege that Polak actually had access to relevant information or that she had a duty to monitor such information. So all claims against her are dismissed.

The allegations of conscious misbehavior and recklessness support a strong inference of scienter for Bor and Stoltz for the statements about CarLotz, Inc.'s reconditioning costs, sourcing partners, and business model, as well as the Item 101 violation. Defendants don't dispute that Bor and Stoltz knew that CarLotz, Inc. paid the reconditioning costs for cars sourced from the

company's main corporate partner. *See* Dkt. 96 at 31–32 (arguing that Bor disclosed the arrangement with the partner). So the only question is whether they were aware that such a significant amount of the company's inventory came from that partner (or at least had access to such information). If so, this would show that Bor and Stoltz knew that their statements about the company's many corporate sourcing partners were wrong (or were at least reckless in making these statements). It would also show that Bor and Stoltz knew that their statements about the company's consignment model were wrong (or at least reckless), as there is no dispute that they knew the 60% partner was on a different model. *See* Dkt. 96 at 40 (arguing that Bor disclosed that the company had a profit-sharing arrangement with the corporate sourcing partner).

Plaintiffs plausibly allege that Bor and Stoltz knew or had access to information indicating that a significant part of CarLotz, Inc.'s inventory came from that one corporate partner. Plaintiffs do not make an "unsupported general claim of the existence of confidential company" reports revealing the truth; they support their claim with the company's own statements confirming the existence of such reports. *San Leandro*, 75 F.3d at 812. First, Bor said in an earnings call that this partner "made up the majority of the additional surge of inflow," suggesting that he had access to contemporaneous information about how much of CarLotz, Inc.'s inventory came from this partner. Dkt. 97-13 at 3; *see Gauquie v. Albany Molecular Research, Inc.*, 2016 WL 4007591, at *2 (E.D.N.Y. July 26, 2016) ("Actively communicating with the public about this issue demonstrates defendants' sensitivity to it."). Second, in another earnings call, Bor explained that the company had "built reporting that helps our clients know by vehicle … what is selling well in which of our hubs." Third Am. Compl. ¶ 276; *see also* Dkt. 97-17 at 156 (explaining that company has technology with "real-time performance metrics" which allows the company to "optimize [its] vehicle sourcing by tracking inventory"). In other words, the company had data showing how many vehicles came from each corporate sourcing partner. Confidential Witness 4 also confirmed that CarLotz, Inc. tracked its inventory. Third Am. Compl. ¶ 276.[9]

Defendants protest that Plaintiffs "allege no facts to support the proposition that [1] the information on this [tracker] system contradicted the Challenged Statements or [2] that reports from this system were shown to Defendants at the relevant time." Dkt. 96 at 51. As to the first point, the Court disagrees: The complaint plausibly alleges that the tracker had up-to-date sourcing information, which would show that 60% of the company's inventory was coming from the one partner with which CarLotz, Inc. had an alternative fee arrangement, contradicting the company's representations that it had a flat-fee, consignment model. *See* Third Am. Compl. ¶¶ 276 (explaining that CarLotz had "built reporting that helps our clients know by vehicle, class, year, make, model, mileage band, pricing band what is selling well in which of our hubs"), 210 (revealing that for "the

---

[9] None of the other confidential-witness allegations supports the inference of scienter. These allegations are vague and fail to "show that individual defendants actually possessed the knowledge highlighting the falsity of public statements." *Glaser v. The9, Ltd.*, 772 F. Supp. 2d 573, 591 (S.D.N.Y. 2011).

fourth quarter of 2020 and continuing during the first quarter of 2021 to date, one of our corporate vehicle sourcing partners has accounted for over 60% of our vehicles sourced").

As to the second point, Defendants do not explain why Plaintiffs must allege "that reports from this system were shown to Defendants at the relevant time." Dkt. 96 at 51. After all, "access to information" is sufficient; it would be reckless to tell investors about the company's sourcing without first looking at the company's sourcing data. *Novak*, 216 F.3d at 311. The share of inventory coming from a single sourcing partner was not a trivial detail, but something the company paid close attention to: CarLotz, Inc. emphasized the necessity of having multiple corporate sourcing partners and the risks of losing "a corporate vehicle sourcing partner from which [it was] sourcing a significant portion of [its] vehicles." Third Am. Compl. ¶ 210; *see also* ¶¶ 181 ("[A]ny one of these clients, if they were our only client, would have very homogenous inventory. It's important for us to be able to pick and choose from these clients' pool of inventory ...."), 227 ("[O]ur inventory mix has been less desirable due to … a higher penetration of dealer-owned units acquired through [auctions]." (alteration in original)). CarLotz, Inc. would pay even closer attention to the share of vehicles coming from this partner because it was on a different model than the one that CarLotz, Inc. said was a key differentiator. ¶¶ 74, 138, 147, 155, 189, 191. *Cf. New Orleans Emps. Ret. Sys. v. Celestica, Inc.*, 455 F. App'x 10, 14 (2d Cir. 2011) (explaining that because inventory "was key to measuring [company's] financial performance," company's executives "would have been alert to information concerning increases in the company's unsold inventory, a fact that reinforces the inference of scienter").

