UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

IN RE CARLOTZ, INC. SEC. LITIG.

21-cv-5906 (AS)

OPINION AND ORDER

ARUN SUBRAMANIAN, United States District Judge:

Defendants move to dismiss Plaintiffs' scheme-liability claim. Because Plaintiffs fail to allege any deceptive acts with the requisite particularity, the motion is GRANTED.

## BACKGROUND

This case arises from allegedly fraudulent statements and conduct surrounding a merger between a used car dealership, CarLotz Group,[1] and a Special Purpose Acquisition Company (SPAC), Acamar. On March 29, 2024, the Court granted in part and denied in part Defendants' motion to dismiss the third amended complaint. *In re CarLotz*, 2024 WL 1348749 (S.D.N.Y. Mar. 29, 2024). The Court granted the motion with respect to all premerger statements, explaining that because Plaintiffs did not purchase stock in CarLotz Group, they lack statutory standing to sue for those statements under *Menora Mivtachim Ins. Ltd. v. Frutarom Indus. Ltd.*, 54 F.4th 82 (2d Cir. 2022). But the Court denied the motion insofar as it concerned many of the allegedly fraudulent statements made after the merger was consummated.

The Court left one issue undecided. The third amended complaint alleged a so-called scheme-liability claim pursuant to Rule 10b-5(b)'s lesser-known siblings, Rule 10b-5(a) and (c). Because the parties had devoted almost all their briefing to the Rule 10b-5(b) claim,[2] the Court denied the motion to dismiss the scheme-liability claim but gave the parties an opportunity to further brief the matter, which they have now done.

Plaintiffs say that Defendants "engaged in a scheme … to defraud the market about [CarLotz Group's] business in order to effectuate the merger between CarLotz and Acamar." Third Am. Compl. ¶ 239, Dkt. 90. They say the scheme "involved using the SPAC vehicle to avoid the type of due diligence, disclosure, and regulatory scrutiny that would accompany a traditional IPO." *Id.* It also involved "disseminating fraudulent statements at numerous investor conferences …, and

---

[1] As explained in this Court's prior opinion, the Court uses "CarLotz Group" to refer to the premerger private company and "CarLotz, Inc." to refer to the post-merger company. When the allegations relate to both the premerger private company and the post-merger company, the Court uses "CarLotz."

[2] As Defendants point out, Plaintiffs have treated the scheme-liability claim as an afterthought. Defendants moved to dismiss the claim in their motion to dismiss the second amended complaint, and Plaintiffs never responded to the argument, seemingly abandoning the claim. In the third amended complaint, Plaintiffs tried to shore up their scheme-liability allegations (despite having never moved to amend the complaint on that ground nor having been granted leave to do so in the Court's March 31 order).

subsequently filing transcripts of these presentations and copies of the accompanying slide decks with the SEC," conducting limited due diligence on CarLotz Group, operating CarLotz with a "vastly unqualified" team, and opening new stores to make CarLotz, Inc. seem more successful than it was. ¶¶ 240–56. Defendants move to dismiss, arguing that Plaintiffs lack statutory standing to sue for premerger conduct and that, in any event, they fail to state a scheme-liability claim.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 179 (2d Cir. 2014) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)). Where, as here, the claim sounds in fraud, "the heightened pleading standard of Federal Rule of Civil Procedure 9(b) applies, requiring that the circumstances of the alleged fraud be set forth in the complaint with particularity." *Id.* at 183.

## DISCUSSION

At the outset, Defendants argue that Plaintiffs lack statutory standing under *Frutarom* because they did not purchase the securities "about which" the alleged scheme to defraud related. Plaintiffs dispute that *Frutarom* applies in the scheme-liability context, and they argue that even if it does, the conduct here was in fact "about" the securities of Acamar and CarLotz, Inc., which they did purchase. This Court has already noted its criticism of *Frutarom* and hesitates to expand that rule to contexts in which it does not clearly apply. *In re CarLotz*, 2024 WL 1348749, at *7.[3] However, the question of whether *Frutarom* applies in the scheme-liability context need not be resolved at this time given the other pleading failures, as "statutory standing in fact is not a standing issue, but simply a question of whether the particular plaintiff has a cause of action under the statute." *Am. Psychiatric Ass'n v. Anthem Health Plans, Inc.*, 821 F.3d 352, 359 (2d Cir. 2016) (internal quotation marks omitted).