In any event, statements made by Bor and Stoltz indicate that they were in fact monitoring contemporaneous statistics about the company's inventory and inventory mix. *See* Third Am. Compl. ¶¶ 12 ("*Today* our inventory … is lower than the peaks we saw earlier this year…." (emphasis added)), 72 ("[W]e've *been running* at above 2,000 units *ever since* … . [O]ur inventories *are at historically high levels*. … [W]e *have* more inventory than we've ever had *by thirty five, forty percent* …" (emphasis added)), 210 ("For the fourth quarter of 2020 and *continuing during the first quarter of 2021 to date*, one of our corporate vehicle partners has accounted for over 60% of our vehicles sourced." (alteration in original) (emphasis added)). That supports a strong inference of scienter.

The "core operations" doctrine also bolsters the inference of scienter here. "The core operations doctrine permits an inference that a company and its senior executives have knowledge of information concerning the core operations of a business," which "include matters critical to the long term viability of the company and events affecting a significant source of income." *Das v. Rio Tinto PLC*, 332 F. Supp. 3d 786, 816 (S.D.N.Y. 2018) (internal quotation marks omitted). Many courts in this district have questioned whether the doctrine survived enactment of the PSLRA. *See Haw. Structural Ironworkers Pension Tr. Fund v. AMC Ent. Holdings, Inc.*, 422 F. Supp. 3d 821, 852 (S.D.N.Y. 2019). But the Second Circuit has indicated in an unpublished opinion that the doctrine "can provide supplemental support for allegations of scienter." *Celestica*, 455 F. App'x at 14 n.3. And many district courts have taken that approach. *Id.*; *see In re Lottery.com, Inc. Sec. Litig.*, 2024 WL 454298, at *33 (S.D.N.Y. Feb. 6, 2024) ("[T]he majority

rule is to consider the core operations allegations to constitute supplementary, but not an independent, means to plead scienter." (citation omitted)).

Sourcing cars was "critical to the long term viability of" CarLotz, Inc. *Rio Tinto*, 332 F. Supp. 3d at 816 (citation omitted); Third Am. Compl. ¶¶ 181, 205. So it is reasonable to infer that both Bor and Stoltz knew that the company was getting a significant portion of its inventory from a single partner. Plus, the consignment-to-retail model was key to distinguishing CarLotz, Inc., as the company repeatedly emphasized. If it is true that CarLotz, Inc. was effectively operating on a completely different model because of its dependence on this partner, its CEO and CFO would likely be aware of that fact.

Plaintiffs also properly allege scienter for the handful of other statements discussed above that are actionable but do not fall neatly into the four buckets. First, Plaintiffs plausibly allege that Bor and Stoltz knew that the logjam had damaged CarLotz, Inc.'s relationship with its main sourcing partner. For one, there was a contractual notice provision. ¶ 231. Defendants counter that the provision required notice for contract termination, not a mere pause. Still, it is plausible to infer from the contractual notice provision, Stoltz's evasion when asked whether the logjam had damaged CarLotz, Inc.'s relationship with that partner, and the comment about progress with sourcing partners' "commitments" that Bor and Stoltz knew at the time of their statements that the logjam had imperiled the company's contract with its main sourcing partner.

Plaintiffs also adequately allege scienter for Stoltz's projection about the company's first-quarter GPU. In a later earnings call, Bor indicated that CarLotz, Inc. had real-time visibility into GPU, stating "We've seen improvement already [in GPU], early in the second quarter," "We've seen pretty significant improvements [in GPU] from the first quarter to the first month of the second quarter," and "we are seeing significant improvement in GPU in the month of April and in the quarter so far." Third Am. Compl. ¶ 214. This is sufficient to support the inference that Stoltz, as CarLotz, Inc.'s CFO, knew what its GPU was for all but two weeks of the quarter when he made this projection.