"To state a scheme liability claim, a plaintiff must show: (1) that the defendant committed a deceptive or manipulative act, (2) in furtherance of the alleged scheme to defraud, (3) with scienter, and (4) reliance." *Plumber & Steamfitters Loc. 773 Pension Fund v. Danske Bank A/S*, 11 F.4th 90, 105 (2d Cir. 2021) (internal quotation marks omitted). And because Rule 9(b) applies, "a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." *Id.* (internal quotation marks omitted). Plaintiffs fail to plausibly allege a deceptive act with the requisite specificity. So their scheme-liability claim is dismissed.

---

[3] Applying the *Frutarom* rule in the scheme-liability context makes even less sense than applying it in the misstatement context. The main justification for that rule was the need to avoid a "fact-oriented" inquiry. *Frutarom*, 54 F.4th at 87 (citation omitted). This justification is a bad fit for claims that don't involve statements. Whereas statements can expressly set out which company they are "about," conduct does not expressly communicate its object. So determining which company fraudulent conduct is "about" will always require a fact-oriented inquiry.

### I. Plaintiffs fail to allege dissemination with particularity.

It's clear that dissemination of misleading statements can count as a deceptive act for purposes of scheme liability. *Sec. & Exch. Comm'n v. Rio Tinto plc*, 41 F.4th 47, 49 (2d Cir. 2022). So the Court will first consider whether any of the alleged conduct qualifies as such. Plaintiffs say that Defendants disseminated misleading statements by (1) attending investor conferences and (2) filing transcripts of those conferences with the SEC. Third. Am. Compl. ¶ 242.[4]

The Second Circuit's first significant discussion of dissemination is in *Lentell v. Merrill Lynch & Co.*, 396 F.3d 161 (2d Cir. 2005). The plaintiffs alleged that Merrill Lynch & Co., through its research analysts, issued false and misleading reports recommending certain investments. *Id.* at 164. According to the complaint, Merrill Lynch and its analysts did not actually think those investments were sound but issued the "falsely optimistic recommendations to cultivate the Firm's investment-banking clients." *Id.* The scheme had five elements: (1) issuing false, bullish research reports, (2) publishing false recommendations, (3) setting unrealistic price targets for the companies' stocks, (4) signing undisclosed agreements with the companies to trade favorable analyst reports for investment-banking business, and (5) sharing investment-banking fees among Merrill Lynch and its analysts. *Id.* at 165–66.

The Second Circuit affirmed the district court's dismissal of the complaint. *Id.* at 167. As relevant here, the Court explained that plaintiffs erred in casting their claims "in terms of market manipulation, pursuant to Rule 10b-5(a) and (c)." *Id.* at 177. Although the plaintiffs framed the scheme as having five separate elements—from publishing false recommendations to sharing investment-banking fees—the Court apparently thought that none of these actions was distinct from the misstatements. And "where the sole basis for [scheme-liability] claims is alleged misrepresentations or omissions, plaintiffs have not made out a market manipulation claim under Rule 10b-5(a) and (c), and remain subject to the heightened pleading requirements of the PSLRA." *Id.*

But fourteen years later, a Supreme Court opinion cast doubt as to whether *Lentell* remained good law. *Lorenzo v. Sec. & Exch. Comm'n*, 587 U.S. 71, 75 (2019). A director at an investment bank, Lorenzo, sent two emails to prospective investors at the direction of his boss, who also supplied the emails' content. *Id.* The emails advertised an investment in a company with $10 million in "confirmed assets." *Id.* Lorenzo knew that the company's assets were actually worth much less but sent the emails anyway. *Id.* The lower court held that Lorenzo was not the statements' "maker" under *Janus Capital Group, Inc. v. First Derivative Traders*, 564 U.S. 135 (2011), because he did not have ultimate authority over the emails' content or whether and how to communicate it. *Lorenzo*, 587 U.S. at 76. But it held that Lorenzo had violated Rule 10b-5(a) and (c) by knowingly disseminating false information to potential investors. *Id.* at 77. The Supreme Court agreed that Rule 10b-5(a) and (c) had been violated, observing that those subsections