Finally, Plaintiffs' scienter allegations also suffice for purposes of the Item 303 violation. Plaintiffs plausibly allege that Bor and Stoltz had "actual knowledge" that the company's reliance on one main sourcing partner was a trend and that this trend was reasonably likely to have material effects on the company's bottom line. *SAIC*, 818 F.3d at 95; *see Litwin*, 634 F.3d at 716. As explained above, Bor and Stoltz had real-time visibility into the company's sourcing concentration and at the time of the registration statement, concentration had been increasing steadily for months, with one corporate partner accounting for 60% of the company's inventory in the fourth quarter of 2020 and continuing into the first quarter of 2021. Bor and Stoltz also knew that increasing concentration was "reasonably likely" to affect the company's financials. 17 C.F.R. § 229.303(b)(2)(ii). After all, the registration statement that omitted the disclosure about increasing concentration also stated that increasing concentration could require sourcing vehicles "on less favorable terms and conditions." Dkt. 97-25 at 42; *see* Third Am. Compl. ¶ 181 (explaining that it's "important to have a wide pool of inventory").

In sum, the Court holds that the inference of scienter as to Solorzano, Bor, and Stoltz is "cogent and at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 441 U.S. at 324. For Solorzano, the motive allegations support a strong inference of scienter. And for Bor and Stoltz, the cumulative effect of the motive allegations and the allegations of conscious misbehavior and recklessness supports a strong inference of scienter.

### C. Loss causation

Plaintiffs also plausibly allege loss causation. "Loss causation is the causal link between the alleged misconduct and the economic harm ultimately suffered by the plaintiff." *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161, 172 (2d Cir. 2005) (internal quotation marks omitted). To show loss causation, plaintiffs must allege that "the misstatement or omission concealed something from the market that, when disclosed, negatively affected the value of the security." *Id.* at 173. "Of course, if the loss was caused by an intervening event, … the chain of causation will not have been established. But such is a matter of proof at trial and not to be decided on a Rule 12(b)(6) motion to dismiss." *Emergent Cap. Inv. Mgmt., LLC v. Stonepath Grp., Inc.*, 343 F.3d 189, 197 (2d Cir. 2003); *see Abramson v. NewLink Genetics Corp.*, 965 F.3d 165, 180 (2d Cir. 2020) (at pleading stage, "conclusive proof of the causal link between the fraud and Plaintiffs' loss" is "not require[d]" (internal quotation marks omitted)).

Plaintiffs point to three relevant corrective disclosures that caused their shares' value to drop. First, on March 15, 2021, CarLotz, Inc. announced (among other things) that 60% of its inventory came from one corporate vehicle sourcing partner. Third Am. Compl. ¶ 210. On this news, CarLotz, Inc.'s stock dropped 8.5%. ¶ 219. This shows loss causation for the statements about CarLotz, Inc.'s sourcing partners and the Item 303 violation.

Second, on a May 10, 2021 earnings call, when asked why CarLotz, Inc. took losses on the vehicles it sold instead of returning them to its sourcing partner, CarLotz, Inc. revealed that it was paying the reconditioning and shipping costs on those vehicles. ¶ 232. CarLotz, Inc. also revealed that its GPU for the first quarter was only $1,182, which was short of the range the company had projected. ¶ 229. Right after, CarLotz, Inc.'s stock dropped 14%. ¶ 234. This shows loss causation for the claims premised on reconditioning costs, CarLotz, Inc.'s business model, the Item 101 violation, and CarLotz, Inc.'s first-quarter GPU. Considering the earlier disclosure about the amount of CarLotz, Inc.'s inventory that came from the one sourcing partner, the disclosure about reconditioning and shipping costs plausibly revealed that CarLotz, Inc.'s business model was not truly consignment-to-retail.

Finally, on May 26, 2021, CarLotz, Inc. revealed that its one corporate sourcing partner had "paused" its relationship. ¶ 236. On this news, CarLotz, Inc.'s stock fell 13.4%. ¶ 238. This shows loss causation for the statements concerning CarLotz, Inc.'s relationship with its main sourcing partner.

In response, Defendants largely repeat their argument that this information was already disclosed, but those arguments fail for the reasons given above: Defendants fail to show where the company disclosed the precise information that Plaintiffs say was missing.