---

[4] In their opposition brief, Plaintiffs also say that Defendants disseminated information by publishing the materials from these conferences on their websites. This allegation is not in the complaint and will not be considered. *See Cambridge Cap. LLC v. Ruby Has LLC*, 565 F. Supp. 3d 420, 453 n.11 (S.D.N.Y. 2021).

3

"capture a wide range of conduct" and are "sufficiently broad to include within their scope the dissemination of false or misleading information with the intent to defraud." *Id.* at 78–79. In so holding, the Supreme Court rejected the "idea that each subsection of Rule 10b-5 governs a separate type of conduct." *Id.* at 81.

In the aftermath of *Lorenzo*, it was unclear whether *Lentell* remained good law. *Lorenzo* could be read to suggest that, contrary to *Lentell*, misstatements and omissions alone could give rise to scheme liability: after all, the only "conduct" at issue was sending an email containing misstatements and omissions. But in *Rio Tinto*, the Second Circuit resolved the uncertainty, holding that *Lentell* remains good law and that "misstatements and omissions can form part of a scheme liability claim, but an actionable scheme liability claim also requires something beyond misstatements and omissions, such as dissemination." *Rio Tinto*, 41 F.4th at 49. The Court distinguished *Lorenzo* and *Lentell* by explaining that because Lorenzo himself "did not make the false statement," his action in emailing the statement was distinct from making a misstatement. *Id.* at 53.

The Second Circuit gave three reasons for requiring something beyond misstatements and omissions. First, "[w]ere misstatements and omissions alone sufficient to constitute a scheme, the scheme subsections would swallow the misstatement subsections." *Id.* at 54. Second, "[p]reserving distinctions between the subsections also assures that private plaintiffs remain subject to the heightened pleading requirements for Rule 10b-5(b) claims." *Id.* Whereas the PSLRA "requires a complaint alleging misstatements or omissions to 'specify each statement alleged to have been misleading, [and] the reason or reasons why the statement is misleading,' … claims brought under Rule 10b-5(a) and (c) need not." *Id.* at 55 (alteration in original) (quoting 15 U.S.C. § 78u-4(b)(1)). Allowing misstatement claims to be repackaged as scheme claims would allow plaintiffs to "evade the pleading requirements imposed in misrepresentation cases." *Id.* (citation omitted). And finally, the Second Circuit pointed out that collapsing the distinction between the subsections "would muddle primary and secondary liability." *Id.* The Second Circuit did not address whether the conduct alleged in that case went "beyond" misstatements and omissions. *Id.* at 53.

So as things currently stand, dissemination includes knowingly sending false statements made by another person to prospective investors. *See Lorenzo*, 587 U.S. at 75–76. But it does not include sending one's own false statements to prospective investors. *See Rio Tinto*, 41 F.4th at 49; *In re Turquoise Hill Res. Ltd. Sec. Litig.*, 625 F. Supp. 3d 164, 248–49 (S.D.N.Y. 2022) ("Where the only fraudulent conduct that is alleged is the making of a false statement to the investing public, a defendant in a private civil action is either liable as a maker under Rule 10b–5(b) or is not liable to investors at all.").

As to the allegations in this case, it is not clear how attending a conference counts as dissemination. The mere act of sitting in a hotel ballroom does not itself "transmi[t]" any information. *Rio Tinto*, 41 F.4th at 53. To the extent Plaintiffs seek to hold Defendants liable for what they themselves said at those conferences, *Rio Tinto* makes clear that making misstatements alone does not give rise to scheme liability.