### D.  Maker

Finally, for liability to attach under Rule 10b-5, "a defendant must have 'made' the allegedly material misstatements," meaning that the defendant had "ultimate authority over the statement, including its content and whether and how to communicate it." *Xu v. Gridsum Holding Inc.*, 624 F. Supp. 3d 352, 359 (S.D.N.Y. 2022) (quoting *Janus Cap. Grp., Inc. v. First Derivative Traders*, 564 U.S. 134, 141 (2011)). Defendants' arguments focus on Polak (who is out of the case) and Solorzano as to a pre-merger 8-K (which is out of the case). The Court need not address the maker issue as to these Defendants.

Beyond this, the parties did not brief the issue of which individual defendants "made" which misstatements. As such, this opinion should not be read to suggest anything about maker status beyond what is noted here. This opinion often refers to "CarLotz, Inc." as having made the misstatements as a shorthand. The parties will have to sort out the "maker" issue as this case goes forward.

## V.   Plaintiffs' Section 20(a) claim for control-person liability survives against Bor.

The third amended complaint also alleges claims for control-person liability under Section 20(a) of the Exchange Act. Third Am. Compl. ¶¶ 325–329, 344–348.

To establish control-person liability under Section 20(a), "a plaintiff must show (1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable person in the controlled person's fraud." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 108 (2d Cir. 2007). Defendants say that there is no control-person liability because the complaint fails to plead a primary violation. That argument fails because, as discussed above, Plaintiffs sufficiently allege violations of Rule 10b-5(b). Defendants also say that, regardless, the Section 20(a) claims against Polak, Stoltz, and Solorzano must be dismissed because the complaint fails to plead control or culpable participation, both of which are required. Dkt. 96 at 64. Plaintiffs fail to respond to that argument, instead writing that "Defendants' only argument for dismissal of the Section 20(a) claims is lack of a primary violation." Dkt. 101 at 63. "In the Second Circuit, a plaintiff's failure to respond to contentions raised in a motion to dismiss constitutes an abandonment of those claims and necessitates dismissal." *Maroney v. Woodstream Corp.*, 2023 WL 6318226, at *10 (S.D.N.Y. Sept. 28, 2023) (cleaned up). As such, Plaintiffs' control-person claims against Polak, Stoltz, and Solorzano are abandoned. Thus, only the Section 20(a) claim against Bor survives, as Defendants do not contest his control or culpable participation.

## VI.   The Court denies without prejudice Defendants' motion as to the scheme-liability claim.

One issue remains. In their briefing, the parties focused almost entirely on the Rule 10b-5(b) claims, and not Plaintiffs' scheme liability claim under Rule 10b-5(a) and (c). Defendants spent about three pages on this claim, while Plaintiffs spent just about one (amidst over 150 pages of briefing in total). That is insufficient, especially given the novel issues presented by the claim,

as the Court addressed with the parties at oral argument. Based on the parties' mutual failure to pay much attention to this claim, the Court would be within its discretion to go either way—either let the claim proceed to discovery, or alternatively to spike it now. However, the Court would prefer to address the viability of this claim on the merits. For that reason, the Court will permit Defendants to file a motion to dismiss focused solely on the Plaintiffs' scheme liability claim by April 10, 2024. Plaintiffs may have until April 24, 2024, to file a response, and any reply is due by May 1, 2024. Opening briefs are limited to 15 pages per side. The reply is limited to 5 pages. The parties should be sure to address *Frutarom*'s application to this claim and whether any of the conduct here counts as dissemination under *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47 (2d Cir. 2022) and *Lorenzo v. Sec. & Exch. Comm'n*, 139 S. Ct. 1094 (2019). If Plaintiffs elect to withdraw this claim, then in lieu of further motion practice, the Court will promptly schedule a conference to address discovery.

## CONCLUSION

For these reasons, the motion to dismiss is GRANTED IN PART AND DENIED IN PART. The motion is granted with respect to (1) claims based on the pre-merger statements; (2) claims against Polak; (3) claims based on paragraphs 196, 205 (to the extent the paragraph references "best-in-class unit economics"), 210, 220, 225, 227, and 231 of the third amended complaint; (4) claims based on Item 503; and (5) control-person liability claims against Stoltz and Solorzano. The motion is otherwise denied.

The Clerk of Court is directed to terminate Dkts. 95 and 98 and to terminate Defendant Polak from the docket.

SO ORDERED.

Dated: March 29, 2024
New York, New York

ARUN SUBRAMANIAN
United States District Judge