4

For a similar reason, Plaintiffs' attempt to root their scheme-liability claim in the SEC filings fails. In their brief, Plaintiffs argue that Solorzano disseminated false statements by filing conference transcripts with the SEC. But Solorzano himself appears to have made some of the statements therein, *see, e.g.*, Third Am. Compl. ¶¶ 101, 112–113, 118, 120, 122, and under *Rio Tinto*, sending one's own false statements to prospective investors is not dissemination, 41 F.4th at 49. The complaint does not identify which SEC filings count as "deceptive or manipulative *acts*" rather than as mere misstatements, when those filings occurred, and who was responsible for them. *Cf. Plumber & Steamfitters Loc. 773*, 11 F.4th at 105 ("To maintain a 10b–5(a) or (c) claim, a plaintiff must specify what deceptive or manipulative acts were performed, which defendants performed them, when the acts were performed, and the effect the scheme had on investors in the securities at issue." (internal quotation marks omitted)).

Instead, the complaint alleges generally that Acamar, CarLotz Group, and the Exchange Act Individual Defendants made "fraudulent statements at numerous investor conferences in the months leading up to the merger, and subsequently [filed] transcripts of these presentations and copies of the accompanying slide decks with the SEC." Third Am. Compl. ¶ 242. Plaintiffs leave it to the Court to go back through the hundreds of paragraphs of the complaint and piece together which statements filed by the SEC were originally made by someone other than the filer, when those filings occurred, and who made them. But "[a]bsent some sort of enumeration of which specific acts constituted an alleged scheme in connection with the purchase or sale of securities, [Plaintiffs'] claim does not comply with the applicable heightened pleading standard and cannot go forward." *Plumber & Steamfitters Loc. 773*, 11 F.4th at 105. As such, Plaintiffs' scheme-liability claim must be dismissed insofar as it is premised on the SEC filings.

Finally, even if the Court could figure out who disseminated what and when, Plaintiffs' claim would still be dismissed because of the failure to allege scienter with the requisite particularity. In fact, the complaint contains no factual allegations as to Solorzano's scienter with respect to filing the conference transcripts. That poses an issue for Plaintiffs. Although the Court held that Plaintiffs plausibly alleged scienter as to Solorzano's post-merger statements, Plaintiffs must "state with particularity facts giving rise to a strong inference" of scienter "with respect to *each act or omission*." 15 U.S.C. § 78u-4(b)(2)(A) (emphasis added); *see In re Turquoise Hill*, 625 F. Supp. 3d at 247 (explaining that scheme-liability claims are subject to the PSLRA's pleading standard with respect to scienter). There are simply no allegations here about what Solorzano's intent was in filing the conference transcripts with the SEC. In addition, even if Solorzano knew the statements he was disseminating were false and had a motive to defraud, the calculus of scienter here is a bit more complicated. When evaluating scienter, the Court must consider "opposing inference[s]." *Tellabs, Inc. v. Makor Issues & Rts., Ltd.*, 551 U.S. 308, 324 (2007). Plaintiffs do not dispute that Solorzano was legally required to file the conference transcripts with the SEC. There is therefore an opposing inference that Solorzano filed the transcripts with the SEC simply because he was required to and not because he had any intent to defraud investors. Because there are no non-conclusory allegations showing Solorzano's intent was to defraud, such as allegations

5

that he knew that by filing the statements, they would reach a broader audience, there is no "strong inference" of scienter here. *Id.* at 314.

To be clear, the Court's decision is based on the particulars of the complaint in this case. On a more robust pleading, a court may hold that an executive's dissemination of someone else's misleading statements to investors through SEC filings can serve as the basis for a scheme-liability claim, and that the defendant can find no refuge in *Frutarom* under the circumstances. The Court declines to resolve these novel and important questions here, where the scheme-liability claim was pleaded as an afterthought and fails to satisfy the applicable rules of pleading, even after three successive attempts.

## II. The complaint does not plausibly allege other deceptive acts.

The Second Circuit has "explicitly left open the question what 'extra' facts—beyond the knowing dissemination to the public of a false statement made by another in *Lorenzo*—would be sufficient to state a claim for scheme liability." *In re Turquoise Hill*, 625 F. Supp. 3d at 248. But it's clear that an act must be "inherently deceptive" to give rise to scheme liability, *id.* at 253; allegations of "corporate mismanagement" do not suffice, *Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 477 (1977). Because the other acts alleged to have been part of the scheme to defraud were not inherently deceptive, they cannot give rise to scheme liability.

Plaintiffs complain that Defendants used a SPAC "to avoid the type of due diligence, disclosure, and regulatory scrutiny that would accompany a traditional IPO." Third Am. Compl. ¶ 239. Plaintiffs also say that Defendants conducted "limited due diligence" on CarLotz Group. ¶ 245. But Plaintiffs do not explain what about the SPAC or the amount of diligence was deceptive. *Santa Fe Industries*, 430 U.S. at 473–74. Plaintiffs do not say, for example, that Defendants concealed that Acamar was a SPAC, misrepresented the nature of a SPAC, or failed to disclose how much due diligence was done. *Cf. In re Garrett Motion Inc. Sec. Litig.*, 2022 WL 976269, at *17 (S.D.N.Y. Mar. 31, 2022). In fact, far from concealing the amount of diligence, Acamar admitted that its diligence was limited. Third Am. Compl. ¶¶ 85, 277. The same goes for Plaintiffs' complaint about CarLotz's unqualified management team: Plaintiffs do not say that CarLotz misrepresented or failed to disclose management's qualifications.

Plaintiffs also fail to plausibly allege that opening new hubs was deceptive. Plaintiffs do not allege that the new hubs were "sham entities" that did not actually process or sell cars. *Cf. In re Turquoise Hill*, 625 F. Supp. 3d at 251, 253. Instead, they say that CarLotz, Inc. opened more hubs than was justified by demand to make the company's business model "seem more successful than it actually was." Third Am. Compl. ¶ 247.[5]

---

[5] In its December 30, 2020 prospectus, Acamar explained that one reason it had chosen to merge with CarLotz Group was the company's "well thought-through nationwide expansion plan." Third Am. Compl. ¶ 248. Of note, there is no allegation that any hubs were opened before the merger; only the announcements occurred premerger. ¶ 247. As explained in this Court's prior opinion, there can be no liability for premerger statements under *Frutarom*.

But the complaint fails to plausibly allege that opening new hubs created a "false impression" of demand. *United States v. Finnerty*, 533 F.3d 143, 148 (2d Cir. 2008). The complaint makes the conclusory assertion that "there was not enough demand to support more locations." Third Am. Compl. ¶ 247. However, it has no factual allegations to back that up. Plaintiffs say that a CarLotz hub in Downers Grove, Illinois was "over-inventoried as of December 2020." ¶ 250. That anecdotal evidence does not render plausible the conclusion that there was insufficient demand to support new hubs months later in different states.

Plus, it's not even clear that the conduct of opening new hubs would have suggested anything to prospective investors about the current state of demand. In the announcements that preceded the expansion, CarLotz Group emphasized that opening new locations would help them source more vehicles and recondition them more quickly. Dkt. 97-17 at 85 ("With additional investment in new hubs, our strategy is to expand our inventory sourcing and reconditioning, further penetrate our existing accounts and leverage our national footprint to access new corporate vehicle sourcing accounts and the public generally, while improving our market share in consigned vehicles."). Thus, a reasonable investor would likely interpret the new hubs as an effort to improve inventory and processing capacity rather than a reflection of the immediate demand for CarLotz's services. *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 575 U.S. 175, 190 (2015) ("[W]hether an omission makes an expression of opinion misleading always depends on context."). The fact that the expansion plan ultimately failed is insufficient to find it deceptive; otherwise, every business idea that ends up failing would give rise to liability because it reflected optimism that turned out to be unwarranted. The securities laws don't demand clairvoyance. *See Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000). In sum, Plaintiffs fail to allege any conduct that was inherently deceptive.

## CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED. That dismissal is with prejudice. Despite having amended their complaint three times, Plaintiffs have failed to allege a plausible scheme-liability claim with the requisite particularity.

The Clerk of Court is directed to terminate Dkt. 147.

SO ORDERED.

Dated: August 23, 2024
    New York, New York

ARUN SUBRAMANIAN
United States District Judge